# EXHIBIT 22

April 15, 2022

W. Scott Lawler - President
Big Sky Energy Corporation
3133 W. Frye Road, Suite 101
Chandler, AZ 85226

Dear Mr. Lawler:

As you are aware, the Tribunal in the ICSID arbitration matter of Big Sky Energy Corporation ("Big Sky") vs. Republic of Kazakhstan ("Kazakhstan") issued an award on November 24, 2021, in favor of Kazakhstan and which also ordered Big Sky to pay Kazakhstan $578,821.71 for Kazakhstan's advances to ICSID (the "Award").

Moreover, the Award was filed in U.S. District Court, District of Nevada, on March 22, 2022, for registration as a judgment for enforcement against the Company.

The Award and its registration constitutes an Event of Default under that certain Loan Agreement entered into by and between Ingalls & Snyder Value Partners, L.P. ("Ingalls") dated September 16, 2013 ("Loan Agreement, as it a breach of Section 6.1(e) of the Loan Agreement.

Such Event of Default is continuing as of the date hereof and due to such, Ingalls' hereby notifies you and Big Sky that Ingalls is electing to enforce its rights under Section 7.01(b) of that certain Guarantee and Collateral Agreement entered into between Big Sky and its subsidiaries at the time of the execution of the Loan Agreement (the "Guarantee Agreement") to register or cause to register any and all of the Pledged Securities (as such term is defined thereunder) in the name of Ingalls.

As a result, you are hereby instructed to immediately register all of the issued and outstanding shares of Big Sky Energy Kazakhstan Ltd., an Alberta corporation, into the name of Ingalls.

You are also hereby instructed to deliver to Ingalls & Snyder (a) all of the Documents, as such term is defined in the Guarantee Agreement, and (b) all other portions of the Collateral, each pursuant to further instructions which shall be provided by Ingalls & Snyder hereafter.

Sincerely,

Tom Boucher
Managing Director - Ingalls & Snyder LLC

# LOAN AGREEMENT

This Loan Agreement (the "**Agreement**") dated as of September 16, 2013, by and between:

**INGALLS & SNYDER VALUE PARTNERS, L.P.**, a limited partnership formed in the State of New York with its head office having an address at 61 Broadway, New York, New York (the "**Lender**");

and

**BIG SKY ENERGY CORPORATION**, a company incorporated and existing under the laws of the State of Nevada (the "**Borrower**").

The Lender and the Borrower are collectively referred to below as the "**Parties**".

**WHEREAS**, the Borrower and the Lender have previously entered into that certain Convertible Note Purchase Agreement dated June 30, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "**Convertible Note Purchase Agreement**");

**WHEREAS**, on or about June 30, 2006, pursuant to a Convertible Note Purchase Agreement, the Lender purchased from the Borrower and the Borrower issued to the Lender that certain Convertible Note Due 2008 in the principal amount of $15,000,000 (the "**Convertible Note**");

**WHEREAS**, the Convertible Note requires the Borrower to make semiannual payments consisting of interest only payments at the rate of 6% per annum, commencing on December 30, 2006, and continuing until the maturity date of June 30, 2008;

**WHEREAS**, the Borrower has failed to make any payments of principal or interest under the Convertible Note (other than the interest payment due on December 30, 2006) and the Lender has not pursued its rights to such payments through litigation;

**WHEREAS**, starting in 2011 through the date hereof, the Lender has made advances to or for the benefit of the Borrower in the aggregate principal amount of US$276,305.87 to finance the Borrower's operations (the "**Existing Advances**") which consisted of, among other things, pursuing enforcement of an IUS arbitration award in the amount of approximately US$30,000,000 in the name of the Borrower's wholly-owned subsidiary, Big Sky Energy Kazakhstan Ltd., a corporation organized under the laws of the Province of Alberta, Canada ("BSEK");

**WHEREAS**, the Borrower may wish to borrow and the Lender may wish to provide additional advances after the date hereof, any such additional advances, if any, being in the sole and absolute discretion of the Lender and upon the terms and conditions set forth herein; and

**WHEREAS**, as one of the conditions to further advances under this Agreement, the Lender has required the Borrower agree to waive and/or toll the statute of limitations for collection and enforcement of the Convertible Note and the Convertible Note Purchase Agreement as set forth herein.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED BY THE PARTIES, THE PARTIES AGREE AS FOLLOWS:**

**SECTION 1. Definitions.**

1.1 Defined Terms. In this Agreement, the following terms shall have the respective meanings set forth below:

"Advances" means the collective reference to the Existing Advances and all advances made by the Lender to the Borrower pursuant to this Agreement

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Availability Period" means the period from and including the Closing Date to but not including September 30, 2015.

"Borrowing Date" means any Business Day specified by the Borrower as a date on which the Borrower requests the Lender to make an Advance hereunder.

"Business Day" means a day or days on which the Lender's office at its address set forth above (or any successor office) is open to conduct regular business.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Closing Date" means the date of this Agreement.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions (domestic or foreign) from time to time in effect and affecting the rights of creditors generally.

"Default" means any of the events specified in Section 6.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Rate" means the rate per annum of seventeen percent (17%).

"Director Claims" means the claims of Servet Harunoglu and Barry Swersky against the Borrower in the aggregate amount of $1,592,000 that have been purchased by the Lender.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Event of Default" has the meaning set forth in Section 6.1.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement of even date herewith, executed by the Borrower and each of its Subsidiaries.

"Guarantee Obligation" means, as to any Person (the "**Guaranteeing Person**"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "**Primary Obligations**") of any other third Person (the "**Primary Obligor**") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"ICSID Proceeding" means the rights and claims of either the Borrower or those of BSEK to bring an international claim for loss of investment against the Republic of Kazakhstan arising out of existing and future treaty rights or otherwise relating to:

(a) BSEK's loss of 100% of its ownership interests of KoZhan LLP, a limited liability

partnership organized and operating in the Republic of Kazakhstan, which owns certain exploration, development and production rights over three blocks in the Atyrau region of Western Kazakhstan;

(b) Enforcement by BSEK of various Credit Agreements against KoZhan;

(c) Enforcement of the existing IUS Award dated 7 November 2008 in favor of BSEK against KoZhan; and

(d) Any claims of the Company and/or BSEK concerning investments made by the Company, BSEK or any of its associated companies in the Republic of Kazakhstan.

"Indebtedness" means, as to any Person at any particular time, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan Amount" means the Principal Amount and accrued and unpaid interest due thereon.

"Loan Documents" means the collective reference to this Agreement, the Note and the Security Documents.

"Loan Parties" the collective reference to (a) the Borrower, and (b) each Subsidiary that is a party to a Loan Document.

"Material Adverse Effect" means a material adverse effect on (a) the business, property, operations, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder.

"Maturity Date" means March 31, 2017, or such earlier date upon which the Loan Amount shall become due and payable.

"Net Cash Proceeds" means in connection with any Recovery Event, the proceeds thereof in the form of cash and cash equivalents (including any such proceeds received by way of deferred payment pursuant to a note or installment receivable or otherwise, but only as and when received) of such Recovery Event, net of repayment of the Borrower's or any Subsidiary's reasonable and documented attorneys' fees actually incurred in connection with the ICSID Proceeding that are unpaid.

"Note" means the promissory note of even date herewith, executed by the Borrower and payable to the order of the Lender in the stated principal amount of $1,868,305.87.

"Obligations" means (a) the unpaid principal of and interest on (including interest accruing after the maturity of the Advances and interest accruing after the filing of any petition under any Debtor Relief Law, or the commencement of any proceeding under any Debtor Relief Law, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Advances and all other obligations and liabilities of the Loan Parties, and each of them, to the Lender whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise, and (b) the Director Claims.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Principal Amount" means, at any time, the outstanding principal amount of the Advances and the Director Claims.

"Recovery Event" means any settlement, recovery, award, judgment, collection or recovery of any kind pursuant to, in connection with or in respect of the ICSID Proceeding.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Requirement of Law" means, as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each

case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Security Documents" means the collective reference to the Guarantee and Collateral Agreement and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the obligations and liabilities of the Borrower or any Subsidiary under any Loan Document.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Time Defense" means, with respect to any claim, any applicable statute of limitations, laches, or other time-bars or defenses based in whole or in part on the time which may elapse from the accrual of such claim to the filing or commencement of an action or proceeding.

1.2 Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b) As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower or any Subsidiary not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c) The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

**SECTION 2.** Amount and Terms of Advances.

2.1 New Advances. Subject to the terms and conditions hereof, the Lender, at the Lender's sole and absolute discretion, may make new Advances to the Borrower from time to time during the Availability Period in an aggregate principal amount not to exceed $2,000,000. The Borrower acknowledges and agrees that the Lender has no obligation to make any Advances to the Borrower or to otherwise extend credit to the Borrower.

2.2 Procedure for Borrowing New Advances. The Borrower may request Advances under this Agreement on any Business Day during the Availability Period, provided that the Borrower shall give the Lender a request for borrowing (which request must be received by the Lender prior to 12:00 Noon, New York City time, at least three (3) Business Days prior to the requested Borrowing Date), specifying (i) the amount of the Advance to be borrowed, (ii) the requested Borrowing Date and (iii) a detailed description of the proposed use of the proceeds of the requested Advance. If the Lender elects to make such Advance, the Lender shall make the Advance available to the Borrower by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Lender by the Borrower. Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such borrowing that all of the representations and warranties of the Borrower contained in Section 4 of this Agreement are true and correct on and as of the date of such borrowing as if made on and as of such date.

2.3 Existing Advances. The Parties hereby agree and acknowledge that the Principal Amount includes all Existing Advances that the Lender has previously loaned to the Borrower since October 31, 2011. As of the date hereof, the aggregate outstanding principal amount of the Existing Advances is $276,305.87. As of the date hereof, the accrued and unpaid interest (including default interest) on the Existing Advances is $104,908.96.

2.4 Interest Rate and Payments. The Borrower shall pay interest on the outstanding Principal Amount at the rate of twelve percent (12%) per annum. Interest shall accrue daily, commencing on the date on which the Lender has made each Advance (including each Existing Advance). Accrued and unpaid interest on the Advances shall be due and payable in arrears on the Maturity Date. The Borrower hereby agrees and acknowledges that the interest rate set forth in this Section 2.4 applies to all amounts that are part of the Principal Amount as of the time that such amounts were loaned to the Borrower, including dates prior to the date hereof. Interest under this Agreement and the Note shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.5 Default Interest. (a) If any amount of principal of any Advance is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable law.

(b) If any amount (other than principal of any Advance) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear

interest at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws.

(c) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand by the Lender.

2.6 Repayment of Loan Amount. The Borrower unconditionally agrees to repay the Loan Amount to the Lender on the Maturity Date.

2.7 Evidence of Debt. The Advances shall be evidenced by one or more accounts or records maintained by the Lender. The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Advances made by the Lender to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. The Note shall evidence the Lender's Advances in addition to such accounts or records. The Lender may attach schedules to the Note and endorse thereon the date, amount and maturity of the Advances and payments with respect thereto.

**SECTION 3.** Payments.

3.1 Payments to Lender. All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, or otherwise, shall be made without setoff, counterclaim, recoupment or other defense and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Lender, in Dollars and in immediately available funds. All such payments shall be made by the Borrower to a bank account designated in writing by the Lender to the Borrower, or in such other manner as designated in writing by the Lender to the Borrower. The Borrower shall be responsible for all wire transfer costs. The Lender may accept payments from any third party designated by Borrower, in writing, to pay the Lender on its behalf. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. All payments by the Borrower under the Loan Documents shall be made without setoff, counterclaim, recoupment or other defense.

3.2 Computations. All interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.

3.3 Application of Payments. Any amounts received by the Lender on account of the Obligations shall be applied by the Lender in the following order:

(a) First, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lender (including fees, charges and disbursements of counsel to the Lender arising under the Loan Documents);

(b) Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Advances and other Obligations arising under the Loan Documents;

(c) Third, to payment of that portion of the Obligations constituting unpaid principal of the Advances;

(d) Fourth, to all other outstanding Obligations; and

(e) Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by applicable law.

3.4 Taxes. All payments made by the Borrower under this Agreement and the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") are required to be withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall be increased to the extent necessary to yield to the Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.

3.5 Optional Prepayments. The Borrower may, upon at least three (3) Business Days' irrevocable notice to the Lender stating the proposed date and principal amount of the prepayment, and if such notice is given the Borrower shall, prepay the Advances in whole or in part without premium or penalty, but with accrued interest to the date of such prepayment on the amount prepaid.

3.6 Mandatory Prepayments. If on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Recovery Event, then such Net Cash Proceeds shall be applied on such date toward the prepayment of the Advances. Each prepayment of the Advances under this Section 3.6 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

**SECTION 4.** Representations and Warranties. To induce the Lender to enter into this Agreement and to make Advances, the Borrower hereby represents and warrants to the Lender that:

4.1 Existence; Compliance with Law. Each of the Borrower and BSEK (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged.

4.2 Power; Authorization; Enforceable Obligations. The Borrower has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a

party and to obtain Advances hereunder. The Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize its borrowing of Advances on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the Advances hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents. Each Loan Document to which the Borrower is a party has been duly executed and delivered on behalf of the Borrower. This Agreement constitutes, and each other Loan Document to which the Borrower is a party upon execution will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.3 No Legal Bar. The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of the Borrower or BSEK and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation.

4.4 No Default. No Default or Event of Default has occurred and is continuing.

4.5 Ownership of Property; Liens. The Borrower and BSEK has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 5.7.

4.6 [Reserved].

4.7 Federal Regulations. No part of the proceeds of any Advances will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board. If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.8 Subsidiaries. Except as disclosed to the Lender by the Borrower in writing from time to time after the Closing Date, (a) Schedule 4.8 sets forth the name and jurisdiction of organization of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by the Borrower and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary.

4.9 Use of Proceeds. The proceeds of the Advances shall be used for general corporate purposes approved by the Lender.

4.10 Accuracy of Information, Etc. No statement or information contained in this Agreement or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to the Borrower that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

4.11 ICSID Proceeding. Within ten (10) days after the end of each fiscal quarter of the Borrower, the Borrower shall deliver to the Lender a summary in reasonable detail of the status of the ICSID Proceeding and copies of all pleadings filed in the ICSID Proceeding during such fiscal quarter.

**SECTION 5.** Covenants. Until the repayment in full of the Obligations, the Borrower shall perform and comply with the following covenants.

5.1 Notices. The Borrower shall promptly give notice to the Lender of:

(a) the occurrence of any Default or Event of Default;

(b) any (i) default or event of default under any Contractual Obligation of the Borrower BSEK or (ii) litigation, investigation or proceeding that may exist at any time between the Borrower or BSEK and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c) any litigation or proceeding affecting the Borrower or BSEK (i) in which the amount involved is $50,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(d) any material developments with respect to the ICSID Proceeding; and

(e) any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.1 shall be accompanied by a statement of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

5.2 Compliance. The Borrower shall, and shall cause BSEK to, comply with (a) all Requirements of Law, including without limitation paying when due all taxes and governmental charges imposed upon it or its property, and (b) all Contractual Obligations.

5.3 Maintenance of Existence. The Borrower shall, and shall cause BSEK to, preserve, renew and keep in full force and effect its organizational existence and take all action

required to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business.

5.4 Further Actions. Promptly upon the request of the Lender, the Borrower shall, and shall cause BSEK to, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Security Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party.

5.5 [Reserved].

5.6 Indebtedness. The Borrower shall not, and shall not permit BSEK to, create, issue, assume, become liable in respect of, or suffer to exist any Indebtedness, except:

(a) Indebtedness pursuant to the Loan Documents; and

(b) Indebtedness of the Borrower pursuant to the Convertible Note Purchase Agreement and the Convertible Note.

5.7 Liens. The Borrower shall not, and shall not permit any Subsidiary to, create, incur assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except Liens in favor of the Lender that secure the Obligations in whole or in part.

5.8 Disposition of Property. The Borrower shall not, and shall not permit any Subsidiary to, Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person.

5.9 Fundamental Changes. The Borrower shall not, and shall not permit any Subsidiary to, enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business.

5.10 Restricted Payments. The Borrower shall not declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary.

5.11 ICSID Proceeding. (a) The Borrower shall not, and shall not permit any Subsidiary to, settle, terminate, discontinue or dismiss, in whole or in part, the ICSID Proceeding or any claims therein or relating thereto for less than USD $75 million, in the aggregate.

(b) The Borrower shall, and shall cause each of its Subsidiaries to, diligently prosecute its claims in the ICSID Proceeding, to the extent that all necessary funding is available.

**SECTION 6.** Default; Remedies.

6.1 Events of Default. Each of the following shall be an "Event of Default":

(a) Non-Payment. The Borrower shall fail to pay when due the Obligations or any part thereof.

(b) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the any Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made.

(c) Breach of Other Provisions. Any Loan Party shall breach, or fail to perform or observe, any other covenant or provision (not specified in Section 6.1(a) or (b) above) contained in this Agreement or any other Loan Document.

(d) Bankruptcy, Etc. The Borrower or BSEK shall have a proceeding instituted by or against it seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up or reorganization of it or its debts under any Debtor Relief Law, or seeking an order for rehabilitation or the appointment of a receiver for it or for any substantial part of its property; or shall take any corporate action to authorize any of the foregoing actions.

(e) Judgments. One or more judgments or decrees shall be entered against the Borrower or BSEK involving in the aggregate a liability of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof.

(f) Indebtedness. The Borrower or BSEK shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Indebtedness of the Borrower or such Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Indebtedness, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness or otherwise to cause, or to permit the holder thereof to cause, such Indebtedness to mature; or any such Indebtedness shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof.

(g) Invalidity of Loan Documents. Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or the Borrower, any Subsidiary or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or the Borrower denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document.

(h) Security Documents. Any Security Document shall for any reason cease to create a valid and perfected first priority Lien on the Collateral purported to be covered thereby.

6.2 Remedies upon Event of Default. If any Event of Default occurs, the Lender may take any or all of the following actions:

(a) terminate all commitments (if any) of the Lender to extend credit to the Borrower;

(b) declare the unpaid principal amount of all outstanding Advances and Director Claims, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by the Borrower; and/or

(c) exercise all rights and remedies available to it under the Loan Documents and/or applicable law; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or any other Debtor Relief Law, any obligation of the Lender to make Advances or otherwise extend credit to the Borrower shall automatically terminate and the unpaid principal amount of all outstanding Advances, all Director Claims and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Lender.

**SECTION 7.** Waiver and Tolling of Statute of Limitations and other Time Defenses.

7.1 The Parties hereby agree that all applicable statutes of limitation as to any and all claims and/or causes of action, whether known or unknown, that the Lender has or may have against the Borrower in connection with, related to, or arising from or under the Convertible Note, the Convertible Note Purchase Agreement and/or the Director Claims or any of the transactions contemplated thereby (collectively, the "**Claims**"), and all other Time Defenses applicable to any of the Claims, are hereby waived or tolled, as applicable, from the date of this Agreement until the expiration of four (4) years from the date of this Agreement.

7.2 The Borrower hereby in all respects and for all purposes ratifies, confirms and acknowledges all of its obligations, liabilities, and indebtedness under the Convertible Note and the Convertible Note Purchase Agreement. The Convertible Note and the Convertible Note Purchase Agreement shall remain in full force and effect in accordance with their respective terms. Nothing contained herein shall constitute a waiver of any default or event of default under the Convertible Note or the Convertible Note Purchase Agreement.

7.3 Nothing in this Agreement constitutes an admission by any Party that, in the absence of this Agreement, any statute of limitations and/or any other Time Defense has or would have run or become applicable, and this Agreement shall not be used in any proceeding as evidence of any such admission, express or implied.

7.4 The Borrower hereby in all respects and for all purposes ratifies, confirms and acknowledges all of its obligations, liabilities, and indebtedness under or with respect to the Director Claims.

7.5 The agreements in this Section 7 shall survive repayment of the Advances and all other amounts payable hereunder.

**SECTION 8.** Miscellaneous.

8.1 Notices. All notices, requests and demands to or upon the Parties to be effective shall be in writing (including by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of email message, when received, addressed as follows, or to such other address as may be hereafter notified by the respective Parties:

Borrower: Big Sky Energy Corporation
4960 S. Gilbert Road, Suite 1-111
Chandler, Arizona 85249
Attention: Scott Lawler
Email: WSL@LawlerFirm.com
Telephone: 602-466-3666

Lender: Ingalls & Snyder Value Partners, L.P.
c/o Ingalls & Snyder LLC
61 Broadway
New York, NY 10006
Attention: Thomas O. Boucher
Email: TOB@Ingalls.com
Telephone: 212-269-7897

provided that any notice, request or demand to or upon the Lender shall not be effective until received.

8.2 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.3 Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of Advances hereunder.

8.4 Payment of Expenses and Taxes. The Borrower agrees (a) to pay or reimburse the Lender for all its out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of counsel to the Lender and filing and recording fees and expenses, (b) to pay or reimburse the Lender for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Lender, (c) to pay, indemnify, and hold the Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold the Lender and each of its Related Parties (each, an "**Indemnitee**") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, claims, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Advances and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (d), collectively, the "**Indemnified Liabilities**"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. All amounts due under this Section 8.4 shall be payable on demand. The agreements in this Section 8.4 shall survive repayment of the Advances and all other amounts payable hereunder.

8.5 Amendments. All amendments, changes or additions to this Agreement shall only be effective if set forth in writing and signed by authorized representatives of both Parties.

8.6 Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.7 Entire Agreement. This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lender with respect to the subject matter hereof and

thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

8.8 GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

8.9 Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 8.1 or at such other address of which the Lender shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.10 Acknowledgements. The Borrower hereby acknowledges and agrees that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b) the Lender does not have any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between the Borrower and the Lender; and

(d) the Director Claims are validly and unconditionally owing by the Borrower to the Lender, may be enforced by the Lender, and are not subject to any offset, counterclaim, recoupment or other defense.

8.11 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

8.12 WAIVERS OF JURY TRIAL. THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

8.13 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors or assigns, provided that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Lender.

***[Signature pages follow]***

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers on and as of the day and year first above written.

INGALLS & SNYDER VALUE PARTNERS, L.P.

Thomas O. Boucher Jr.
Ingalls & Snyder Value Partners, L.P.
General Partner

By: ____________________
Name: ____________________
Title: ____________________

BIG SKY ENERGY CORPORATION,
a Nevada corporation

By: ____________________
Name: W. Scott Lawler
Title: President

# SCHEDULE 4.8

## SUBSIDIARIES

| Subsidiary | Owner | Class of Stock of other Equity Interest | Ownership Percentage |
|---|---|---|---|
| Big Sky Energy Kazakhstan Ltd., a corporation organized under the laws of Alberta, Canada | Big Sky Energy Corporation, a Nevada corporation | Common | 100% |
| Big Sky Energy Atyrau Ltd., a corporation organized under the laws of Alberta, Canada | Big Sky Energy Corporation, a Nevada corporation | Common | 100% |
| Big Sky Energy Alakol Ltd, a corporation organized under the laws of Alberta, Canada | Big Sky Energy Corporation, a Nevada corporation | Common | 100% |

| Subsidiary | Owner | Class of Stock of other Equity Interest | Ownership Percentage |
|---|---|---|---|
| Big Sky Energy Caspian Ltd, a corporation organized under the laws of Alberta, Canada | Big Sky Energy Corporation, a Nevada corporation | Common | 100% |
| KoZhaN LLP, a limited liability partnership organized under the laws of the Republic of Kazakhstan | Big Sky Energy Kazakhstan Ltd., a corporation organized under the laws of Alberta, Canada | Partnership Interest | 100%[1] |
| Vector Energy West LLP, a limited liability partnership organized under the laws of the Republic of Kazakhstan | Big Sky Energy Atyrau Ltd., a corporation organized under the laws of Alberta, Canada | Partnership Interest | 100% |

[1] KoZhan LLP was previously owned 100% by Big Sky Energy Kazakhstan Ltd. ("KSEK"). This ownership has been taken away from BSEK by various counts in the Republic of Kazakhstan. BSEK and Borrower dispute the legality of such court decisions, therefore, neither Borrower nor BSEK can guarantee the ownership of any interest in KoZhan LLP.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**W. SCOTT LAWLER 480.339.0181**

B. E-MAIL CONTACT AT FILER (optional)
**WSL@LAWLERFIRM.COM**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**W. SCOTT LAWLER, ESQ.**
**3133 W. FRYE RD. #101**
**CHANDLER, AZ 85226**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
**BIG SKY ENERGY CORPORATION**

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3133 W. FRYE ROAD, STE 101** | **CHANDLER** | **AZ** | **85226** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
**INGALLS & SNYDER VALUE PARTNERS L.P.**

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **61 BROADWAY** | **NEW YORK** | **NY** | **10006** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL PROPERTY OF BIG SKY ENERGY CORPORATION, A NEVADA CORPORATION, AND ALL OF ITS SUBSIDIARIES AND ITS SUBSIDIARIES' SUBSIDIARIES, NOW OWNED OR HEREAFTER ACQUIRED.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

# Instructions for UCC Financing Statement (Form UCC1)

Please type or laser-print this form. Be sure it is completely legible. Read and follow all Instructions, especially Instruction 1; use of the correct name for the Debtor is crucial.
Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. The filing office cannot give legal advice.
Send completed form and any attachments to the filing office, with the required fee.

**ITEM INSTRUCTIONS**

A and B. To assist filing offices that might wish to communicate with filer, filer may provide information in item A and item B. These items are optional.

C. Complete item C if filer desires an acknowledgment sent to them. If filing in a filing office that returns an acknowledgment copy furnished by filer, present simultaneously with this form the Acknowledgment Copy or a carbon or other copy of this form for use as an acknowledgment copy.

1. **Debtor's name.** Carefully review applicable statutory guidance about providing the debtor's name. Enter only one Debtor name in item 1 -- either an organization's name (1a) or an individual's name (1b). If any part of the Individual Debtor's name will not fit in line 1b, check the box in item 1, leave all of item 1 blank, check the box in item 9 of the Financing Statement Addendum (Form UCC1Ad) and enter the Individual Debtor name in item 10 of the Financing Statement Addendum (Form UCC1Ad). Enter Debtor's correct name. Do not abbreviate words that are not already abbreviated in the Debtor's name. If a portion of the Debtor's name consists of only an initial or an abbreviation rather than a full word, enter only the abbreviation or the initial. If the collateral is held in a trust and the Debtor name is the name of the trust, enter trust name in the Organization's Name box in item 1a.

1a. Organization Debtor Name. "Organization Name" means the name of an entity that is not a natural person. A sole proprietorship is **not** an organization, even if the individual proprietor does business under a trade name. If Debtor is a registered organization (e.g., corporation, limited partnership, limited liability company), it is advisable to examine Debtor's current filed public organic records to determine Debtor's correct name. Trade name is insufficient. If a corporate ending (e.g., corporation, limited partnership, limited liability company) is part of the Debtor's name, it must be included. Do not use words that are not part of the Debtor's name.

1b. Individual Debtor Name. "Individual Name" means the name of a natural person; this includes the name of an individual doing business as a sole proprietorship, whether or not operating under a trade name. The term includes the name of a decedent where collateral is being administered by a personal representative of the decedent. The term does not include the name of an entity, even if it contains, as part of the entity's name, the name of an individual. Prefixes (e.g., Mr., Mrs., Ms.) and titles (e.g., M.D.) are generally not part of an individual name. Indications of lineage (e.g., Jr., Sr., III) generally are not part of the individual's name, but may be entered in the Suffix box. Enter individual Debtor's surname (family name) in Individual's Surname box, first personal name in First Personal Name box, and all additional names in Additional Name(s)/Initial(s) box.

If a Debtor's name consists of only a single word, enter that word in Individual's Surname box and leave other boxes blank.

For both organization and individual Debtors. Do not use Debtor's trade name, DBA, AKA, FKA, division name, etc. in place of or combined with Debtor's correct name; filer may add such other names as additional Debtors if desired (but this is neither required nor recommended).

1c. Enter a mailing address for the Debtor named in item 1a or 1b.

2. **Additional Debtor's name.** If an additional Debtor is included, complete item 2, determined and formatted per Instruction 1. For additional Debtors, attach either Addendum (Form UCC1Ad) or Additional Party (Form UCC1AP) and follow Instruction 1 for determining and formatting additional names.

3. **Secured Party's name.** Enter name and mailing address for Secured Party or Assignee who will be the Secured Party of record. For additional Secured Parties, attach either Addendum (Form UCC1Ad) or Additional Party (Form UCC1AP). If there has been a full assignment of the initial Secured Party's right to be Secured Party of record before filing this form, either (1) enter Assignor Secured Party's name and mailing address in item 3 of this form and file an Amendment (Form UCC3) [see item 5 of that form]; or (2) enter Assignee's name and mailing address in item 3 of this form and, if desired, also attach Addendum (Form UCC1Ad) giving Assignor Secured Party's name and mailing address in item 11.

4. **Collateral.** Use item 4 to indicate the collateral covered by this financing statement. If space in item 4 is insufficient, continue the collateral description in item 12 of the Addendum (Form UCC1Ad) or attach additional page(s) and incorporate by reference in item 12 (e.g., See Exhibit A). Do not include social security numbers or other personally identifiable information.

*Note*: If this financing statement covers timber to be cut, covers as-extracted collateral, and/or is filed as a fixture filing, attach Addendum (Form UCC1Ad) and complete the required information in items 13, 14, 15, and 16.

5. If collateral is held in a trust or being administered by a decedent's personal representative, check the appropriate box in item 5. If more than one Debtor has an interest in the described collateral and the check box does not apply to the interest of all Debtors, the filer should consider filing a separate Financing Statement (Form UCC1) for each Debtor.

6a. If this financing statement relates to a Public-Finance Transaction, Manufactured-Home Transaction, or a Debtor is a Transmitting Utility, check the appropriate box in item 6a. If a Debtor is a Transmitting Utility and the initial financing statement is filed in connection with a Public-Finance Transaction or Manufactured-Home Transaction, check only that a Debtor is a Transmitting Utility.

6b. If this is an Agricultural Lien (as defined in applicable state's enactment of the Uniform Commercial Code) or if this is not a UCC security interest filing (e.g., a tax lien, judgment lien, etc.), check the appropriate box in item 6b and attach any other items required under other law.

7. **Alternative Designation.** If filer desires (at filer's option) to use the designations lessee and lessor, consignee and consignor, seller and buyer (such as in the case of the sale of a payment intangible, promissory note, account or chattel paper), bailee and bailor, or licensee and licensor instead of Debtor and Secured Party, check the appropriate box in item 7.

8. **Optional Filer Reference Data.** This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 8 any identifying information that filer may find useful. Do not include social security numbers or other personally identifiable information.