**E-filed: December 5, 2025**

Bob L. Olson, Esq. (Nevada Bar No. 3783)
Erin M. Gettel, Esq. (Nevada Bar No. 13877)
SNELL & WILMER L.L.P.
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
Email: bolson@swlaw.com
egettel@swlaw.com

*Attorneys for Republic of Kazakhstan*

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>BIG SKY ENERGY CORPORATION,<br><br>Debtor. | Case No. 25-50445-hlb<br><br>Chapter 7<br><br>**REPUBLIC OF KAZAKHSTAN'S RESPONSE TO ORDER TO SHOW CAUSE WHY BANKRUPTCY CASE SHOULD NOT BE DISMISSED**<br><br>**Hearing Date: December 19, 2025**<br>**Hearing Time: 10:30 a.m.** |

Republic of Kazakhstan ("Kazakhstan" or "Creditor") by and through its attorneys, Snell & Wilmer L.L.P., submits this response to the Court's *Order to Show Cause Why Bankruptcy Case Should Not be Dismissed* [ECF No. 52].

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

At the November 5, 2025, hearing on Debtor's *Objection to Subpoenas and Motion to Quash or Modify Subpoenas and for Protective Order* ("Motion for Protective Order"), the Court stated that it was going to issue an order to show cause why Debtor's case should not be dismissed. The Court stated that this bankruptcy case appears to be a two-party dispute and bad faith filing by Debtor. The Court also stated that dismissal may be appropriate under 11 U.S.C. § 1112, *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828-29 (9th Cir. 1994), and *Margitan v. Hanna (In re Hanna)*, 2018 WL 1770960 (9th Cir. BAP 2018) (unpublished disposition). The Court subsequently

issued that *Order to Show Cause Why Bankruptcy Case Should not be Dismissed* on November 5, 2025. [ECF No. 52].

It is hard to imagine a better example of a bad faith filing than this case. Notwithstanding Debtor's and Scott Lawler's bad faith in filing this case, Kazakhstan submits that dismissal is not appropriate. This case should remain in Chapter 7 because there are many remedies available to the Court, Kazakhstan, and the trustee under other provisions of the Bankruptcy Code. Moreover, Debtor's lack of good faith is irrelevant under 11 U.S.C. § 707(a). Keeping this case in Chapter 7 would provide the trustee and Kazakhstan with the opportunity to investigate and seek to avoid transfers for the benefit of creditors, such as the April 2022 transfer of Debtor's interests in Big Sky Energy Kazakhstan, an Alberta corporation ("Big Sky Canada") to Ingalls & Snyder Value Partners L.P. ("Ingalls") and Lawler and/or International Legal Services, a company ("ILS"), a company that Lawler owns and controls. It is likely that avoiding the transfer of the Big Sky Canada stock would result in Debtor's estate becoming solvent with creditors being paid 100 cents on the dollar. Allowing this case to remain in Chapter 7 is just because it would deprive Lawler and Debtor of the benefits they hoped to reap – such as running out the statute of limitations for filing fraudulent transfer action - by filing this petition in bad faith.

## II. FACTUAL BACKGROUND

Kazakhstan agrees that Debtor filed its bankruptcy petition in bad faith and for the sole purpose of thwarting Kazakhstan's efforts to obtain discovery against it. As is set forth in more detail in the *Opposition to Objection to Subpoenas and Motion to Quash or Modify Subpoenas and for Protective Order* [ECF No. 45 at 2-3, 6-10], Kazakhstan has been attempting to obtain post-judgment discovery regarding Debtor's assets and liabilities for almost two years now. After being served with a second set of subpoenas, Debtor and Scott Lawler ("Lawler") unsuccessfully moved to quash those subpoenas before the United States District Court for the District of Nevada.[1] Undeterred by their loss in Nevada, Debtor and Lawler then unsuccessfully sought the same relief

[1] A true and correct copy of the August 23, 2023, Order issued by the Nevada District Court denying Debtor's and Lawler's request to quash subpoenas without prejudice is attached hereto as **Exhibit A.**

Snell & Wilmer L.L.P. LAW OFFICES 1700 South Pavilion Center Drive, Suite 700 Las Vegas, Nevada 89135 702.784.5200

from the United States District Court for the District of Arizona.[2] The Arizona District Court ordered Debtor and Lawler to produce all nonprivileged documents and a privilege log by no later than February 24, 2025. That deadline was ultimately extended by stipulation of the parties to April 25, 2025,[3] then to May 6, 2025,[4] and finally to May 16, 2025,[5] to allow the parties to discuss settlement.

Debtor filed its chapter 7 bankruptcy petition on May 15, 2025, for the sole purpose of circumventing the Arizona District Court's order to produce documents and a privilege log by May 16, 2025. Lawler testified at the meeting of creditors that Big Sky filed for bankruptcy to avoid preparing and producing documents as ordered by the Arizona District Court.[6] He described producing the documents as a "waste of time" and admitted that no privilege log was prepared despite the Arizona District Court's order.[7]

Kazakhstan believes it has discovered the reason that Lawler and Debtor continue to refuse to produce any relevant documents. Although Big Sky and Lawler have not disclosed the precise date on which Ingalls and Lawler and/or ILS subsequently acquired their interests in Big Sky Canada, the Shareholder Register[8] suggests that all of the stock of Big Sky Canada was transferred to Ingalls & Snyder on April 15, 2022, approximately five months after entry of the International Centre for Settlement of Investment Disputes Award (the "ICSID Award")[9] of $575,821.71, in favor of Kazakhstan and against Debtor, and less than one month after Kazakhstan filed the Enforcement Action in Nevada. Then, on July 13, 2023, Ingalls & Snyder transferred 15.77% of the Big Sky Canada stock to Lawler *not* ILS.[10] In other words, almost immediately after the commencement of the Enforcement Action, Big Sky disposed of its interest in Big Sky Canada—

---

[2] A true and correct copy of the January 24, 2025, Order issued by the Arizona District Court denying Debtor's and Lawler's request to quash the subpoenas without prejudice is attached hereto as **Exhibit B.**
[3] *See* **Exhibit C.**
[4] *See* **Exhibit D.**
[5] *See* **Exhibit E.**
[6] *See* **Exhibit F** at 14.
[7] *See* **Exhibit G** at 7-8.
[8] *See* **Exhibit H**.
[9] The ICSID Award is attached as **Exhibit I**.
[10] *See* Ex. H.





Snell & Wilmer L.L.P. LAW OFFICES 1700 South Pavilion Center Drive, Suite 700 Las Vegas, Nevada 89135 702.784.5200

which appears to have been Debtor's primary asset and likely the only asset that the Trustee may be able to liquidate for the benefit of creditors.

Almost all the statutory badges of fraud are present in this case. One of the transfers was to Lawler, an insider,[11] who appears to remain in control of Big Sky Canada.[12] Lawler and Debtor have been concealing these transfers.[13] The transfers were initiated almost immediately after entry of the ICSID Award.[14] The transfer appeared to be substantially all of Debtor's assets[15] and the Debtor appears to have been rendered insolvent as a result of the transfers.[16]

Kazakhstan believes, as confirmed in the Motion for Protective Order and by Lawler's testimony, Big Sky Canada is or was the holder of a $30M arbitration award, which with interest had risen to substantially more, that it was recently seeking to enforce in Switzerland against an unrelated third party at the same time as the commencement of the Enforcement Action. Kazakhstan believes that Big Sky Canada received a substantial payment in settlement of that claim that Debtor and Lawler are trying to conceal from Debtor's creditors, including Kazakhstan, the trustee and the bankruptcy court.

## III. ARGUMENT

There is no doubt that Debtor's case was filed in bad faith. However, this case is a chapter 7 proceeding governed by 11 U.S.C. § 707. Dismissal of this case is not governed by *Marsch*, *Hanna* and 11 U.S.C. § 1112.[17]

11 U.S.C. § 707(a)[18] provides:

---

[11] It appears that the transfer was initially to Ingalls and then to Lawler. This brings into play two badges of fraud. NRS 112.180(2)(a) provides that a transfer to insider is a badge of fraud). NRS 112.180(2)(k) provides that a transfer of essential assets to a business lienor who transferred the assets to an insider is a badge of fraud.

[12] NRS 112.180(2)(b).

[13] NRS 112.180(2)(c).

[14] This brings into play two badges of fraud. NRS 112.180(2)(d) provides that a badge of fraud is present if the debtor had been sued or threatened with suit before the transfer. NRS 112.180(2)(j) provided that a badge of fraud is present if the transfer occurred shortly before or shortly after a substantial debt was incurred.

[15] NRS 112.180(2)(e).

[16] NRS 112.180(2)(i).

[17] *See* 11 U.S.C.

[18] 11 U.S.C. § 707(b) is not relevant to this case because it governs dismissal of petitions filed by individual debtors.



Snell & Wilmer L.L.P. LAW OFFICES 1700 South Pavilion Center Drive, Suite 700 Las Vegas, Nevada 89135 702.784.5200

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

> (a) The court may dismiss a case under this chapter only after notice and a hearing an only for cause, including –
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States Trustee.

In *In re Padilla*, 222 F.3d 1184 (9th Cir. 2000), the Ninth Circuit considered whether a chapter 7 petition may be dismissed for bad faith due to the debtor's credit card "bust-out." The bankruptcy court dismissed the case as a bad faith filing pursuant to 11 U.S.C. § 707(a). The Bankruptcy Appellate Panel reversed and remanded the case for reinstatement of the petition. The trustee appealed to the Ninth Circuit which affirmed the Panel's decision.

The Ninth Circuit stated that the issue of whether a chapter 7 case could be dismissed for bad faith was a "matter of first impression for this court."[19] After discussing the split among various circuits, the Ninth Circuit held that "we agree with the Eighth Circuit that bad faith as a general proposition does not provide "cause" to dismiss a Chapter 7 petition under § 707(a)."[20]

The Ninth Circuit first reasoned that other relief was available to creditors and trustees including objecting to dischargeability of the claim under section 523, objecting to the debtor's discharge under section 727, seeking dismissal if the debtors are consumer debtors and granting relief would be a substantial abuse of the provisions of chapter 7, and seeking dismissal for cause under section 707(b).[21] It then applied the statutory construction cannon that requires "[w]here both a specific and general statute address the same subject matter, the specific one takes precedence regardless of the sequence of the enactment and must be applied first."[22] Thus, the debtor's conduct should be analyzed under the most specific provision of the Bankruptcy Code

[19] *Id.* at 1191.
[20] *Id.*
[21] *Id.* at 1191-92.
[22] *Id.* at 1192 (internal citations omitted).

addressing that type of misconduct. Since other relief is available under the Bankruptcy Code, dismissal for cause was not available.[23]

The *Padilla* Court noted that the Ninth Circuit has held that the "dismissal for cause" provisions in Chapters 11 and 13 allow for dismissal of cases due to bad faith.[24] The *Padilla* Court distinguished those Chapter 11 and 13 cases from chapter 7 cases as follows:

> What distinguishes Chapters 11 and 13 from Chapter 7 is the language of the Bankruptcy Code itself and the post-filing relationship between the debtor and his creditors. The Bankruptcy Code specifically mentions good faith in Chapters 11 and 13 when it permits a court to confirm a payment plan only if it is proposed in good faith. No mention of good faith or bad faith is made in Chapter 7. Also, the post-filing debtor-creditor relationship is markedly different in liquidation and reorganization bankruptcies. Chapters 11 and 13, both reorganization chapters, permit the debtor to "retain its assets and reorder its contractual obligations to its creditors. In return for these benefits, . . . the debtor [must] approach its new relationship with the creditors in good faith." . . Chapter 7, a liquidation chapter, "requires no ongoing relationship between the debtor and its creditors" and should be available to any debtor willing to surrender all of its nonexempt assets, "regardless of whether the debtor's motive in seeking such a remedy was grounded in good faith." . . . The Bankruptcy Code's language and the protracted relationship between reorganization debtors and their creditors lead us to conclude that bad faith per se can properly constitute "cause" for dismissal of a Chapter 11 or Chapter 13 petition but not of a Chapter 7 petition under § 707(a).[25]

The Ninth Circuit concluded that the debtor's bad faith credit card "bust out" did not constitute cause for dismissal under 11 U.S.C. § 707(a).

The Ninth Circuit reexamined the issue of whether a Chapter 7 case may be dismissed for bad faith in *In re Sherman*, 491 F.3d 948 (9th Cir. 2007). There, the Ninth Circuit held that the debtors alleged misconduct of improperly filing solely to take refuge from the jurisdiction of another court while engaging in scorched earth tactics and making misrepresentations in their statements and schedules did not constitute cause for dismissing a Chapter 7 case.

The Ninth Circuit described *Padilla* as requiring a two-part inquiry:

> First, we must consider whether the circumstances asserted to constitute "cause" are "contemplated" by any specific Code provision applicable to Chapter 7

---

[23] *Id.*
[24] *Id.*
[25] *Id.* at 1192-93 (internal citations omitted).



Snell & Wilmer L.L.P. LAW OFFICES 1700 South Pavilion Center Drive, Suite 700 Las Vegas, Nevada 89135 702.784.5200

> petitions. . . If the asserted "cause" is contemplated by a specific Code provision, then it does not constitute cause under § 707(a). . . If, however, the asserted "cause" is not contemplated by a specific Code provision, then we must further consider whether the circumstances asserted otherwise meet the criteria for "cause" for discharge under §707(a).[26]

The *Sherman* Court then noted § 362(a) addresses the alleged misconduct of using bankruptcy to take refuge from the jurisdiction of another court.[27] Second, it noted that § 547 can be used to address misconduct by a debtor in connection with the transfer of assets.[28] Third, it held that section 727 may be used to address allegations that the debtor misrepresented its financial condition in its statements and schedules.[29]

In the present case, there is other specific relief available to redress the Debtor's and Lawler's actions, thereby precluding dismissal under section 707(a). Such relief includes, but is not limited to:

1. Empowering the Trustee with the ability to seek to avoid the transfers of the equity in Big Sky Canada and any other assets under 11 U.S.C. §§ 544, 547 and 548. Importantly, the trustee has the ability to waive the attorney-client privilege when investigating such avoidable transfers.[30] This tool is not generally available to general creditors suing to avoid fraudulent transfers outside of bankruptcy court. Empowering trustees to waive the attorney-client privilege increases their ability to investigate insider misconduct, and potentially avoidable transfers.[31] Here, Lawler and Debtor are trying to hide behind the attorney-client privilege to thwart all investigations into the transfer of Debtor's assets.

---

[26] *Sherman*, 491 F.3d at 970.
[27] *Id*. at 971-72.
[28] *Id*. at 972-73.
[29] *Id*. at 973.
[30] *See Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343 (1985).
[31] The *Weintraub* Court stated:

> We find no federal interests that would be impaired by the trustee's control of the corporation's attorney client privilege with respect to prebankruptcy communications. On the other hand, the rule suggested by respondents – that the debtor's directors have this power – would frustrate an important goal of the bankruptcy laws. In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. . . . It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had



Snell & Wilmer L.L.P. LAW OFFICES 1700 South Pavilion Center Drive, Suite 700 Las Vegas, Nevada 89135 702.784.5200

2. Obtaining the discovery regarding Debtor's assets and liability 11 U.S.C. §§ 341-343 and Federal Rule of Bankruptcy Procedure 2004. Kazakhstan has elected this remedy by examining Lawler at the meeting of creditors and obtaining authority from the Court to obtain discovery from Debtor and Lawler under FRBP 2004. As mentioned above, the trustee's power to obtain such discovery is heightened because he can waive the attorney-client privilege.
3. Objecting to Lawler's ability to obtain a discharge in any subsequent bankruptcy case he may file pursuant to 11 U.S.C. § 727(a)(7).
4. Pursuant to 18 U.S.C. § 3057(a), the trustee or the court may refer Debtor and Lawler to the U.S. Attorney's Office for criminal investigation and prosecution for commission of bankruptcy crimes committed which expressly includes concealment of assets and making false oaths and accounts. 28 U.S.C. §§ 152-157.
5. Seeking relief from the automatic stay of 11 U.S.C. § 362 to reinitiate proceedings against Debtor and Lawler in the United States District Courts for Nevada and Arizona.

Given the various remedies available to the Court, the trustee and Kazakhstan under various provisions of the Bankruptcy Code, the Court should not dismiss Debtor's Chapter 7 case.

## IV. CONCLUSION

Unlike bad faith filings of Chapter 11 and 13 cases, the Court has no power to dismiss Chapter 7 cases that were filed in bad faith. Such relief is not available under the plain language of 11 U.S.C. § 707(a). The Ninth Circuit confirmed in *Padilla* and *Sherman* that Chapter 7 cases may not be dismissed because of a debtor's bad faith. The Bankruptcy Code also contains multiple remedies to address cases like this including empowering a trustee to seek to avoid transfers of assets (and waive the attorney-client privilege when doing so), allowing affected creditors to seek relief from the automatic stay to reinstate other court proceedings and allowing objections to the

---

> wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.

*Id*. at 353-54 (internal citations omitted).

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

discharge of debtor's insiders in future bankruptcy cases. Thus, Kazakhstan respectfully requests that the Court not dismiss Debtor's case.

Dated: December 5, 2025

SNELL & WILMER L.L.P.

By: */s/ Bob L. Olson*

Bob L. Olson, Esq. (NV Bar No. 3783)
Erin M. Gettel (NV Bar No. 13877)
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
Email: bolson@swlaw.com
egettel@swlaw.com

*Attorneys for Republic of Kazakhstan*

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

# EXHIBIT A

EXHIBIT A

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| REPUBLIC OF KAZAKHSTAN,<br>Plaintiff(s),<br>v.<br>BIG SKY ENERGY CORPORATION,<br>Defendant(s). | Case No. 2:22-cv-00509-JCM-NJK<br>**Order**<br>[Docket No. 22] |

Pending before the Court is a motion to quash subpoenas filed by Big Sky and Scott Lawler. Docket No. 22.[1] Plaintiff filed a response in opposition. Docket No. 29. Big Sky and Lawler filed a reply. Docket No. 30. After the motion was filed, the case was reassigned to the undersigned magistrate judge. *See* Docket Nos. 25-26. The motion is properly decided without a hearing. *See* Local Rule 78-1. For the reasons discussed below, the motion to quash is **DENIED** without prejudice to its refiling in the appropriate forum.

A motion to quash a subpoena must be filed in "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(3)(A), (B). The movant bears the burden of persuasion on a motion to quash, *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015), including of showing that the motion was filed in the correct district, *York Holding, Ltd. v. Waid*, 354 F.R.D. 626, 627 (D. Nev. 2024). Subpoena-related motions that have been filed in the wrong district are routinely denied without prejudice to refiling in the proper tribunal. *See, e.g.*, *Europlay Cap. Advisors, LLC v. Does*, 323 F.R.D. 628, 629-30 (C.D. Cal. 2018).[2]

---

[1] On its face, the motion was filed by Big Sky only. Docket No. 22 at 1. The reply specifies that the motion was intended to also have been filed by Lawler. *See* Docket No. 30 at 1 n.1.

[2] The rules provide the potential for transferring a subpoena-related motion from the court where compliance is required to the issuing court. *See* Fed. R. Civ. P. 45(f). The authority to make that decision rests with the court where compliance is required. *See id.* "As such, this provision does not allow a movant to bypass, in the first instance, the court for the district where compliance is required." *York Holding*, 345 F.R.D. at 627 n.2 (citing *Omnitracs, LLC v. Platform Sci., Inc.*, 2023 WL 2815363, at *1 (S.D. Cal. Apr. 6, 2023)).

Plaintiff argues that the pending motion was filed in the wrong district, pointing to the fact that the depositions will take place in Arizona and the deponents are located in Arizona. Docket No. 29 at 7-8.[3] Big Sky and Lawler respond that the face of the subpoena identifies the place for the pre-deposition document production as being in Nevada, although the face of the subpoena identifies the place for the depositions themselves as being in Arizona, and that Big Sky and Lawler still maintain some connection to Nevada. *See* Docket No. 30 at 7-8.

The Court agrees with Plaintiff that Lawler and Big Sky have not shown that Nevada is the place of compliance. Lawler does not dispute that he resides in Arizona. *See* Docket No. 30-1 at ¶ 5. Based on Lawler's own representation, Big Sky does no business at all and is a defunct entity with nothing happening other than Lawler (an Arizona resident) acting as its sole officer and attorney. Docket No. 22-3 at ¶¶ 2-16.[4] Despite these arrows pointing to Arizona for purposes of this motion, Lawler declares in reply that he has a "presence" in Nevada "as needed." *See* Docket No. 30-1 at ¶¶ 5-6. Big Sky and Lawler provide no elaboration of any kind that having a presence in this District "as needed" means that they also "reside[], [are] employed, or *regularly* transact[] business in person" in this District for purposes of the governing rules. *See* Fed. R. Civ. P. 45(c)(1) (emphasis added). By failing to provide meaningfully developed argument on this issue, Big Sky and Lawler have failed to meet their burden of persuasion in showing that they filed their motion in accordance with the governing rules. *Cf. Kor Media*, 294 F.R.D. at 582 n.3.

---

[3] The parties have a history of litigating discovery disputes in federal court in Arizona, including as to documents that Big Sky and Lawler claim overlap with the instant subpoenas. *See, e.g.*, Docket No. 22 at 2.

[4] The reply insinuates that Big Sky should be deemed as residing in Nevada because it was a Nevada entity when it did business a decade ago. *See* Docket No. 30 at 7-8. The governing rules are written based on where the subpoena recipient "resides, is employed, or regularly transacts business in person" in the present tense. *See, e.g.*, Fed. R. Civ. P. 45(c)(1)(A). The reply provides no legal authority or meaningfully developed argument that this inquiry turns on where a defunct entity allegedly did business years ago and such an outcome seems farfetched when, according to its own representations, that business now has and does nothing apart from its sole officer who currently resides in a different state. Ultimately, the Court need not formally resolve the issue because it is the burden of Big Sky and Lawler to show that their motion was properly filed in this District, *York Holding*, 354 F.R.D. at 627, and they waived this argument by failing to develop it in meaningful fashion, *cf. Kor Media Grp., LLC v. Green*, 294 F.R.D. 579, 582 n.3 (D. Nev. 2013).

In short, Big Sky and Lawler fail to meet their burden of showing that they filed their motion in the "district where compliance is required." Accordingly, the motion to quash is **DENIED** without prejudice to its refiling in the appropriate forum.

IT IS SO ORDERED.

Dated: August 23, 2024

Nancy J. Koppe
United States Magistrate Judge

## Aguirre, Joy

**From:** cmecf@nvd.uscourts.gov
**Sent:** Friday, August 23, 2024 1:19 PM
**To:** cmecfhelpdesk@nvd.uscourts.gov
**Subject:** Activity in Case 2:22-cv-00509-JCM-NJK Republic of Kazakhstan v. Big Sky Energy Corporation Order on Motion to Quash

**[EXTERNAL]** cmecf@nvd.uscourts.gov

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Nevada**

### Notice of Electronic Filing

The following transaction was entered on 8/23/2024 at 1:19 PM PDT and filed on 8/23/2024
**Case Name:** Republic of Kazakhstan v. Big Sky Energy Corporation
**Case Number:** 2:22-cv-00509-JCM-NJK
**Filer:**
**WARNING: CASE CLOSED on 07/28/2022**
**Document Number:** 32

**Docket Text:**
**ORDER denying [22] Motion to Quash without prejudice to its refiling in the appropriate forum. Signed by Magistrate Judge Nancy J. Koppe on 8/23/2024. (Copies have been distributed pursuant to the NEF - HAM)**

**2:22-cv-00509-JCM-NJK Notice has been electronically mailed to:**

Bob L. Olson bolson@swlaw.com, docket_las@swlaw.com, jfung@swlaw.com, mfull@swlaw.com, sdugan@swlaw.com

Alex Fugazzi afugazzi@swlaw.com, DOCKET_LAS@swlaw.com, jaguirre@swlaw.com, mshypkoski@swlaw.com

Brenoch Wirthlin bwirthlin@hutchlegal.com, dkelley@hutchlegal.com, jlinder@hutchlegal.com

Erin M. Gettel egettel@swlaw.com, DOCKET_LAS@swlaw.com, jaguirre@swlaw.com, jforrest@swlaw.com

Steven Cooper scooper@reedsmith.com

Samuel Kadosh skadosh@gulkoschwed.com

Jonathan P Gordon JGordon@oved.com

**2:22-cv-00509-JCM-NJK Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=8/23/2024] [FileNumber=11641960-0] [2cadec83662929f716122dffd77bfa2b14d7e5391de0ea60de14340fd524e3c03c7ab5308ffe094b2418f245f45d5e3b21a5ee3f7d7065a670863ddb87be9c77]]

# EXHIBIT B

EXHIBIT B

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Republic of Kazakhstan,<br>Plaintiff,<br>v.<br>Big Sky Energy Corporation,<br>Defendant. | No. MC-24-00029-PHX-GMS<br>**ORDER** |

Before the Court is Defendant Big Sky Energy Corporation's Objection to Subpoenas and Motion to Quash or Modify Subpoenas (Doc. 1) and Plaintiff Republic of Kazakhstan's Motion for Leave to File a Surreply (Doc. 7). For the reasons below, the Court denies both Motions.

**BACKGROUND**

On July 8, 2022, the District of Nevada entered a default judgment for Plaintiff Republic of Kazakhstan ("Kazakhstan") and against Defendant Big Sky Energy Corporation ("Big Sky") in the amount of $587,030.43, plus applicable interest. *Republic of Kazakhstan v. Big Sky Energy Corp.*, No. 2:22-cv-00509, 2022 WL 19000617, *1 (D. Nev. July 8, 2022). Kazakhstan brought the action to recognize and enforce an International Centre for Settlement of Investment Disputes (ICSID) arbitral award it received against Big Sky in 2021 from a proceeding that Big Sky had initiated in 2017. *Id.*; *See also* Case Details, *Big Sky Energy Corp. v. Republic of Kazakhstan* (ICSID Case No. ARB/17/22), https://icsid.worldbank.org/cases/case-database/case-

detail?CaseNo=ARB/17/22. On January 3, 2024, Kazakhstan served two subpoenas. (Doc. 5 at 5). The first was served on Big Sky, in care of William Scott Lawler, the sole officer and attorney for Big Sky. (Doc. 1-1 at 2). The second was served on Lawler. (Doc. 1-1 at 21) (hereafter collectively "Big Sky"). Both involve a subpoena ad testificandum and a subpoena duces tecum. The parties agreed that Big Sky had until July 8, 2024 to respond to the subpoenas. (Doc. 5 at 6; Doc. 6 at 4).

On July 8, 2024, Big Sky filed its Original Motion to Quash ("Original Motion"). (*Republic of Kazakhstan v. Big Sky Energy Corp.*, in the District of Nevada, No. 2:22-cv-00509-JCM-NJK, Doc. 22). On August 23, 2024, the District of Nevada denied the Original Motion without prejudice to its refiling in the appropriate forum—Arizona. (No. 2:22-cv-00509-JCM-NJK, Doc. 32). The court explained that "a motion to quash a subpoena must be filed in 'the court for the district where compliance is required,'" and "Big Sky is a defunct entity with nothing happening other than Lawler (an Arizona resident) acting as its sole officer and attorney." (*Id.* at 2) (quoting Fed. R. Civ. P. 45(d)(3)(B)).

On September 6, 2024, Big Sky filed its Objection to Subpoenas and Motion to Quash or Modify Subpoenas (Doc. 1) in this Court.[1] Specifically, Big Sky requests the Court quash or modify the subpoenas served on Big Sky and Mr. Lawler, its officer and counsel. (Doc. 1 at 1).

## DISCUSSION

### I. Defendant Big Sky's Motion to Quash or Modify Subpoenas

#### a. Legal Standard

A money judgment creditor whose interest appears of record may, in aid of the judgment or execution, "obtain discovery from any person—including the judgment debtor—as provided in [the Federal Rules of Civil Procedure] or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2). Rule 69 authorizes the use of

[1] Kazakhstan initially disputed this date of filing in its Response, (Doc. 5 at 6), but clarified that Big Sky did, indeed, serve the Motion on Kazakhstan's counsel on September 6. (Doc. 7 at 2).

all discovery tools, including subpoenas, to obtain discovery. *See* Fed. R. Civ. P. 69, 1970 Advisory Committee's Note. However, where a subpoena is issued, Federal Rule of Civil Procedure 45(d)(3) states that, upon a timely motion, a court must quash or modify a subpoena if it "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).

Courts evaluate a motion to quash under Rule 26. *See Hamilton v. Yavapai Cmty College Dist.*, No. CV-12-08193, 2021 WL 1264007, at *1 ("Motions to quash are evaluated in the context of Rule 26."). Rule 26 states that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also R. Prasad Indus. v. Flat Irons Env't Sols. Corp.*, No. CV-12-08261, 2014 WL 2804376, at *2 (D. Ariz. June 20, 2014) ("[Rule] 26 . . . defines the permissible scope of discovery, and a Rule 45 subpoena is subject to that same scope."). "The moving party bears the burden of persuasion on a motion to quash, but the party issuing the subpoena must demonstrate that the discovery is relevant." *In re Rule 45 Subpoenas Issued to Google LLC and LinkedIn Corp.*, 337 F.R.D. 639, 645 (N.D. Cal. 2020); *see also Pravati Cap. LLC v. Moore*, No. CV-24-02119, 2024 WL 4299400, at *1 (D. Ariz. 2024) (holding the moving party bears the burden of persuasion and the party issuing the subpoena must demonstrate the information sought is relevant).

**b. Timeliness of Motion**

Kazakhstan asserts that Big Sky's Motion is untimely as to the deposition portions of the Subpoenas and the Lawler Subpoena in its entirety. (Doc. 5 at 8). Rule 45 permits a person commanded to produce "documents or tangible things" to object before the earlier of 14 days after the subpoena is served or the time specified for compliance. Fed. R. Civ. P. 45(d)(2)(B). Rule 45 requires that any motion to quash or modify a subpoena, including

a subpoena to testify, do so in a "timely motion." *Id.* at 45(d)(3)(A). Courts have generally read "timely" to mean "before the compliance date designated in the subpoena." *Odyssey Reinsurance Co. v. Nagby*, No. 16-CV-3038, 2018 WL 1963665, at *2 (S.D. Cal. April 26, 2018); *see also HI.Q, Inc. v. ZeetoGroup, LLC*, No. 22-cv-1440, 2022 WL 17345784, at *6 (S.D. Cal. Nov. 29, 2022).

As to the production portions, Big Sky timely filed the Original Motion in Nevada on July 8, 2024, the time specified for compliance by the parties. Although Big Sky filed in the wrong jurisdiction, "in unusual circumstances and for good cause, the failure to act timely will not bar consideration of objections to a Rule 45 subpoena." *See HI.Q, Inc.*, 2022 WL 17345784, at *11 (cleaned up). Big Sky refiled in Arizona within 14 days of the District of Nevada order, constituting a good-faith effort at compliance. *See Baker v. Ensign*, No. 11-CV-2060, 2014 WL 3058323, at *6 (S.D. Cal. July 3, 2014) ("Courts have found unusual circumstances where . . . the subpoenaed witness is a non-party acting in good faith."). As to the deposition portions, Big Sky filed in Nevada in advance of the July 18 and July 19, 2024 deposition dates and timely filed the Motion in this Court, as directed by the Nevada court. As such, Big Sky and Lawler complied with Rule 45's timing requirements.

**c. Analysis**

**i. Privileged or Confidential Information**

Big Sky asserts the subpoenas should be quashed or modified because they seek information in violation of Big Sky's attorney-client privilege. (Doc. 1 at 7). "A person withholding subpoenaed information under a claim that it is privileged or subject to protection . . . must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2). General objections do not satisfy the requirements of Rule 45(e)(2). *See Compaq Comput. Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995); *see also Relevant Grp., LLC v. Nourmand*, No. CV-19-5019, 2021

WL 9696765, at *4 (C.D. Cal. 2021) ("Cases in this Circuit and beyond consistently hold that a subpoenaed non-party must provide a privilege log when withholding responsive documents based on privilege.").

Here, Big Sky neither served a privilege log nor described the nature of the withheld documents, in violation of the Rule 45(e)(2) requirements. *See* Fed. R. Civ. P. 45(e)(2). Big Sky and Lawler are ordered to serve a privilege log that lists all documents withheld on the ground of privilege against disclosure and provides information as to each document in compliance with Rule 45(e)(2). *See Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) (finding ten items sufficient to sustain the burden of asserting the attorney-client privilege).

**ii. Unduly Burdensome and Facially Overbroad**

Big Sky asserts Kazakhstan's subpoenas are unduly burdensome and overly broad because the requests are not relevant to Big Sky's ability to pay and set forth too broad a time period. (Doc. 1 at 8-9). "[T]he rules governing discovery in post judgment execution proceedings are quite permissive." *Invesco High Yield Fund v. Jecklin*, 10 F.4th 900, 905 (9th Cir. 2021) (quoting *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 138 (2014)). However, a court must quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). "In determining whether a subpoena poses an undue burden, courts weigh the burden to the subpoenaed party against the value of the information to the serving party." *Soto v. Castlerock Farming and Transp., Inc.*, 282 F.R.D. 492, 504 (E.D. Cal. 2012). "Generally, this requires consideration of relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.* "[T]he party issuing the subpoena must demonstrate that the discovery is relevant." *In re Rule 45 Subpoenas Issued to Google LLC and LinkedIn Corp.*, 337 F.R.D. at 645. However, the party claiming that discovery is unduly burdensome "must allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence." *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape*

*Maint. Ass'n*, 316 F.R.D. 327, 334 (D. Nev. 2016) (internal quotation omitted).

As to relevance, Big Sky argues the requested documents are not relevant because they "fall outside" documents related to Big Sky's ability to pay a judgment. (Doc. 1 at 9). Although information pertaining to Big Sky's ability to pay is relevant, so is information about where Big Sky's assets may be located. *See Experience Hendrix, LLC v. Pitsicalis*, No. CV-21-3362, 2023 WL 4247749, at *4 (C.D. Cal. April 18, 2023) ("The question before the Court is not whether Judgment Creditors may reach the assets of these various entities to satisfy their judgment against Pitsicalis. Rather, Judgment Creditors need only show that discovery regarding these entities is relevant to their search for Pitsicalis' assets."). Kazakhstan asserts its subpoenas seek information regarding entities that are relevant to identifying assets potentially available for application to and satisfaction of the Judgment or to whom money may have been fraudulently transferred to avoid payment of the Judgment. (Doc. 5 at 15-16). Big Sky failed to allege specific facts indicating any burden that complying with the subpoena might cause it. Thus, Kazakhstan has met its burden to show the subpoenas seek relevant information, and the subpoenaed documents are not overly broad.

As to the time period, Big Sky asserts the time period applicable to all document requests in the subpoenas—from September 30, 2015 through the present—is unduly burdensome. (Doc. 1 at 8). However, Big Sky fails to allege any specific facts to demonstrate the "nature and extent of the burden." *Nationstar Mortg., LLC*, 316 F.R.D. at 334 (holding the party claiming the discovery is unduly burdensome bears the burden to allege specific facts which indicate the extent of the burden). As such, the time period provided in the subpoenas is permissible.

## II. Plaintiff Kazakhstan's Motion for Leave to File a Surreply

Kazakhstan's Motion for Leave to File a Surreply is denied because no further briefing is required. *See Young v. Buttigieg*, No. 23-15219, 2024 WL 4553784, at *1 (9th Cir. 2024) (holding the magistrate judge did not abuse his discretion in denying a motion for leave to file a surreply because the magistrate judge determine no further briefing was

required).

Accordingly,

**IT IS ORDERED** denying Defendant's Objection to subpoenas and Motion to Quash or Modify Subpoenas (Doc. 1).

**IT IS FURTHER ORDERED** Defendant serve a privilege log that lists all documents withheld on the ground of privilege against disclosure and provides information as to each document in compliance with Rule 45(e)(2) and this Order by **February 24, 2025** and file a Notice of Service.

**IT IS FURTHER ORDERED** denying Plaintiff's Motion for Leave to File a Surreply (Doc. 7).

Dated this 24th day of January, 2025.

G. Murray Snow
Senior United States District Judge

# EXHIBIT C

EXHIBIT C

PIERSON FERDINAND LLP
Alejandro Pérez (SBN 030968)
3050 North Central Avenue, Suite 1060
Phoenix, Arizona 85016
Alejandro.perez@pierferd.com
(602)887-3368

W. Scott Lawler PLC (pro hac application pending)
3133 W. Frye Road, Ste 101
Chandler, AZ 85226
Tel: 480-339-0181
wsl@lawlerfirm.com

*Attorneys for Movant/Defendant*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| REPUBLIC OF KAZAKHSTAN<br><br>Plaintiff,<br><br>v.<br><br>BIG SKY ENERGY CORPORATION,<br><br>Defendant. | Case No.: 2:24-mc-00029-GMS<br><br>**JOINT STIPULATION TO EXTEND DEADLINE FOR PRODUCTION OF PRIVILEGE LOG** |

Defendant Big Sky Energy Corporation and Plaintiff the Republic of Kazakhstan (collectively, the "Parties") stipulate and jointly move the Court for an Order extending the deadline for production of the privilege log to April 25, 2025.

On September 9, 2024, Defendant filed a motion to quash a subpoena duces tecum issued by Plaintiff. [Doc. 1.] On January 25, 2025, the Court issued an order denying Defendant's motion and further ordered Defendant to serve a privilege log that lists all documents withheld on the ground of privilege against disclosure and provides information as to each document in compliance with Rule 45(e)(2) and this Order by 2/24/25. [Doc. 9.]

The Parties have agreed to extend Big Sky's deadline to produce the

Case 2:24-cv-01029-GMN Document 22 Filed 04/11/25 Page 2 of 3

privilege log until April 25, 2025. Good cause exists for this extension because the Parties are participating in good faith settlement discussions and wish to focus their time and resources on such discussions.

Based on the foregoing, the Parties request that the Court enter the proposed order lodged contemporaneously with this filing, allowing Big Sky to disclose its privilege log up to and including April 25, 2025.

PIERSON FERDINAND LLP

*/s/ Alejandro Pérez*
Alejandro Pérez
*Attorneys for Defendant*

SNELL AND WILMER LLP

*/s/ Bob L. Olson (with permission)*
Bob L. Olson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically transmitted the foregoing **OBJECTION TO SUBPOENAS AND MOTION TO QUASH OR MODIFY SUBPOENAS** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic Filing.

Dated this 9/4/2024

*/s/ Alejandro Pérez*
Alejandro Pérez

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| REPUBLIC OF KAZAKHSTAN<br><br>Plaintiff,<br><br>v.<br><br>BIG SKY ENERGY CORPORATION,<br><br>Defendant. | Case No.: 2:24-mc-00029-GMS<br><br>**ORDER RE: JOINT STIPULATION TO EXTEND DEADLINE FOR PRODUCTION OF PRIVILEGE LOG** |

Pursuant to the parties' Joint Stipulation to Extend Deadline for Production of Privilege Log, and for good cause shown:

IT IS HEREBY ORDERED that the Stipulation is GRANTED. Defendant shall have up to and including April 25, 2025, to produce its privilege log.

# EXHIBIT D

EXHIBIT D

PIERSON FERDINAND LLP
Alejandro Pérez (SBN 030968)
One Renaissance
Two North Central Ave. Suite 1800
Phoenix, Arizona 85004
Alejandro.perez@pierferd.com
(602)887-3368

W. Scott Lawler PLC (pro hac application pending)
3133 W. Frye Road, Ste 101
Chandler, AZ 85226
Tel: 480-339-0181
wsl@lawlerfirm.com

*Attorneys for Movant/Defendant*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| REPUBLIC OF KAZAKHSTAN<br><br>Plaintiff,<br><br>v.<br><br>BIG SKY ENERGY CORPORATION,<br><br>Defendant. | Case No.: MC-24-00029-PHX-GMS<br><br>**JOINT STIPULATION TO EXTEND DEADLINE FOR PRODUCTION OF PRIVILEGE LOG** |

Defendant Big Sky Energy Corporation and Plaintiff the Republic of Kazakhstan (collectively, the "Parties") stipulate and jointly move the Court for an Order extending the deadline for production of the privilege log to May 6, 2025.

On September 9, 2024, Defendant filed a motion to quash a subpoena duces tecum issued by Plaintiff. [Doc. 1.] On January 25, 2025, the Court issued an order denying Defendant's motion and further ordered Defendant to serve a privilege log that lists all documents withheld on the ground of privilege against disclosure and provides information as to each document in compliance with Rule 45(e)(2) and this Order by 2/24/25. [Doc. 9.]

The Parties then filed a joint motion to extend Big Sky's deadline to produce the privilege log until April 25, 2025, which the Court granted. [Docs. 10-11.] Because the Parties continue to engage in good faith settlement discussions, they currently seek an additional extension up to and including May 6, 2025

Good cause exists for this as the Parties wish to focus their time and resources on such discussions, and successful settlement discussions would obviate the need to produce the privileged log. This motion is not filed for purposes of delay and the parties will not suffer prejudice as a result of its granting.

Based on the foregoing, the Parties request that the Court enter the proposed order lodged contemporaneously with this filing, allowing Big Sky to disclose its privilege log up to and including May 6, 2025.

PIERSON FERDINAND LLP

*/s/ Alejandro Pérez*
Alejandro Pérez
*Attorneys for Defendant*

SNELL AND WILMER LLP

*/s/ Bob L. Olson (with permission)*
Bob L. Olson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically transmitted the foregoing **OBJECTION TO SUBPOENAS AND MOTION TO QUASH OR MODIFY SUBPOENAS** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic Filing.

Dated this 25th day of April 2025.

*/s/ Alejandro Pérez*
Alejandro Pérez

# EXHIBIT E

EXHIBIT E

PIERSON FERDINAND LLP
Alejandro Pérez (SBN 030968)
One Renaissance
Two North Central Ave. Suite 1800
Phoenix, Arizona 85004
Alejandro.perez@pierferd.com
(602)887-3368

W. Scott Lawler PLC (pro hac application pending)
3133 W. Frye Road, Ste 101
Chandler, AZ 85226
Tel: 480-339-0181
wsl@lawlerfirm.com

*Attorneys for Movant/Defendant*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| REPUBLIC OF KAZAKHSTAN<br><br>Plaintiff,<br><br>v.<br><br>BIG SKY ENERGY CORPORATION,<br><br>Defendant. | Case No.: MC-24-00029-PHX-GMS<br><br>**THE PARTIES' THIRD JOINT STIPULATION TO EXTEND DEADLINE FOR PRODUCTION OF PRIVILEGE LOG** |

Defendant Big Sky Energy Corporation and Plaintiff the Republic of Kazakhstan (collectively, the "Parties") stipulate and jointly move the Court for an Order extending the deadline for production of the privilege log to May 16, 2025.

On September 9, 2024, Defendant filed a motion to quash a subpoena duces tecum issued by Plaintiff. [Doc. 1.] On January 25, 2025, the Court issued an order denying Defendant's motion and further ordered Defendant to serve a privilege log that lists all documents withheld on the ground of privilege against disclosure and provides information as to each document in compliance with Rule 45(e)(2) and this Order by 2/24/25. [Doc. 9.]

The Parties are actively participating in discussions related to early resolution. To focus on these discussions, the Parties initially filed a joint motion to extend Big Sky's deadline to produce the privilege log until April 25, 2025, which the Court granted. [Docs. 10-11.] The Parties then made—and the Court granted—a second request extending the deadline to May 6, 2025. [Docs. 12-13.]

As of today, the Parties continue discussing settlement. The Parties hope to resolve the case by the proposed deadline and wish to use the additional time to ensure a fully contemplated agreement that disposes of the matter. Good cause continues to exist because successful settlement discussions would obviate the need to produce the privileged log. This motion is not filed for purposes of delay, and the Parties will not suffer prejudice as a result of its granting.

Based on the foregoing, the Parties request that the Court enter the proposed order lodged contemporaneously with this filing, allowing Big Sky to disclose its privilege log up to and including May 16, 2025.

PIERSON FERDINAND LLP

*<u>/s/ Alejandro Pérez</u>*
Alejandro Pérez
*Attorneys for Defendant*

SNELL AND WILMER LLP

*<u>/s/ Bob L. Olson (with permission)</u>*
Bob L. Olson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I electronically transmitted the foregoing **THE PARTIES' THIRD JOINT STIPULATION TO EXTEND DEADLINE FOR PRODUCTION OF PRIVILEGE LOG** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic Filing.

Dated this 6th day of May 2025.

*/s/ Alejandro Pérez*
Alejandro Pérez

# EXHIBIT F

EXHIBIT F

# In The Matter Of:

25-50445

In Re: Big Sky Energy

## Transcription Of:

*341 MEETING OF CREDITORS BEFORE W. DONALD GIESEKE*

*June 18, 2025*

envision legal solutions

702-805-4800

scheduling@envision.legal

Nevada Firm No. 088F

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA (RENO)

BIG SKY ENERGY CORPORATION, Case No.

Debtor. 25-50445

Wednesday, June 18, 2025

BEFORE: W. Donald Gieseke

UNITED STATES TRUSTEE

(341 Meeting of Creditors)

eventually reversed. So the membership interest in those LLCs went back to those six original Kazakh residents, nationals.

Q Okay. Were there any US assets that were transferred or what happened to any US assets?

A The company really didn't have any US assets other than maybe furniture that was held, you know, at its Calgary headquarters.

Q Okay. The company has no money and you're not being compensated. Where did the $3,500 come from to pay Mr. Wirthlin?

A Out of my bank account.

Q So you paid it personally?

A Yes.

Q Okay. Why are you filing bankruptcy? No assets, one unsecured creditor that you list?

A Because the unsecured creditor is kind of making my life miserable by going after a tremendous, unreasonable, unfathomable breadth and depth of documents that I do not have time to even look at the requests, let alone find the documents. And as sole practitioner to respond to that request, I would -- I would lose my practice.

Q Okay. How many boxes are there that would have to be gone through?

# EXHIBIT G

EXHIBIT G

# In The Matter Of:

25-50445

In Re: Big Sky Energy

## Transcription Of:

*341 MEETING OF CREDITORS, BEFORE W. DONALD GIESEKE*

*June 23, 2025*

envision
legal solutions

702-805-4800
scheduling@envision.legal

Nevada Firm No. 088F

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA (RENO)

---

BIG SKY ENERGY CORPORATION, Case No.

Debtor. 25-50445

---

Monday, June 23, 2025

BEFORE: W. Donald Gieseke

UNITED STATES TRUSTEE

(341 Meeting of Creditors)

A P P E A R A N C E S

ON BEHALF OF THE OFFICE OF THE US TRUSTEE:

W DONALD GIESEKE, CHAPTER 7 TRUSTEE
18124 Wedge Parkway, Suite 518
Reno, NV 89511
(775) 742-9107

ON BEHALF AND AS REPRESENTATIVE FOR DEBTOR BIG SKY ENERGY CORPORATION:

BRENOCH WIRTHLIN, ESQUIRE (by telephone)
Wirthlin & Verlaine
400 South 4th Street, Suite 300
Las Vegas, NV 89101
(702) 717-9132
bwirthlin@wirthlinlawfirm.com

A P P E A R A N C E S (CONT'D)

ON BEHALF OF THE CREDITOR REPUBLIC OF KAZAKHSTAN:

BOB L. OLSON, ESQUIRE (by telephone)
Snell & Wilmer LLP
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
(702) 784-5200

and

LUCY WINNINGTON-INGRAM, ESQUIRE (by telephone)
Reed Smith LLP
Global Commercial Disputes Group
Connaught House, 15-17 Upper George Street
Luton, Bedfordshire, UK L412RD
+44 (0)20 3116 3891
lwinnington-ingram@reedsmith.com

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By The Trustee | 6 |
| By Mr. Olson | 7 |
| By The Trustee | 15 |
| BY Mr. Olson | 17 |
| By The Trustee | 24 |
| By Mr. Olson | 24 |


E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|

(None marked.)

Q Thank you. And I received the 2019 bank statement showing a zero balance. Was that the only bank account that you -- or the business had at that time?

A Yes.

THE TRUSTEE: All right. I had to cut the last meeting of creditors short. So I'm going to open this up to creditors. We have -- it looks like Mr. Bob Olson and Ms. Lucy Winnington-Ingram.

MR. OLSON: Good morning, Mr. Trustee. Bob Olson of Snell & Wilmer on behalf of the Republic of Kazakhstan.

EXAMINATION

BY MR. OLSON:

Q Mr. Lawler, what was the primary purpose for filing this bankruptcy?

A Well, the company has no operations, no assets, anything as to wind it up and get it done and get it out of my life. It has no purpose.

Q Was the other reason to avoid producing documents pursuant to an Arizona District Court order?

A No. The purpose was to avoid waste of time because there's no -- there's no assets. There's no -- there's nothing to produce and to satisfy the attorney's, judgment that the Republic of Kazakhstan

is trying to enforce.

Q And what specifically was the waste of time? Would that been preparation and a summary of the documents that were required by the ROK subpoena?

A Yes.

Q Was that the main reason the bankruptcy petition was filed?

MR. LAWLER: Judge, I already answered that.

BY MR. OLSON:

Q I believe the district court in Arizona set a deadline for Big Sky Energy to prepare a privilege log of the documents in its possession. Was a privilege log ever prepared?

A Not that I'm aware of.

Q How much time did you personally spend assembling the documents described in the subpoena to certify the Republic -- Republic of Kazakhstan?

A I have no idea.

Q Give a guess of an hour, more than 10 hours?

A More.

Q How much more?

A I don't want to -- I don't know.

Q Has Big Sky Energy ever advised any representative of the Republic of Kazakhstan that it

# EXHIBIT H

EXHIBIT H

# SHAREHOLDERS REGISTER
# BIG SKY ENERGY KAZAKHSTAN LTD.
# RECORD OF CERTIFICATES ISSUED AND TRANSFERRED
# CLASS A COMMON

| Certificates Issued | | Issued To (Name and Address) | Date Issued | Shares Transferred From (If Original Issue Enter as Such) | | Amount Paid Thereon | Enter Original Issues Only | Outstanding Shares |
|---|---|---|---|---|---|---|---|---|
| Cert. No. | No. Shares | | | Name | Cert. Nos. | | | |
| | | | | | | | | |
| 1* | 8,000,000 | Big Sky Energy Canada Ltd.<br>311 840 6th Avenue SW<br>Calgary, Alberta T2P3E5 | July 29, 2003 | | | * | 8,000,000 | 8,000,000 |
| 2* | 2,000,000 shares acquired by group – unknown breakdown | Glen Van Doorne<br>310-505-8 Avenue SW<br>Calgary Alberta T2P 5E9 | July 29, 2003 | | | * | | |
| 3* | 2,000,000 shares acquired by group – unknown breakdown | James Gotmy<br>136 Gateway Place SW<br>Calgary Alberta T3E 4J2 | July 29, 2003 | | | * | | |
| 4* | 2,000,000 shares acquired by group – unknown breakdown | Malcolm Albery<br>920 Cresent Blvd. SW<br>Calgary Alberta T2S 1L5 | July 29, 2003 | | | * | | |
| 5* | 2,000,000 shares acquired by group – unknown breakdown | Jodi Larmour<br>196 Sierra Morena Circle SW<br>Calgary Alberta T3H 2W8 | July 29, 2003 | | | * | | |

# SHAREHOLDERS REGISTER
# BIG SKY ENERGY KAZAKHSTAN LTD.
# RECORD OF CERTIFICATES ISSUED AND TRANSFERRED
# CLASS A COMMON

| Certificates Issued | | Issued To (Name and Address) | Date Issued | Shares Transferred From (If Original Issue Enter as Such) | | Amount Paid Thereon | Enter Original Issues Only | Outstanding Shares |
|---|---|---|---|---|---|---|---|---|
| Cert. No. | No. Shares | | | Name | Cert. Nos. | | | |
| 6* | 2,000,000 shares acquired by group – unknown breakdown | Delphine de Rohan Chabot<br>67 Eccleston Square<br>London England SW1V 1PJ | July 29, 2003 | | | * | | 10,000,000 |
| 7 | 10,000,000 | China Energy Ventures Corp.<br>1002, Building C, Huiyuan Apartment, Asia Game Village, Beijing, China | January 12, 2004 | Big Sky Energy Canada Ltd.<br>Jodi Larmour<br>Malcolm Albury<br>James Gotmy<br>Glen Van Doorne<br>Delphine de Roban Chabot | 1,2,3,4,5, 6 Canceled | | | 10,000,000 |
| 8 | 10,000,000 | Big Sky Energy Corporation (formerly China Energy Ventures Corp.)<br>2133 W. Frye Road, Suite 101, Chandler, AZ 85226 | December 15, 2004 | China Broadband Corporation | 7 canceled | | | 10,000,000 |
| 9 | 10,000,000 | Ingalls & Snyder Value Partners L.P.<br>61 Broadway, New York, New York | April 15, 2022 | Big Sky Energy Corporation 2133 W. Frye Road, Suite 101, Chandler, AZ 85226 | 8 canceled | | | 10,000,000 |

Case 25-50445-hlb Doc 45 Entered 11/05/25 15:30:48 Page 4 of 42

# SHAREHOLDERS REGISTER
# BIG SKY ENERGY KAZAKHSTAN LTD.
# RECORD OF CERTIFICATES ISSUED AND TRANSFERRED
# CLASS A COMMON

| Certificates Issued | | Issued To (Name and Address) | Date Issued | Shares Transferred From (If Original Issue Enter as Such) | | Amount Paid Thereon | Enter Original Issues Only | Outstanding Shares |
|---|---|---|---|---|---|---|---|---|
| Cert. No. | No. Shares | | | Name | Cert. Nos. | | | |
| 10 | 8,423,000 | Ingalls & Snyder Value Partners L.P.<br>61 Broadway, New York, New York | July 13, 2023 | Ingalls & Snyder Value Partners L.P. 61 Broadway, New York, New York | 9 canceled | | | 8,423,000 |
| 11 | 1,577,000 | W Scott Lawler<br>2133 W. Frye Road, Suite 101, Chandler, AZ 85226 | July 13, 2023 | Ingalls & Snyder Value Partners L.P. 61 Broadway, New York, New York | 9 canceled | | | 10,000,000 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | China | | |

***NOTE: No original minute book provided – entity revived March 10, 2011. No initial data including subscription agreements for share certificates 1 through 6. Stated value of equity issued to holders in published financial statements from September 2003 as part of acquisition by China Energy Ventures Corp. was $1 in total.**

# EXHIBIT I

EXHIBIT I

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**BIG SKY ENERGY CORPORATION**

Claimant

and

**REPUBLIC OF KAZAKHSTAN**

Respondent

**ICSID Case No. ARB/17/22**

# AWARD

***Members of the Tribunal***
Professor Bernardo M. Cremades, President
Professor Stanimir A. Alexandrov, Arbitrator
Judge Peter Tomka, Arbitrator

***Secretary of the Tribunal***
Dr. Jonathan Chevry

*Date of dispatch to the Parties:* November 24, 2021

Case 25-50445-hlb Doc 52 Entered 12/05/25 11:32:51 Page 53 of 220

## REPRESENTATION OF THE PARTIES

*Representing Big Sky Energy Corporation*:

Mr. Stephen Fietta
Mr. Ashique Rahman
Ms. Laura Rees-Evans
Ms. Oonagh Sands
Ms. Miglena Angelova
Fietta LLP
1 Fitzroy Square
London W1T 5HE, United Kingdom

*Representing the Republic of Kazakhstan*:

Ms. Belinda Paisley
Ms. Chloe Carswell
Ms. Lucy Winnington-Ingram
Ms. Azhar Kuzutbayeva
Ms. Dina Nazargalina
Mr. Lucian Ilie
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London EC2A 2RS, United Kingdom

and

Mr. Samuel Wordsworth QC
Mr. Paul Choon Kiat Wee
Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG, United Kingdom

## TABLE OF CONTENTS


I. INTRODUCTION AND PARTIES ........ 1
II. PROCEDURAL HISTORY ........ 2
III. FACTUAL BACKGROUND ........ 13
A. General Factual Background ........ 13
(1) Main Actors ........ 13
a. Big Sky Energy Corporation ........ 14
b. BSEK ........ 14
c. KoZhan LLP (Kozhan) ........ 16
d. The Original Owners and their Spouses ........ 16
e. The Kazakhstan Ministry of Energy and Mineral Resources (the MEMR) .. 18
f. The Kazakh Courts ........ 18
g. ABT ........ 18
h. The "Three Oligarchs" ........ 19
i. The Office of the General Prosecutor and the National Security Committee 22
j. Mr. Ogai ........ 23
(2) Background to the Claimant's Investment in Kazakhstan ........ 24
(3) The Court Proceedings ........ 26
(4) The Sale of Kozhan after the Court Proceedings ........ 28
B. The Parties' Factual Allegations Specific to the Kazakh Court Proceedings ........ 29
(1) The Claimant's Position ........ 29
a. The 2003 SPA Proceedings ........ 29
b. The 2008 ABT Proceedings ........ 35
c. The 2009 Set-Off Proceedings ........ 36
d. The 2012 Set-Off Proceedings ........ 37
(2) The Respondent's Position ........ 38
a. The 2003 SPA Proceedings ........ 38
b. The 2008 ABT Proceedings ........ 41
c. The 2008 Set-Off Proceedings ........ 42
d. The 2012 Set-Off Proceedings ........ 43
C. The Tribunal's Consideration of the Parties' Statements of Facts ........ 45
IV. THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........ 45
A. The Claimant's Request for Relief ........ 45

B. The Respondent's Request for Relief ... 46
V. JURISDICTION ... 47
A. The Parties' Position on Denial of Benefits ... 47
(1) The Respondent's Position ... 47
a. The Issue of Control ... 48
b. The Claimant's Substantial Activities in the United States ... 51
(2) The Claimant's Position ... 54
a. The Issue of Control ... 56
b. Substantial Activities in the United States ... 59
B. The Tribunal's Analysis ... 62
(1) Control by Nationals of a Third Country ... 62
a. Controller-in-Law ... 63
b. Controller-in-Fact ... 63
(2) Substantial Business Activities ... 69
VI. LIABILITY ... 75
A. The Claimant's Position on the Merits ... 75
(1) Article III(1) of the BIT – Expropriation ... 76
(2) Article II(2)(a) of the BIT – FET ... 79
(3) Article II(2)(b) of the BIT – Arbitrary or Discriminatory Measures ... 83
(4) Article II(6) of the BIT – Effective Means ... 84
(5) Article II(2)(a) of the BIT – FPS ... 85
(6) Denial of Justice ... 86
B. The Respondent's Position on the Merits ... 87
(1) Standards of Protection ... 87
a. The Necessity for the Claimant to Establish a Denial of Justice ... 87
b. Article II(2)(a) of the BIT – FET ... 88
c. Article III(1) of the BIT – Judicial Expropriation ... 90
d. Article II(6) of the BIT – Effective Means ... 91
e. Article II(2)(a) of the BIT – FPS ... 91
f. Article II(2)(b) of the BIT – Arbitrary or Discriminatory measures ... 92
(2) Application of the Law to the Facts ... 92
a. The 2003 SPA Proceedings ... 92
b. The 2008 ABT Proceedings ... 93

c. The 2009 Set-Off Proceedings ............................................................. 93

d. The 2012 Set-Off Proceedings ............................................................. 94

C. The Tribunal's Analysis ............................................................. 94

(1) Denial of Justice ............................................................. 94

a. Whether the Appellate Collegium improperly prejudged the merits when it remitted the 2003 SPA case back to the District Court ............................................................. 96

b. Whether the Supervisory Collegium violated the requirement to state reasons when it declined to open a supervisory review of the Appellate Collegium's decision allegedly prejudging the case for the District Court in the second phase of the 2003 SPA Proceeding ............................................................. 99

c. The District Court's decision to take jurisdiction over Ms. Tulegenova's claim and to add Mr. Baikenov as a new defendant ............................................................. 99

d. The District Court's refusal to summon Mr. Baikenov as a witness ........... 103

e. Reaching a final, non-appealable, judgment in the 2003 SPA Proceeding despite the withdrawal of the claims by the plaintiff spouses Ms. Tulegenova and Mr. Seidagaliev ............................................................. 105

f. Failing to consider or decide dispositive evidence and arguments submitted to the court demonstrating that the plaintiff spouses had failed to prove that BSEK knew or should have known of their alleged disagreement to the 2003 SPA ............................................................. 109

g. Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was brought in bad faith ............................................................. 117

h. Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was time-barred ..... 120

i. District Court's failure to send BSEK a copy of the Second 2003 SPA Decision in a timely manner ............................................................. 122

j. The 2008 ABT Proceedings ............................................................. 122

k. Failing to notify the Claimant of the hearings in the 2009 or 2012 Set-Off Proceedings ............................................................. 125

l. Setting off debts purportedly owed by Big Sky US against assets held by its subsidiary, BSEK, and failing to give any legal basis for lifting of the corporate veil127

m. The Bailiff's failure to obtain an independent and serious valuation of BSEK's 10% shareholding in Kozhan ............................................................. 133

n. The Bailiff's failure to make any attempt to sell the 10% shareholding at a public auction ............................................................. 135

(2) Article III(1) of the BIT – Judicial Expropriation ............................................................. 138

(3) Article II(2)(a) of the BIT – FET ............................................................. 140

Case 25-50445-hlb Doc 52 Entered 11/05/25 12:32:51 Page 57 of 220


(4) Article II(6) of the BIT – Effective Means ........ 145

(5) Article II(2)(a) of the BIT – FPS ........ 146

(6) Article II(2)(b) of the BIT – Arbitrary or Discriminatory Measures ........ 149

VII. DAMAGES ........ 151

A. The Claimant's Positions on Damages ........ 151

B. The Respondent's Positions on Damages ........ 154

C. The Tribunal's Analysis ........ 156

VIII. COSTS ........ 156

A. Claimant's Cost Submissions ........ 156

B. Respondent's Cost Submissions ........ 157

C. The Tribunal's Decision on Costs ........ 158

IX. AWARD ........ 161

## TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| BIT or Treaty | Treaty Between the United States of America and the Republic of Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment, which entered into force on January 12, 1994 |
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Hearing | Hearing held January 4 to 12, 2021. |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| RL-[#] | Respondent's Legal Authority |
| Transcript Day [#] [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal reconstituted on June 15, 2018 |

## I. INTRODUCTION AND PARTIES

1. This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Treaty Between the United States of America and the Republic of Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment, which entered into force on January 12, 1994 (the "**BIT**" or "**Treaty**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "**ICSID Convention**"). The United States has been a party to the ICSID Convention since October 14, 1966, the Republic of Kazakhstan since October 21, 2000.

2. The claimant is Big Sky Energy Corporation ("**Big Sky**", "**Big Sky US**", or the "**Claimant**"), a company incorporated under the laws of the United States of America.

3. The respondent is the Republic of Kazakhstan ("**Kazakhstan**" or the "**Respondent**").

4. The Claimant and the Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5. This dispute relates to Big Sky Energy Corporation's efforts to explore, develop, and exploit oil resources in western Kazakhstan, and more specifically to judicial proceedings that resulted from legal actions relating to the corporate agreements that were concluded by the Claimant in order to initiate and pursue these efforts. In addition, it should be noted that the Claimant refers in its request for arbitration to entities and individuals that are related but not party to the dispute. These include, *inter alia*, the following: KoZhaN LLP, a Kazakh limited-liability partnership, Big Sky Energy Kazakhstan Ltd., a Canadian entity, and three Kazakh oligarchs, Mr. Alexander Mashkevich, Mr. Alidzhan Ibragimov and Mr. Patoh Shodiyev.

## II. PROCEDURAL HISTORY

6. On June 19, 2017, ICSID received a request for arbitration dated the same date from Big Sky Energy Corporation against the Republic of Kazakhstan (the "**Request**").

7. On July 7, 2017, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8. The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the presiding arbitrator, to be appointed by agreement of the two co-arbitrators.

9. On November 27, 2017, the Claimant requested that the Chairman of the ICSID Administrative Council (the "**Chairman**") appoint the arbitrator not yet appointed and designate him or her to be the President of the Tribunal in this case, pursuant to Article 38 of the ICSID Convention and ICSID Arbitration Rule 4.

10. In accordance with these provisions, ICSID shall use its best efforts to comply with this request within 30 days. ICSID conducted a ballot to assist the Parties in selecting a mutually agreeable presiding arbitrator.

11. The Tribunal was composed of Dr. Michael Moser, a national of the Republic of Austria, President, appointed by agreement of the Parties; Professor Stanimir A. Alexandrov, a national of the Republic of Bulgaria, appointed by the Claimant; and Professor Rolf Knieper, a national of the Federal Republic of Germany, appointed by the Respondent.

12. On January 29, 2018, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was

therefore deemed to have been constituted on that date. Mr. Alex B. Kaplan, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

13. On January 30, 2018, the Claimant filed its Request for the Disqualification of Arbitrator Professor Rolf Knieper, with Exhibits 1 through 33 ("**Request for Disqualification**"). The proceeding was suspended in accordance with ICSID Arbitration Rule 9(6).

14. On February 26, 2018, the Respondent filed its Reply to the Claimant's Request for the Disqualification of Arbitrator Professor Rolf Knieper, with Exhibits DA R-001 through DA R-026.

15. On February 27, 2018, pursuant to ICSID Arbitration Rule 10(1), the Secretary-General informed the Parties that Dr. Michael Moser had resigned as the presiding arbitrator "due to certain unforeseen conflicts which have arisen" since his appointment. In accordance with ICSID Arbitration Rule 10(2), the proceeding remained suspended until the vacancy resulting from Dr. Moser's resignation had been filled.

16. On March 26, 2018, ICSID informed the Parties of its intention to propose to the Chairman the appointment of Professor Bernardo M. Cremades, a national of the Kingdom of Spain, as the presiding arbitrator. Without objection from the Parties, the Chairman proceeded to seek Professor Cremades' acceptance of the appointment.

17. On April 4, 2018, ICSID informed the Parties that Professor Cremades had accepted his appointment to serve as the presiding arbitrator in this case, and the vacancy created on the Tribunal following the resignation of Dr. Moser had been filled.

18. On April 9, 2018, Professor Knieper furnished explanations regarding the Request for Disqualification in accordance with ICSID Arbitration Rule 9(3).

19. On April 19, 2018, the Claimant filed its Further Observations on its Request for Disqualification of Arbitrator Professor Rolf Knieper, with Exhibits 34 and 35.

20. On May 3, 2018, Arbitrators Professor Bernardo M. Cremades and Professor Stanimir A. Alexandrov issued their Decision on Request for Disqualification of Professor Rolf

Case 25-50445-hlb Doc 27 Entered 11/05/25 11:21:51 Page 64 of 220

Knieper. In accordance with the Decision, Professor Rolf Knieper was disqualified and the proceeding remained suspended pursuant to ICSID Arbitration Rule 10(2).

21. On June 15, 2018, Judge Peter Tomka, a national of the Slovak Republic, accepted his appointment as arbitrator, appointed by the Respondent in accordance with ICSID Arbitration Rule 11(1). The proceeding was resumed pursuant to ICSID Arbitration Rule 12.

22. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on July 13, 2018 by teleconference.

23. Following the first session, on July 17, 2018, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from April 10, 2006, that the procedural language would be English, and that the place of proceeding would be London, the United Kingdom. Procedural Order No. 1 also set out a schedule for the jurisdictional and merits phase of the proceedings.

24. In accordance with Procedural Order No. 1, on September 21, 2018, the Claimant filed its Memorial on the Merits ("**Claimant's Memorial on the Merits**"), including:

- Exhibits C-0034 through C-0194;
- Legal Authorities CL-0001 through CL-0118;
- Witness Statement of Matthew Heysel, dated September 16, 2018;
- Expert Report of Asset Abzhanov (English and Russian versions), dated September 12, 2018, including Exhibits AA-0001 through AA-0057; and
- Expert Report of Paul Rathbone, dated September 21, 2018, including Exhibits PR-0001 through PR-0040 as well as Appendices A through P.

25. On October 4, 2018, the Respondent filed its Application for an Order for the Production of Documents ("**Application for Production of Documents**"), including Exhibits R-0001 through R-0005 and Legal Authorities RL-0001 through RL-0005. The Application for

Production of Documents sought documents that the Respondent believed to be related to the applicability of the denial of benefits clause in Article I(2) of the BIT.

26. On October 12, 2018, having requested and obtained leave from the Tribunal, the Claimant filed its Observations on the Respondent's Application for Production of Documents of October 4, 2018 ("**Observations on Production of Documents**"). Together with its Observations, the Claimant produced 11 documents, labelled "enclosures" 1 through 11.

27. On October 17, 2018, upon leave of the Tribunal, the Respondent filed its Response to the Claimant's Observations on Production of Documents ("**Response to Observations on Production of Documents**").

28. On October 18, 2018, the Claimant filed its brief reply to the Respondent's Response to Observations on Production of Documents.

29. On October 19, 2018, the Respondent filed its Request for Bifurcation, including Exhibits R-0006 through R-0020 and Legal Authorities RL-0006 through RL-0019, seeking to determine the applicability and effect of Article I(2) as a preliminary objection.

30. On October 23, 2018, the Tribunal issued Procedural Order No. 2, by which it granted the Respondent's Application for Production of Documents and ordered the Claimant to produce to the Respondent documents responsive to the Respondent's two requests for production by October 29, 2018.

31. On November 2, 2018, the Claimant filed its Observations on the Respondent's Request for Bifurcation, including Exhibits C-0195 through C-0207 and Legal Authorities CL-0119 through CL-0129.

32. On December 5, 2018, the Tribunal issued its Decision on the Respondent's Request for Bifurcation (the "**Bifurcation Decision**"), which forms part of this Award. In the Bifurcation Decision, the Tribunal denied the Respondent's Request for Bifurcation and reserved costs for a later decision.

33. On March 29, 2019, the Respondent filed its Memorial on Jurisdiction and Counter-Memorial on the Merits ("**Respondent's Memorial on Jurisdiction and Counter-**

**Memorial on the Merits**" or "**Respondent's Counter-Memorial**") and Quantum, including:

- Expert Report of Dr. Miras Daulenov on the Substantive Law of the Republic of Kazakhstan, dated March 28, 2019, with Exhibits MD-0001 through MD-0024;[1]

- Expert Report of Associate Professor Dr. Fatima Aidarovna Tlegenova on Civil Procedural Law of Kazakhstan (Russian and English versions), dated March 28, 2019, with FT-0001 through FT-0020;[2]

- First Expert Report of John Fisher of PwC, dated March 29, 2019, with Exhibits PwC-0001 through PwC-0032;[3]

- Expert Report of Dr. John W. Hornbrook of DeGolyer and MacNaughton, dated March 29, 2019, with Exhibits DM-0001 through DM-0008;[4]

- Exhibits R-0021 through R-0166; and

- Legal Authorities RL-0020 through RL-0060.

34. In accordance with Section 15 of Procedural Order No. 1 and the Procedural Timetable (as revised by email of March 18, 2019), each Party first served on the other Party a request for the production of documents in the form of a Stern Schedule. Next, each Party set forth its objections to the other Party's requests for documents, using the Stern Schedule provided by the other Party.

35. On May 10, 2019, each Party set forth its reply to the other Party's objections to production, using the same Stern Schedules. On the same date, each Party submitted its Redfern Schedule to the Tribunal, together with a cover letter offering general observations on the document requests.

---

1 Exhibits MD-0001 through MD-0024 are also labelled as R-83 through R-106.

2 Exhibits FT-1 through FT-20 are also labelled as R-107 through R-126.

3 Exhibits PwC-1 through PwC-32 are also labelled as R-127 through R-158.

4 Exhibits DM-0001 through DM-0008 are also labelled as R-159 through R-166.

36. On May 22, 2019, the Tribunal issued Procedural Order No. 3 concerning production of documents.

37. On July 5, 2019, the Claimant filed a request for the Tribunal to decide on production of documents, including Annexes A through M.

38. On July 8, 2019, the Respondent filed a request for the Tribunal to decide on production of documents, including Exhibits R-0167 through R-0174 and Legal Authorities RL-0061 through RL-0063.

39. On July 15, 2019, the Respondent filed observations on the Claimant's request for the production of documents of July 5, 2019.

40. On July 16, 2019, the Tribunal issued its ruling on the Claimant's request of July 5, 2019.

41. On July 19, 2019, the Claimant filed its Counter-Memorial on Preliminary Objections and Reply on the Merits ("**Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits**" or "**Claimant's Reply**"), including:

- Second Expert Report of Professor Asset Abzhanov (Russian and English versions), dated July 18, 2019 with resubmitted Exhibits AA-0001 through AA-0005, AA-0010 through AA-0012, and AA-0014 through AA-0017, as well as Exhibits AA-0058 through AA-0088;

- Expert Report of Andrew Spriggs, dated July 19, 2019 with Exhibits AS-0001 through AS-0026;

- Second Witness Statement of Matthew Heysel, dated July 19, 2019;

- Second Expert Report of Paul Rathbone, dated July 19, 2019, with revised Exhibit PR-0034 and Exhibits PR-0041 through PR-0069, revised Appendices E, I, K, L, M and P as well as Appendices Q, S.4, S.5, T and U;

- Exhibits C-0208 through C-0342; and

- Legal Authorities CL-0130 through CL-0179.

42. On July 26, 2019, the Claimant filed observations on the Respondent's request for the production of documents of July 8, 2019.

43. On the same date, the Claimant requested that the Tribunal reconsider its ruling of July 16, 2019 on the Claimant's request for the production of documents.

44. On July 30, 2019, the Tribunal issued its ruling on the Respondent's request for production of documents of July 8, 2019.

45. On the same date, the Tribunal issued its ruling on the Claimant's request of July 26, 2019, by which it declined to reconsider its ruling of July 16, 2019.

46. On November 22, 2019, the Tribunal issued a ruling on the Claimant's and the Respondent's further requests for production of documents of November 8, 2019 and November 15, 2019.

47. On December 20, 2019, the Respondent filed its Reply on Jurisdiction and Rejoinder on the Merits and Quantum (the "**Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum**" or "**Respondent's Rejoinder**"), including:

- Witness Statement of Daniyar Maratovich Abulkhairov, dated December 19, 2019;

- Joint Expert Report of Associate Professor Doctor Fatima Aidarovna Tlegenova and Assistant Professor Doctor Rinat Kashifovich Mukhamedshin on Civil Procedural Law of Kazakhstan (Russian and English versions), dated December 20, 2019, with resubmitted Exhibits FT-0001, FT-0004 and FT-0015, and Exhibits FT-0021 through FT-0056;

- Joint Expert Report of Professor Iskander Zhanaidarov and Dr Miras Daulenov on the Substantive Law of the Republic of Kazakhstan (Russian and English versions), dated December 17, 2019, with resubmitted Exhibits MD-0001, MD-0002, MD-0008, MD-0017, MD-0019, MD-0022 and MD-0023, and Exhibits MD-0025 through MD-0057;

- Second Expert Report of Dr. John W. Hornbrook, dated December 19, 2019, with Exhibits DM-0009 through DM-0052;

- Second Expert Report of John Fisher of PwC, dated December 20, 2019, with Appendices 2.1, 2.1, 2.3, 7.1 and 8.1, and Exhibits PwC-0033 through PwC-0100;

- Expert Report of Associate Professor Sergey Pen on the Criminal Law of the Republic of Kazakhstan, dated December 17, 2019, with Exhibits SP-0001 through SP-0014;

- Resubmitted Exhibits R-0083, MD-0001, R-0084/MD-0002, R-0090/MD-0008, R-0099/MD-0017, R-0101/MD-0019, R-0104/MD-0022, R-0105/MD-0023, R-0107/FT-0001, R-0110/FT-0004 and R-0121/FT-0015;

- Exhibits R-0175 through R-0504; and

- Legal Authorities RL-0065 through RL-0097.

48. On February 7, 2020, the Claimant filed its Rejoinder on Preliminary Objections (the "**Claimant's Rejoinder on Jurisdiction**"), including Exhibits C-0343 through C-0396 and Legal Authorities CL-0180 through CL-0185.

49. On February 14, 2020, the Parties notified each other of the witnesses and experts called for cross-examination.

50. On February 28, 2020, the President of the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

51. On the same date, the Tribunal issued Procedural Order No. 4 concerning the organization of the hearing. At the time, the hearing was scheduled to be held in London, from April 27 to May 5, 2020.

52. On February 23, 2020, the Claimant requested that the Tribunal order the Respondent to produce a series of documents referred to in its Rejoinder and to call Mr. Alexander Ogai ("**Mr. Ogai**") as a witness in this arbitration for examination at the hearing.

53. On March 13, 2020, the Tribunal invited the Parties to express any concerns and/ or proposals they might have on the organization of the hearing because of the Coronavirus situation. After reviewing the Parties' comments and proposals, the Tribunal decided that

the hearing would not be held from April 27 to May 5, 2021 as originally scheduled, and that it would be re-scheduled for January 2021.

54. On April 3, 2020, the Tribunal decided that Mr. Ogai would appear as a witness called by the Tribunal in the hearing and established the conditions for the testimony of Mr. Ogai.

55. On October 5, 2020, the ICSID Secretary-General informed the Parties and the Tribunal that Dr. Jonathan Chevry, ICSID Legal Counsel, would replace Mr. Alex B. Kaplan to serve as Secretary of the Tribunal in this case going forward.

56. Upon review of the Parties' respective communications in relation to hearing organization, on October 14, 2020, the Tribunal confirmed that the hearing would be organized remotely from January 4, 2021 through January 12, 2021 (including Saturday and Sunday).

57. On October 19, 2020, the Respondent requested that the Tribunal permit it to file additional documents, comprising (i) corrected translations of existing Respondent's Kazakh law Exhibits R-0344 and R-0347; (ii) new Exhibits R-0516 through R-0521; and (iii) two new Legal Authorities RL-0098 and RL-0099.

58. On October 21, 2020, the Claimant sought leave from the Tribunal to submit six additional documents to the record, comprising (i) full / published versions of two existing Exhibits AA-30 and AA-99; (ii) two new Exhibits AA-101 and AA-102; (iii) a corrected translation of existing Claimant's Exhibit C-0066; and (iv) a new Legal Authority CL-0186.

59. On October 22, 2020, the Parties confirmed that they did not object to each other's application to add new documents to the record. On the same date, the Tribunal granted the Parties' respective requests.

60. On December 5, 2020, the Tribunal issued Procedural Order No. 5, enclosing a protocol for the upcoming hearing to be held virtually from January 4 to 12, 2021.

61. A hearing on jurisdiction and the merits was held remotely, from January 4 to 12, 2021 (the "**Hearing**"). The following persons were present at the Hearing:

Case 25-50445-hlb Doc 35-5 Entered 11/05/25 11:21:54 Page 19 of 220

*Tribunal*:

| | |
|---|---|
| Professor Bernardo M. Cremades | President of the Tribunal |
| Professor Stanimir Alexandrov | Arbitrator |
| Judge Peter Tomka | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Dr. Jonathan Chevry | Secretary of the Tribunal |

*For the Claimant*:

| | |
|---|---|
| Mr. Stephen Fietta | Counsel, Fietta |
| Mr. Ashique Rahman | Counsel, Fietta |
| Ms. Laura Rees-Evans | Counsel, Fietta |
| Mr. Oonagh Sands | Counsel, Fietta |
| Ms. Miglena Angelova | Counsel, Fietta |
| Mr. Sam Winter-Barker | Counsel, Fietta |
| Mr. Xiao Wang | Counsel, Fietta |
| Ms. Jane Byne | Paralegal, Fietta |
| Ms. Sylvia Yanzu | Legal Assistant, Fietta |
| Mr. Alexey Bukhtiyarov | Kazakh Law Consultant |
| Mr. Scott Lawler | Party representative |

*For the Respondent*:

| | |
|---|---|
| Ms. Belinda Paisley | Counsel, Reed Smith |
| Ms. Chole Carswell | Counsel, Reed Smith |
| Ms. Azhar Kuzutbayeva | Counsel, Reed Smith |
| Ms. Dina Nazargalina | Counsel, Reed Smith |
| Mr. Lucian Ilie | Counsel, Reed Smith |
| Ms. Lucie Winnington-Ingram | Counsel, Reed Smith |
| Ms. Olga Kacprzak | Counsel, Reed Smith |
| Ms. Heather Stewart | Counsel, Reed Smith |
| Ms. Galiya Mustafina | Counsel, Reed Smith |
| Mr. Aitmaganbet Ospanbekov | Counsel, Reed Smith |
| Mr. Mansur Nurlybayev | Counsel, Reed Smith |
| Mr. Sam Wordsworth | Counsel, Essex Court Chambers |
| Mr. Paul Wee | Counsel, 3 Verulam Building |
| Ms. Esme Shirlow | Consultant – ANU College of Law |
| | |
| Mr. Talgat Tatubayev | Party representative, Ministry of Justice |
| Mr. Sultan Seidalin | Party representative, Ministry of Justice |
| Mr. Dastan Smagulov | Party representative, Ministry of Justice |
| Ms. Aliya Essenbayeva | Party representative, Ministry of Justice |

*Court Reporters*:

| | |
|---|---|
| Mr. Trevor McGowan | Court Reporter |
| Ms. Georgina Vaughn | Court Reporter |
| Ms. Anne-Marie Stallard | Court Reporter |

*Interpreters*:

| | |
|---|---|
| Ms. Julia Poger-Guichot de Fortis | Interpreter |
| Ms. Helena Bayliss | Interpreter |
| Ms. Elena Edwards | Interpreter |

62. During the Hearing, the following persons were examined:[5]

*On behalf of the Claimant*:

| | |
|---|---|
| Mr. Matthew Heysel | Witness |
| Professor Asset Abzhanov | Expert |
| Mr. Andy Spriggs | Expert |
| Mr. Paul Rathbone | Expert |

*On behalf of the Respondent*:

| | |
|---|---|
| Mr. Daniyar Abulkhairov | Witness |
| Mr. John Hornbrook | Expert |
| Mr. John Fisher | Expert |
| Mr. Sergey Pen | Expert |
| Mr. Miras Daulenov | Expert |
| Ms. Fatime Tlegenova | Expert |

*Witness called by the Tribunal*:

| | |
|---|---|
| Mr. Alexander Ogai | Witness called by the Tribunal |

63. The Parties submitted their joint corrections to the transcript on January 27, 2021.[6]

64. The Parties filed their respective statements on costs on February 9, 2021.

---

5 This list includes only the names of the experts who testified at the Hearing and omits the partners, associates, and collaborators of these experts (or of their firms).

6 The Tribunal has used the Parties' agreed corrections when reviewing the transcript in the preparation of this Award, as well as when citing or quoting from the transcript in this Award.

65. On October 15, 2021, the Claimant filed an updated statement on costs.

66. The proceeding was closed on October 26, 2021.

## III. FACTUAL BACKGROUND

67. This section summarizes the factual background of the dispute that gave rise to this arbitration. It does not purport to be exhaustive and is meant to provide a general overview of the key facts and factual allegations to put the Tribunal's analysis in proper context.

68. As further developed below, there is a general level of agreement between the Parties regarding the general timeline of the Claimant's investment in Kazakhstan and about the underlying factual background to this investment (**Section A.**). The Parties however disagree on the handling of the court proceedings relating to the corporate agreements concluded by a company owned by the Claimant in order to undertake its operations in Kazakhstan (**Section B.**).

### A. General Factual Background

69. The dispute relates to the Claimant's investment in KoZhan LLP ("**Kozhan**"), a Kazakh company that owned since 2003 licenses to explore, develop and exploit a number of oil fields in western Kazakhstan.

70. The present section focuses on (i) the main actors to the factual matrix underlying this dispute, (ii) the background to the Claimant's investment in Kazakhstan, (iii) the general timeline of the court proceedings (although the exact content of the court proceedings is addressed in more detail below), and (iv) the factual events that occurred after the proceedings and the sale of Kozhan to third parties.

#### (1) Main Actors

71. The Annex to the Claimant's Reply contains a *dramatis personae* for this case.[7] The Annex refers to 74 natural persons and 16 legal entities. Not all these persons or entities are

[7] Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, Annex.

directly relevant to the Tribunal's analysis of the facts of this case and, as a result, they do not need to be all presented here. The following developments address only the main actors that the Tribunal considers to be directly relevant to the factual background of the dispute.

***a. Big Sky Energy Corporation***

72. Big Sky Energy Corporation, or Big Sky (also referred to as "**Big Sky US**" by the Respondent, and on occasions by the Claimant as well), the Claimant, is a company that was incorporated in Nevada, USA, on February 9, 1993. It was originally named "Institute for Counselling INC", and after several name changes throughout its history, its name was ultimately changed to Big Sky Energy Corporation on December 9, 2004.[8] Mr. Matthew Heysel was the Chairman of the Board of Directors from April 2000 to June 2009, and CEO of the Claimant from April 2000 to March 2005.[9] The present Sole Director of Big Sky is Mr. Scott Lawler.

73. Mr. Heysel incorporated Big Sky Energy Kazakhstan ("**BSEK**") in July 2003 as a special purpose vehicle to be owned by the Claimant, with expectations that the Claimant would acquire and fund Kozhan, further to BSEK's acquisition of the rights to exploit the oil fields from Kozhan.[10]

74. The Claimant claims to have contributed in non-pecuniary ways to the development of Kozhan through providing international oil industry management expertise and know-how.[11]

***b. BSEK***

75. BSEK (also referred to as "**Big Sky Canada**" by the Respondent) is a company that was incorporated under the laws of Alberta, Canada, on July 29, 2003.[12] BSEK is presented as being wholly owned by the Claimant.[13]

---

8 Claimant's Memorial on the Merits, ¶¶ 4, 20.

9 Claimant's Memorial on the Merits, ¶ 23.

10 Claimant's Memorial on the Merits, ¶ 52.

11 Claimant's Memorial on the Merits, ¶ 69.

12 Claimant's Memorial on the Merits, ¶ 24.

13 Claimant's Memorial on the Merits, ¶¶ 5, 24.

76. On August 11, 2003, BSEK concluded a Sale and Purchase Agreement (the "**2003 SPA**") with five Kazakh nationals who owned Kozhan at that time (the "**Original Owners**").[14] Pursuant to this SPA, BSEK acquired 90% of the Original Owners' collective interest in Kozhan.[15] BSEK further signed the 2005 Sale and Purchase Agreement ("**2005 SPA**") with the Original Owners, pursuant to which it acquired the remaining 10% collective interest in Kozhan.[16]

77. Further to the conclusion of the 2003 SPA, BSEK entered into loan agreements with Kozhan in order to finance, among other things, the fees that were associated with the acquisition of the licenses and which had to be paid to the Kazakhstan Ministry of Energy and Mineral Resources ("**MEMR**"),[17] and Kozhan's operating costs.[18] These loan agreements included a loan agreement dated October 17, 2003,[19] a line of credit agreement dated December 1, 2003,[20] and a line of credit agreement dated December 14, 2004. The December 14, 2004 loan agreement (the "**2004 Line of Credit Agreement**") was amended a number of times between 2004 and 2006, resulting in the increase of the credit to USD 50 million.[21]

78. As further developed below, the dispute in this Arbitration concerns the conduct and consequences of various court proceedings relating to the validity of the 2003 SPA and the 2005 SPA, including a legal action initiated by the spouses of the Original Owners. BSEK was respondent in the action filed by the Original Owners' spouses (*see infra*).[22] BSEK also filed criminal complaints against the Original Owners and their spouses to the General Prosecutor, Chief Finance Police and Chief of Agency on Internal Affairs for Fraud.[23]

---

14 Claimant's Memorial on the Merits, ¶¶ 4, 5, 56.

15 Claimant's Memorial on the Merits, ¶¶ 4, 5, 56.

16 Claimant's Memorial on the Merits, ¶¶ 5, 87.

17 Claimant's Memorial on the Merits, ¶ 67.

18 Claimant's Memorial on the Merits, ¶ 68.

19 Claimant's Memorial on the Merits, ¶ 67.

20 Claimant's Memorial on the Merits, ¶ 68.

21 Claimant's Memorial on the Merits, ¶ 68; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 39.

22 Claimant's Memorial on the Merits, ¶¶ 104-204.

23 Claimant's Memorial on the Merits, ¶ 222.

Case 25-50445-hlb Doc 35 Entered 11/05/25 12:13:54 Page 74 of 220

79. Also in dispute is the conduct of the Kazakh courts in the proceeding resulting from BSEK's attempt to recover from Kozhan a part of the funds loaned under the 2004 Line of Credit Agreement.[24]

### *c. KoZhan LLP (Kozhan)*

80. Kozhan is a limited liability partnership established on April 28, 2001 under the laws of Kazakhstan and founded by five Kazakh nationals (i.e. the Original Owners – *see infra*).[25]

81. Shortly after its establishment, Kozhan successfully acquired rights from the MEMR in relation to the exploration, development, and exploitation of three oil fields in Western Kazakhstan – the Morskoye, Karatal and Dauletaly fields (the "**Oil Fields**") – through the conclusion of three subsoil use contracts with the MEMR (the "**Subsoil Use Contracts**").[26]

82. Kozhan was also a party to two agreements signed with the Kazakh construction company ABT Ltd. LLP – the "**2004 ABT Agreement**" and "**the 2004 Transfer Agreement**." Under these agreements, ABT undertook to perform construction works and to finance certain drilling works required on the Morskoye oil field.[27] In return, Kozhan transferred 45% of the rights to explore and exploit the Morskoye field to ABT.[28] Kozhan also executed the 2006 ABT Agreement with the Claimant and ABT Ltd. LLP (the "**2006 ABT Agreement**"), which replaced the 2004 agreements, wherein it undertook to make certain payments and repay loans to ABT.[29]

### *d. The Original Owners and their Spouses*

83. The Original Owners are the five founding partners of Kozhan, namely:

- Mr. Bolat Mukashev;

---

24 Claimant's Memorial on the Merits, ¶¶ 250-251.

25 Claimant's Memorial on the Merits, ¶ 36.

26 Claimant's Memorial on the Merits, ¶ 37-39.

27 Claimant's Memorial on the Merits, ¶ 78-79.

28 Claimant's Memorial on the Merits, ¶ 79.

29 Claimant's Memorial on the Merits, ¶ 91; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 51.

- Mr. Garifolla Kaschapov;
- Mr. Kadyr Baikenov;
- Mr. Ruslan Faskhutdinov; and
- Ms. Turgan Asanova.[30]

84. Each of these five individuals had a 20% interest in Kozhan.[31] As indicated above, on August 11, 2003, BSEK concluded a Sale and Purchase Agreement with the Original Owners.[32] The SPA was signed by Mr. Mukashev on behalf of all the Original Owners, and Mr. Yang, BSEK's president at the time.[33]

85. In August and September 2006, four of the Original Owners' spouses initiated legal actions against BSEK, requesting the court to invalidate the 2003 SPA on the ground that they had not provided their notarized consent to their spouses selling their interest in Kozhan. These were Ms. Roza Gumarovna Faskhutdinova, spouse of Mr. Mukashev, Ms. Radina Faskhutdinova, spouse of Mr. Faskhutdinov, Ms. Zhanat Faizullayeva, spouse of Mr. Kaschapov and Mr. Shyngskhan Seidagaliev, spouse of Ms. Asanova.[34] While the fifth spouse (Ms. Bayansulu Teleugalievna Tulegenova, spouse of Mr. Kadyr Baikenov) did not initiate a claim against BSEK at the same time as the other four spouses in August-September 2006, she later joined the proceedings.[35]

---

30 Claimant's Memorial on the Merits, ¶ 36; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 16.

31 Claimant's Memorial on the Merits, ¶ 36.

32 Claimant's Memorial on the Merits, ¶ 56, Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 25.

33 Claimant's Memorial on the Merits, ¶ 57.

34 Claimant's Memorial on the Merits, ¶¶ 104-114.

35 Claimant's Memorial on the Merits, ¶¶ 115, 175; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 137.

86. Several of the Original Owners were also involved in separate legal proceedings that are relevant to this Arbitration, including claims relating to other agreements concluded further to the acquisition of Kozhan by BSEK.[36]

### *e. The Kazakhstan Ministry of Energy and Mineral Resources (the MEMR)*

87. The MEMR is the Respondent's central executive body responsible for the regulation of oil operations and oil products in Kazakhstan. The MEMR carries out the function of forming and implementing national policy relating to oil and gas and of coordinating the management process of oil and gas projects in the country.[37]

88. On February 17, 2003, the MEMR signed three Subsoil Use Contracts with Kozhan for the exploration and production of hydrocarbons at the Oil Fields.[38] Pertinent to the case's background are also several orders that the MEMR issued further to the conclusion of the Subsoil Use Contracts, including the suspension order dated March 18, 2005, the termination order of October 5, 2005, and the reinstatement order of January 18, 2006.[39]

### *f. The Kazakh Courts*

89. This Arbitration relates to the conduct of judicial proceedings concerning the corporate agreements concluded between BSEK and Kozhan for the use of the rights to exploit the oil fields. The proceedings relevant to this case occurred before several organs of the Kazakh judicial system, including (i) the Bostandyk District Court, (ii) the Court of Appeal of the Almaty City Court, (iii) the Supervisory Collegium of the Almaty City Court, and (iv) the Supervisory Collegium of the Kazakh Supreme Court.

### *g. ABT*

90. ABT Ltd. LLP ("**ABT**") is a Kazakh construction company.[40] ABT concluded two agreements with Kozhan in 2004: the 2004 ABT Agreement and the 2004 Transfer

---

[36] Claimant's Memorial on the Merits ¶ 254; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98(b).

[37] Claimant's Memorial on the Merits, ¶ 31.

[38] Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 20.

[39] Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 44(b) and 46; fn. 77.

[40] Claimant's Memorial on the Merits, ¶ 74.

Agreement. These two agreements aimed to finance and build infrastructure required for the operation of one of the Oil Fields.[41] These agreements were terminated in 2006 and replaced with the 2006 ABT Agreement.[42] Under the 2006 ABT Agreement, Kozhan agreed to (i) repay the loan provided by ABT to Kozhan under the 2004 ABT Agreement, (ii) pay for the construction works performed by ABT, (iii) pay a sum of money in consideration for ABT's waiver of its right to the 45% interest in the Morskoye Oil Field.[43] Big Sky, for its part, undertook to transfer a 9.7% stake of its share ownership to ABT.[44] This transfer further resulted in a loan agreement between Big Sky and Kozhan, whereby Kozhan would become indebted towards the Claimant for the amount corresponding to the value of the stake transferred from Big Sky to ABT (the "**2006 Loan Agreement**").[45]

91. As further explained below, in 2008, two of the Original Owners filed a claim before the District Court against Big Sky, BSEK, ABT and Kozhan seeking the invalidation of the 2004 and 2006 ABT Agreements.[46] ABT filed a counterclaim, seeking to invalidate the 2006 ABT Agreement on the ground that it was misled as to the values of the share it had acquired from Big Sky. The proceeding resulted in Big Sky owing a judgment debt of approximately USD 27 million to ABT.[47]

### *h. The "Three Oligarchs"*

92. According to the Claimant, the proceedings against BSEK by the Original Owners and their spouses were part of an illicit scheme orchestrated by three influential Kazakh individuals. These individuals (referred to as the "**Three Oligarchs**" by the Claimant) are:

---

41 Claimant's Memorial on the Merits, ¶ 78; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 40-42.

42 Claimant's Memorial on the Merits, ¶¶ 90-93; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 51.

43 Claimant's Memorial on the Merits, ¶¶ 90-93; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 51.

44 Claimant's Memorial on the Merits, ¶¶ 90-93; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 51.

45 Claimant's Memorial on the Merits, ¶ 93; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 51.

46 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98.

47 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98(b).

- Mr. Alexander Antonovich Mashkevich;
- Mr. Patoh Shodiyev; and
- Mr. Alidzhan Ibragimov.[48]

93. The Parties refer in their submissions to several legal persons, that are either owned by Messrs. Mashkevich, Shodiyev and Ibragimov, or in which they have a financial interest. According to the Claimant, these legal persons are also connected, either directly or indirectly, to the Respondent.[49] These legal persons include, *inter alia*:

- Eurasia Financial Industrial Company JSC ("**EFIC**"), a company whose help the Claimant enlisted regarding a separate investment.[50] According to the Claimant, it was through this engagement that the Three Oligarchs came to be aware of the Claimant's investment in Kozhan.[51]
- KGC Incorporated Limited Liability Partnership ("**KGC**"), an entity with alleged links to the Three Oligarchs and the Original Owners. According to the Claimant, this company was part of the alleged illicit scheme to take Kozhan from BSEK.[52]
- **IntEnt LLP**, another entity with alleged links to the Three Oligarchs and the Original Owners. According to the Claimant, this company was part of the alleged illicit scheme to take Kozhan from BSEK.[53]
- Eurasian Natural Resources Corporation Limited (or "**ENRC**"), which later was acquired by, and became known as, European Resources Group (or "**ERG**"), a mining company allegedly co-founded by the Three Oligarchs, and in which the Respondent had a financial interest. According to the Claimant, this company was part of the alleged illicit scheme to take Kozhan from BSEK.[54]
- International Mineral Resources II B.V. (or "**IMR II BV**" or "**IMR**"), a Dutch company, allegedly owned by the Three Oligarchs, which acquired Kozhan in

---

48 Claimant's Memorial on the Merits, ¶ 7. The Tribunal notes that Mr. Ibragimov died in February 2021.

49 Claimant's Opening Statement, Presentation on "Eurasia, the Three Oligarchs and their Close ties to Respondent" at Slide 2.

50 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 25.

51 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 29.

52 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 34-42.

53 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 32-45.

54 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 114-120.

2010.[55] According to the Claimant, this acquisition was one of the final steps of the illicit scheme to take Kozhan from BSEK.

94. In its opening presentation at the Hearing, the Claimant presented the following chart to illustrate the alleged connections between the Three Oligarchs, the various entities they owned or controlled, the Original Owners, and Kazakhstan:[56]




95. The Respondent refutes the Claimant's allegations of collusion between the Three Oligarchs and Kazakhstan.[57] The Respondent submits that the Claimant's allegations that the Three Oligarchs, the Original Owners and Kazakhstan were involved in an illicit scheme the main purpose of which was to deprive the Claimant of its investment is not supported by evidence.[58]

---

55 Claimant's Memorial on the Merits, ¶¶ 314-315; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 47.

56 Claimant's Opening Presentation, "Eurasia, the Three Oligarchs and their Close Ties to the Respondent," p. 2.

57 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 19-20.

58 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 19-20.

### *i. The Office of the General Prosecutor and the National Security Committee*

96. In Kazakhstan, one of the functions of public prosecutors is to supervise the accurate and uniform application of laws in civil proceedings on behalf of the State.[59] Public prosecutors may therefore play a role in appellate proceedings by filing a "protest" in respect of any court decision they consider wrong in law.[60]

97. As further explained below, the Office of the General Prosecutor became involved in the SPA proceedings, by exercising its statutory power to suspend the execution of decisions issued by Kazakh courts, after BSEK unsuccessfully appealed these decisions.[61] The Office of the General Prosecutor also filed a protest to the Collegium of the Supreme Court of Kazakhstan seeking to reverse some of the decisions issued in the SPA proceedings.[62]

98. Further, the Office of the General Prosecutor opened a criminal investigation against the Original Owners and their spouses in 2008 in response to BSEK's complaints and referred the matter to the National Security Committee for preliminary investigation.[63]

99. The National Security Committee is a special State body under the direct authority of the President of Kazakhstan tasked with overseeing issues related to national security, intelligence coordination and defense strategy.[64]

100. The National Security Committee started investigating the criminal complaint filed by BSEK against the original owners after the file was transmitted to it by the Office of the General Prosecutor. The National Security Committee issued a ruling that the criminal case should be closed due to the absence of the element of crime.[65]

---

59 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 84-85.

60 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 84-85.

61 Claimant's Memorial on the Merits, ¶ 213; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 192.

62 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 193-199; Claimant's Memorial on the Merits, ¶ 214.

63 Claimant's Memorial on the Merits, ¶ 223; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 200.

64 Claimant's Memorial on the Merits, ¶ 33.

65 Claimant's Memorial on the Merits, ¶ 244; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 212.

### *j. Mr. Ogai*

101. Mr. Ogai was, at the relevant time, Head of Department at the General Prosecutor's Office and was the person in charge of the investigation against the Original Owners in response to BSEK's complaints.[66]

102. Along with its Rejoinder, the Respondent produced five exhibits (R-179 to R-183) that allegedly constituted the "complete criminal files" from the investigations carried out by the Office of the General Prosecutor and the National Security Committee (the "**Criminal Files**").[67] According to the Claimant, the exhibits produced by the Respondent were incomplete. The Claimant therefore wrote to the Respondent on February 7, 2020 inviting it to produce the complete record of the Criminal Files.[68] The Respondent refused to produce additional documents and, as a result, the Claimant requested on February 23, 2020 an order from the Tribunal requiring the Respondent to produce the complete record of the Criminal Files and to call Mr. Ogai as a witness in this arbitration for examination at the Hearing (or another appropriate person if Mr. Ogai was not available) "to testify as to the Respondent's knowledge of, and complicity in, the [i]llicit [s]cheme that led to the taking of the Claimant's investment in Kozhan."[69] By letter of February 27, 2020, the Tribunal decided to order the Respondent to produce the evidence allegedly missing from the Criminal Files, and that, if this evidence could not be produced, the Tribunal would call Mr. Ogai as a witness in the Hearing.[70]

103. By letter of April 3, 2020 the Tribunal decided that Mr. Ogai would appear as a witness called by the Tribunal in the Hearing and established the conditions for his testimony.[71]

104. Mr. Ogai was present at the Hearing and testified pursuant to the conditions established by the Tribunal in consultation with the Parties.

---

66 Letter from the Claimant to the Tribunal, dated February 23, 2020, pp. 8-9.

67 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 54-55.

68 Letter from the Claimant to the Respondent, dated February 7, 2020; Letter from the Claimant to the Tribunal, dated February 23, 2020.

69 Letter from the Claimant to the Tribunal, dated February 23, 2020.

70 Letter from the Tribunal to the Parties, dated February 27, 2020.

71 Letter from the Tribunal to the Parties, dated April 3, 2020.

### (2) Background to the Claimant's Investment in Kazakhstan

105. The dispute finds its origin in the Claimant's acquisition in 2003 of Kozhan, a Kazakh company which held the rights to explore, develop and exploit the three Oil Fields in western Kazakhstan.[72]

106. Kozhan had acquired these rights after a successful bidding campaign which started in 2001 and which successfully ended in 2003 with the conclusion of three subsoil use contracts with the MEMR for the exploration and production of hydrocarbons at the Oil Fields (i.e., the Subsoil Use Contracts).[73] Pursuant to the Subsoil Use Contracts, Kozhan obtained explorations right, for an initial period of six years, and production rights for an initial period of 25 years.[74] In exchange, the Contracts contained a series of financial obligations for Kozhan, including: the payment of signature bonuses to the MEMR totaling USD 1 million;[75] the obligation to invest several tens of millions of dollars (for each contract) for the exploration and production of the Oil Fields throughout the duration of the contracts;[76] and financial participation in social programs in the region.[77]

107. The chronology of the Claimant's acquisition of Kozhan is described in Mr. Heysel's first witness statement.[78] In brief, according to Mr. Heysel and the Claimant, neither the Original Owners nor Kozhan had the financial capacity to fulfil the obligations contained in the Subsoil Use Contracts and therefore needed external financial support. Mr. Heysel was approached by Kozhan shortly after the Contracts were signed and, after an initial review of these Contracts and of geological and technical data relating to the Oil Fields, he started to look for potential funders in order to secure the financing that would be required

---

72 Claimant's Memorial on the Merits, ¶ 36.

73 See *supra*, ¶ 81.

74 Claimant's Memorial on the Merits, ¶ 20.

75 Claimant's Memorial on the Merits, ¶ 41; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 21.

76 The Parties do not agree on the exact amount of these required investments. The Claimant refers to a total investment of USD 69 million, while the Respondent refers to required expenditures of USD 5.1 million during the exploration period and a total expenditure of USD 40 million over the life of the contract. See Claimant's Memorial on the Merits, ¶ 41, and Respondent's Counter-Memorial on the Merits, ¶ 21.

77 Claimant's Memorial on the Merits, ¶ 40; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 20-21.

78 Heysel First Witness Statement.

to invest in Kozhan.[79] Mr. Heysel approached Big Sky and received a positive response. He incorporated BSEK in July 2003 "as a special purpose vehicle to be owned by Big Sky US."[80]

108. Following completion of due diligence work, on August 11, 2003, BSEK entered into the 2003 SPA with the Original Owners. Pursuant to this SPA, BSEK acquired 90% of the Original Owners' collective interest in Kozhan. In exchange, BSEK undertook to allow Kozhan to honor its commitments with the MEMR by sharing expenses associated with Kozhan's operations in direct proportion to owned interest, by "assist[ing] with western style expertise of management," and by providing assistance for the purchase of the western equipment required for Kozhan's operations.[81]

109. After the conclusion of the SPA, on January 12, 2004, Big Sky acquired BSEK and thus became an indirect owner of the 90% interest in the capital of Kozhan.[82]

110. The Parties' respective accounts of the factual narrative start to substantially differ after the conclusion of the SPA. According to the Claimant, Big Sky made substantial financial contribution and other contributions to Kozhan following the 2003 SPA.[83] These contributions allowed Kozhan to commence exploration development and exploitation of the Oil Fields in 2004.[84] As part of the Claimant's investment strategy, Kozhan entered into the 2004 ABT Agreement and the 2004 Transfer Agreement with ABT.[85] It acquired the Original Owners' remaining 10% interest in Kozhan via the 2005 SPA,[86] and continued to explore, develop and exploit the Oil Fields.[87] The Claimant explains that the termination of the 2004 ABT Agreement and the 2004 Transfer Agreement and their replacement with

---

79 Claimant's Memorial on the Merits, ¶¶ 45-52; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 23-24.

80 Heysel First Witness Statement, ¶ 35.

81 Claimant's Memorial on the Merits, ¶ 61.

82 Claimant's Memorial on the Merits, ¶ 63; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 35.

83 Claimant's Memorial on the Merits, ¶¶ 64-70.

84 Claimant's Memorial on the Merits, ¶¶ 71-73.

85 Claimant's Memorial on the Merits, ¶¶ 74-80.

86 Claimant's Memorial on the Merits, ¶¶ 81-88.

87 Claimant's Memorial on the Merits, ¶ 89.

the 2006 ABT Agreement was planned.[88] According to the Claimant, Kozhan's growing success drew the attention of the Original Owners, who decided to establish a plan or "illicit scheme" to take back Kozhan from BSEK.[89]

111. The Respondent tells a different story, insisting on the difficulties that the Claimant faced in the early years of its management of Kozhan.[90] According to the Respondent, under the Claimant's management, Kozhan failed to honor its commitments under the Subsoil Use Contracts and, as a result, the MEMR suspended these Contracts and later terminated two of these Contracts.[91] Because of the Claimant's mismanagement and lack of resources, Kozhan was constrained to accumulate substantial debt and was running the risk that the other Subsoil Use Contracts would not be extended beyond their initial 6 year exploration period, and that these Contracts would, in fact, be terminated.[92]

### (3) The Court Proceedings

112. At the heart of this Arbitration are the outcomes of four court proceedings relating to several of the instruments concluded by the Claimant for the purpose of its investment in Kazakhstan. Each of these four proceedings followed a relatively complex chronology, with several decisions issued by courts at different levels, some of them being interrelated, some of them being upheld, and others being reversed.[93] These four proceedings are discussed at length below. The purpose of the present section is simply to draw the basic chronology of these four proceedings.

113. The first proceedings (the "**2003 SPA Proceedings**") concern the claim filed by the Original Owners' spouses in August and September 2006 with the Bostandyk District Court seeking the invalidation of the 2003 SPA on the ground that the Original Owners had not obtained notarized spousal consent to sell jointly owned marital property, as

---

88 Claimant's Memorial on the Merits, ¶¶ 90-96.

89 Claimant's Memorial on the Merits, ¶¶ 97-103.

90 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 36.

91 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 45-49.

92 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 685.

93 See the Claimant's 15-page "Timeline" presented during the Claimant's opening statement at the Hearing.

required under Kazakh Matrimony Law.[94] This proceeding culminated with a ruling of the Kazakh Supreme Court on January 30, 2008 that had the result of invalidating the 2003 SPA.[95]

114. The <u>second proceedings</u> (the "**2008 ABT Proceedings**") concerned a claim filed in 2008 by two of the Original Owners before the District Court against Big Sky, BSEK, ABT, and Kozhan, for the invalidation of the 2004 and 2006 ABT Agreements.[96] This second proceeding resulted in a judgment from the Bostandyk District Court dated September 15, 2008 (the "**2008 ABT Decision**"). The 2008 ABT Decision invalidated the 2004 and 2006 ABT Agreements and ordered the Claimant to reimburse approximately USD 27 million to ABT and approximately USD 2.5 million to Kozhan.[97]

115. The <u>third proceedings</u> (the "**2009 Set-Off Proceedings**") concerned an action filed further to the issuance of the 2008 ABT Decision. On October 6, 2008, ABT and Kozhan entered into a settlement agreement where ABT assigned to Kozhan the USD 27 million judgment debt payable by the Claimant.[98] As a consequence, Big Sky owed the total sum of USD 29,626,053 to Kozhan. On November 14, 2008, Kozhan applied to the bailiff to enforce the Court-ordered debt.[99] Due to the alleged difficulty of enforcing this debt against any of the Claimant's assets, the bailiff applied to the District Court for an order to change the method and order of execution of the judgment debt to permit execution against BSEK's 10% remaining interest in the charter capital of Kozhan.[100] On July 1, 2009, the District Court granted the bailiff's application and ordered the partial execution of the judgment debt against BSEK's 10% interest in Kozhan, which had been valued at USD 163,867 (the "**2009 Set-Off Ruling**").[101]

---

94 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98.

95 Claimant's Memorial on the Merits, ¶¶ 228-238, Exh. C-28.

96 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98.

97 Claimant's Memorial on the Merits, ¶¶ 257-258, Exh. C-29.

98 Claimant's Memorial on the Merits, ¶ 275.

99 Claimant's Memorial on the Merits, ¶ 275.

100 Claimant's Memorial on the Merits, ¶ 275.

101 Claimant's Memorial on the Merits, ¶ 277; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98; Exh. C-30.

116. The fourth and last proceeding (the "**IUS Award and 2012 Set-Off Proceedings**") concerned the actions that BSEK took in order to recover the approximately USD 30.7 million owned under the 2004 Line of Credit Agreement.[102] On May 8, 2008, BSEK filed a claim against Kozhan at the IUS International Arbitration Court, pursuant to the relevant provisions of the Credit Agreement. On November 7, 2008, the IUS tribunal issued an award ordering Kozhan to reimburse BSEK approximately USD 30.1 million (the "**IUS Award**").[103] On March 13, 2012, while BSEK was trying to enforce this judgment, Kozhan filed a petition seeking to offset the remaining balance of the partially-satisfied judgment debt resulting from the 2008 ABT Proceedings.[104] On April 10, 2012, the District Court granted the bailiff's petition and ordered the set-off of the judgment debt against the IUS Award (the "**2012 Set-Off Ruling**").[105]

### (4) The Sale of Kozhan after the Court Proceedings

117. As a result of the proceedings, the ownership of Kozhan was transferred back to the Original Owners.[106]

118. Further to a two-tier transaction, which occurred on December 9, 2009 and January 6, 2010, the Original Owners sold their entire 100% shareholding in Kozhan to IMR, a Dutch company, allegedly owned by the "Three Oligarchs".[107]

119. From January 2010, IMR fully owned and controlled Kozhan. During that time, Kozhan continued to produce oil and reinvested most of the surplus cash generated in capital expenditure.[108]

---

102 See *supra*, ¶ 77.

103 Claimant's Memorial on the Merits, ¶ 251.

104 Claimant's Memorial on the Merits, ¶¶ 290-293.

105 Claimant's Memorial on the Merits, ¶ 293; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 98.

106 Claimant's Memorial on the Merits, ¶¶ 312-313.

107 Claimant's Memorial on the Merits, ¶¶ 314-315.

108 Claimant's Memorial on the Merits, ¶ 318.

120. On August 12, 2015, IMR sold its 100% interest in Kozhan to Geo-Jade Petroleum Corporation ("**Geo-Jade**"), a Chinese company listed on the Shanghai Stock Exchange, for USD 340.5 million cash consideration.[109]

## B. THE PARTIES' FACTUAL ALLEGATIONS SPECIFIC TO THE KAZAKH COURT PROCEEDINGS

121. The Parties disagree as to whether these proceedings complied with Kazakh procedural law and whether the courts correctly applied Kazakh law, which are matters that relate to the very merits of this case. This section presents the Parties' respective main factual descriptions of and arguments concerning these proceedings.

### (1) The Claimant's Position

122. The Claimant submits that the Kazakh courts committed several serious violations of procedural and substantive law, especially by not addressing critical arguments, by not stating their reasoning, and by omitting to give proper notice to all parties.[110]

#### *a. The 2003 SPA Proceedings*

123. The Claimant submits that the Kazakh courts arbitrarily invalidated the 2003 SPA in order to return Kozhan to its Original Owners without compensation.

124. In August 2006, four of the five spouses of the Original Owners filed claims against BSEK, their spouses, the Kazakh Ministry of Justice (the "**MOJ**") and the notary that had validated the SPA before the Bostandyk District Court.[111] In short, the spouses sought to challenge the validity of the 2003 SPA on the basis that they never declared their notarized consent to the selling of the Original Owners' shares.[112] They therefore requested the invalidation

---

109 Claimant's Memorial on the Merits, ¶ 320.

110 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 159-201; Exh., C-21, C-23, C-24, C-25, C-30, C-32, C-39, C-40, C-41, C-44, C-45, C-46, C-49, C-50, C-54, C-55, C-64, C-68, C-72, C-127, C-139, C-149, C-160, C-210, C-317, R-50.

111 Claimant's Memorial on the Merits, ¶¶ 104-118.

112 Claimant's Memorial on the Merits, ¶¶ 104-118. The actions were filed separately but the court shortly decided to join the claims into a single proceeding.

of the 2003 SPA and the cancellation of the registration of Kozhan as an entity owned by BSEK.[113]

125. The main ground for this action was the Kazakh domestic Law on Marriage and Family ("**Kazakh Matrimony Law**" – Exh. C-127) (and, in particular, its Article 33), which provides that the disposal of marital property requires, under certain circumstances, spousal consent.[114] According to the Claimant, however, under Kazakh law, the spouse's consent is presumed unless (i) the spouse positively disagreed, and (ii) the third party knew or should have known of this disagreement.[115] The Claimant submits that none of these exceptions applied and the spouses' action should have been dismissed on that basis.[116]

126. On September 12, 2006, the District Court ordered the seizure of 36% of the interest in the charter capital of Kozhan as a security for the outcome of the proceedings and further prohibited a re-registration of Kozhan so that BSEK would be hindered in selling its interests.[117]

127. On September 13, 2006, Kozhan was joined to the proceedings as a third party.[118]

128. On October 17, 2006, the spouses further asked the Court to invalidate the power of attorney which was granted to Mr. Mukashev by the other Original Owners to execute the SPA on their behalf.[119]

129. On October 23, 2006 the District Court ordered an additional seizure of 36% in the charter capital of Kozhan as a security on the outcome of the proceedings.[120]

---

113 Claimant's Memorial on the Merits, ¶¶ 104, 106, 109, 111, 114-116; Exh. C-126, C-127, C-128, C-130, C-137. The fourth spouse, Ms. Zhanat Faizullayeva furthermore requested the seizure of an additional 18% of Kozhan's shares, Claimant's Memorial on the Merits, ¶ 114.

114 Claimant's Memorial on the Merits, ¶ 106; Exh. C-127.

115 Claimant's Memorial on the Merits, ¶ 107; Exh. C-126.

116 Claimant's Memorial on the Merits, ¶ 108.

117 Claimant's Memorial on the Merits, ¶ 112; Exh. C-132, C-133, C-134.

118 Claimant's Memorial on the Merits, ¶ 113; Exh. C-135, C-136.

119 Claimant's Memorial on the Merits, ¶ 116; Exh. C-138.

120 Claimant's Memorial on the Merits, ¶ 117; Exh. C-134.

130. The Claimant considers it to be obvious that the spouses and the Original Owners had conspired together and that the spouses knew about the 2003 SPA at the time of its conclusion; or that they had this knowledge at least since the 2005 SPA.[121]

131. The Claimant further submits that BSEK, Kozhan, the notary of the 2003 SPA and the MOJ all raised defences before the District Court arguing that (i) the spouses' claims were time-barred, (ii) the spouses' claims were not supported by any evidence, (iii) the spouses' consent was to be presumed, (iv) no notarial spousal consent was required and BSEK and Kozhan did not have knowledge of the lack of consent, and (v) the 2003 SPA was concluded in accordance with the laws of Kazakhstan.[122]

132. The Claimant further argues that the conspiracy between the spouses and the Original Owners is shown by the statements which Messrs. Faskhutdinov and Mukashev (two of the Original Owners) submitted in favor of their spouses even though – according to the Claimant – these statements were largely deceptive.[123] In fact, the Claimant contends that Mr. Mukashev's statement in the preliminary hearings in October 2006 was incorrect and misleading.[124]

133. The Claimant submits that Mr. Mukashev was the "mastermind" behind the court proceedings and that he mainly sought a settlement of an enormous amount of money.[125] In fact, on numerous occasions, the proceedings were adjourned in order to allow a potential amicable settlement.[126] The Claimant argues that Mr. Mukashev and Mr. Faskhutdinov already thought at the time about re-transferring Kozhan to third parties, and in particular to the Three Oligarchs.[127] According to the Claimant, the settlement negotiations failed.[128]

---

121 Claimant's Memorial on the Merits, ¶¶ 118-120.

122 Claimant's Memorial on the Merits, ¶¶ 121-126, 133-135; Exh. C-139, C-41, C-140, C-141, C-142, C-50, C-143, C-144, C-49, C-145, C-146, C-149.

123 Claimant's Memorial on the Merits, ¶¶ 127-130; Exh. C-147, C-148, C-2.

124 Claimant's Memorial on the Merits, ¶¶ 131-132.

125 Claimant's Memorial on the Merits, ¶¶ 137-139; Exh. C-153, C-154, C-155.

126 Claimant's Memorial on the Merits, ¶¶ 136; Exh. C-150, C-151, C-152.

127 Claimant's Memorial on the Merits, ¶ 139; Exh. C-155.

128 Claimant's Memorial on the Merits, ¶¶ 140-141; Exh. C-156.

134. After a hearing on November 22, 2006, the District Court dismissed the spouses' claims by stating that the transaction did not require a notarized spousal consent, that the spouses did not prove the requirement of knowledge of BSEK and that the 2003 SPA was in accordance with Kazakh law.[129] Additionally, the Claimant points out that the District Court considered the claims to be time-barred.[130]

135. On December 11, 2006 the spouses filed an appeal against the District Court's decision,[131] arguing that the findings of the District Court on the merits of the case were wrong, and that, with respect to the proceeding, the fifth spouse was deprived of her right to participate in the case.[132]

136. The Court of Appeal overruled the District Court's decision on February 6, 2007. According to the Claimant, this decision was flawed in many ways, and especially because it entirely failed to address BSEK's arguments against the appeal.[133] Based on the conclusion of Professor Abzhanov,[134] the Claimant also argues specifically that the Court of Appeal violated Kazakh law by prejudging the merits of the case when referring it back to the District Court.[135]

137. On February 19, 2007, BSEK lodged an appeal against the Court of Appeal's decision to the Supervisory Collegium of the Almaty City Court.[136] The Supervisory Collegium summarily rejected the appeal.[137] According to the Claimant, this decision was also flawed in a number of respects, and in particular because the Supervisory Collegium allegedly failed to state reasons.[138]

---

129 Claimant's Memorial on the Merits, ¶¶ 142-158; Exh. C-157, C-127, C-41, C-21, C-40, C-39.

130 Claimant's Memorial on the Merits, ¶ 156; Exh. C-21.

131 Claimant's Memorial on the Merits, ¶¶ 159-174; Exh. C-158, C-53, C-42, C-22, C-41, C-23, C-43.

132 Claimant's Memorial on the Merits, ¶¶ 159-160; Exh. C-158, C-53.

133 Claimant's Memorial on the Merits, ¶¶ 162-166; Exh. C-22.

134 Claimant's Memorial on the Merits, ¶¶ 167-171; Exh. C-22.

135 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 218-222; Exh. C-22, C-23.

136 Claimant's Memorial on the Merits, ¶ 172; Exh. C-43.

137 Claimant's Memorial on the Merits, ¶¶ 173-174; Exh. C-43, C-23.

138 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 223-224; Exh. C-23.

138. On March 29, 2007, all five spouses filed an amended claim before the District Court.[139] The District Court asked the fifth spouse, Ms. Tulegenova, to submit her claim independently because she was not an original claimant.[140]

139. The Claimant argues that BSEK again argued that the spouses' claims should be dismissed and that Ms. Tulegenova's claim as "third party having an independent claim to the subject matter of the dispute" was not admissible.[141] The District Court nevertheless accepted its jurisdiction over this third party claim.[142] The Claimant contends that the District Court did not allow Mr. Baikenov, who was a defendant according to the fifth spouse's claim, to appear as a witness even though the Court of Appeals had allegedly instructed the District Court to do so.[143]

140. On the merits, the District Court ultimately declared the 2003 SPA invalid, i.e., it upheld the spouses' claims by following the Court of Appeal's reasoning that a voluntary notarization of the SPA led to the requirement of a notarized consent of the spouses.[144] The Claimant considers that this decision had no basis in Kazakh law.[145]

141. The Claimant submits that BSEK did not receive a copy of the District Court's decision in time to file an appeal, so that it first filed an appeal based merely on its general knowledge of the decision and, once BSEK had received a copy of the decision after the deadline for the filing of an appeal, an amended appeal.[146]

142. The Court of Appeal proceeded to review the case, and eventually concurred with the District Court and therefore dismissed the appeal.[147]

---

139 Claimant's Memorial on the Merits, ¶¶ 175-204.

140 Claimant's Memorial on the Merits, ¶ 176; Exh. C-53.

141 Claimant's Memorial on the Merits, ¶¶183-190.

142 Claimant's Memorial on the Merits, ¶ 189; Exh. C-55.

143 Claimant's Memorial on the Merits, ¶¶ 190-194; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 239-247; Exh. C-44, C-162, C-56, C-54, C-57.

144 Claimant's Memorial on the Merits, ¶¶ 195-204; Exh. C-24, C-40, C-39, C-160, C-54, C-126, C-128, C-130, C- 137, C-52, C-2, C-21, C-22, C-23, C-49, C-50.

145 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 225-277.

146 Claimant's Memorial on the Merits, ¶¶ 205-208; Exh. C-24, C-45, C-163, C-57.

147 Claimant's Memorial on the Merits, ¶¶ 209-212; Exh. C-25, C-24.

143. The Claimant further submits that Kazakh law allows an appeal through a public prosecutor and that it fell back on this possibility.[148] The General Prosecutor granted BSEK a suspension of the District Court's decision.[149] At BSEK's request, the Almaty City Prosecutor lodged a protest at the Supervisory Collegium.[150] The Supervisory Collegium rejected the protest and confirmed the lower courts' decisions.[151]

144. The General Prosecutor still suspended the District Court's decision and called on the Kazakh Supreme Court to decide on the issue.[152]

145. Whilst the appeal proceedings were pending before the Court of Appeal, BSEK filed several complaints for fraud against the Original Owners and their spouses which led the General Prosecutor to open criminal cases.[153]

146. In January 2008, two spouses and the respective Original Owners (Ms. Asanova and Mr. Seidagaliev, and Mr. Baikenov and Ms. Tulegenova) issued a statement that they withdrew every claim made against BSEK.[154] The Claimant considers this as evidence that Mr. Mukashev had orchestrated the spouses' claims.[155]

147. Despite the withdrawal of two of the spouses claims and alleged irregularities and legal flaws in the District Court's and Court of Appeal's decisions invalidating the 2003 SPA, the Supreme Court upheld these decisions on January 30, 2008.[156]

148. The Claimant contends that the Supreme Court's decision was legally flawed and that this can be deduced from a later and contradictory decision of the Supreme Court in which it

---

148 Claimant's Memorial on the Merits, ¶ 213.

149 Claimant's Memorial on the Merits, ¶ 213; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 215-217; Exh. C-164, C-157, C-22, C-46, C-165, C-210, C-28.

150 Claimant's Memorial on the Merits, ¶¶ 214-219; Exh. C-46.

151 Claimant's Memorial on the Merits, ¶ 220; Exh. C-26.

152 Claimant's Memorial on the Merits, ¶¶ 221, 224-225; Exh. C-165, C-47, C-28.

153 Claimant's Memorial on the Merits, ¶¶ 222-223; Exh. C-166, C-27.

154 Claimant's Memorial on the Merits, ¶¶ 226-227; Exh. C-47, C-48, C-167.

155 Claimant's Memorial on the Merits, ¶ 231.

156 Claimant's Memorial on the Merits, ¶¶ 228-238; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 209, 278-302; Exh. C-168, C-58, C-28, C-167, C-319, C-236, C-48, C-47, C-270, C-58, C-291, C-271, C-210, C-293, C-320, C-321, C-322.

did not require a spousal consent for the sale of a participation in a limited liability partnership but presumed such consent.[157]

149. The Claimant submits that, shortly after the decision by the Supreme Court, the criminal investigations were abandoned, due to an alleged absence of criminal elements, and the decision against BSEK was enforced.[158] The Claimant submits that this conduct was, again, in violation of Kazakh law.[159]

***b. The 2008 ABT Proceedings***

150. The Claimant argues that the District Court fabricated a debt which the Claimant allegedly owed to Kozhan as a part of a plan to dispossess the Claimant of its investment in Kozhan.[160]

151. The Claimant submits that in order to recover a part of its investment after the 2003 SPA Proceedings, it initiated an IUS arbitration under the 2004 Line of Credit Agreement which led to an award ordering Kozhan to pay USD 30,073,722 to BSEK.[161]

152. The Claimant contends that the Original Owners constructed an artificial debt in order to gain the remaining 10% interest BSEK held in Kozhan by off-setting the debt against the IUS Award.[162]

153. The Claimant argues that the Original Owners relied on the 2004 and 2006 Agreements in order to reverse the debt originally owned by Kozhan to BSEK.[163] Two of the Original Shareholders (Messrs. Kaschapov and Faskhutdinov) commenced court proceedings against the Claimant, BSEK, ABT and Kozhan in order to invalidate the 2004 and 2006 Agreements regarding the Morskoye field.[164] The Claimant argues that these claims were

---

157 Claimant's Memorial on the Merits, ¶¶ 239-243; Exh. C-28; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 210-214; Exh. C-317, C-293, C-281.

158 Claimant's Memorial on the Merits, ¶¶ 244-249; Exh. C-170, C-27, C-171.

159 Claimant's Memorial on the Merits, ¶ 247; Exh. C-171.

160 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 308-309.

161 Claimant's Memorial on the Merits, ¶¶ 250-251; Exh. C-172, C-173, C-20.

162 Claimant's Memorial on the Merits, ¶¶ 252-274.

163 Claimant's Memorial on the Merits, ¶¶ 252-253; Exh. C-12, C-13, C-14, C-15, C-174, C-175.

164 Claimant's Memorial on the Merits, ¶¶ 254-256; Exh. C-12, C-13, C-14, C-15, C-174, C-176, C-29.

merely fabricated, especially because the 2004 Agreements had been terminated and replaced by the 2006 Agreements and because the claims were without legal substance.[165] The District Court sustained these claims and invalidated the 2004 and 2006 Agreements partially or fully (depending on the specific Agreement) and ordered that the parties be reinstated to their original positions. The Claimant submits that this conclusion is meritless, especially because it does not consider the fact that it was originally Kozhan which owed a debt to BSEK.[166] The Claimant contends that the ABT Decision, according to which it suddenly owed a debt of USD 29,626,053 to Kozhan, was not based on Kazakh law (which is supported by the Claimant's legal expert, Professor Abzhanov).[167]

154. The Claimant further clarifies that in its opinion, ABT started to behave in a more hostile manner towards BSEK because of external threats.[168] It also contends that it is of no relevance that it did not file an appeal against the 2008 ABT Proceeding and that it could reasonably believe that any attempt to appeal would be fruitless.[169]

155. Finally, the Claimant contends that the Tribunal does not need access to the pleadings in the 2008 ABT Proceeding for its decision.[170] The Claimant especially points out that, even if it cannot be determined whether BSEK raised arguments in its defense, the court should have considered the issues of its own motion.[171]

### *c. The 2009 Set-Off Proceedings*

156. The Claimant further complains that BSEK's remaining 10% participation was then set off against this so-called Court-ordered Debt even though Kozhan's original debt was owed to Big Sky and not to BSEK.[172] As a result, the Original Owners regained 100% control over

---

165 Claimant's Memorial on the Merits, ¶¶ 254-256; Exh. C-12, C-13, C-14, C-15, C-174, C-176, C-29.

166 Claimant's Memorial on the Merits, ¶¶ 257-258; Exh. C-29.

167 Claimant's Memorial on the Merits, ¶¶ 259-274; Exh. C-12, C-29, C-62, C-177; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 333-340; Exh. C-29.

168 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 312-315; Exh. C-29

169 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 316-319; Exh. C-323, C-324, C-177, R-50, C-30, C-32.

170 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 321-340; Exh. C-13, C-29, C-14, C-60, C-61, C-300

171 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 322-332.

172 Claimant's Memorial on the Merits, ¶¶ 275-288; Exh. C-63, C-30, C-64, C-29, C-65, C-66, C-177.

Kozhan.[173] The Claimant considers this conduct to be unlawful and inconsistent with Kazakh law.[174] According to the Claimant, the 2009 Set-Off was supposed to allow the Three Oligarchs to take over Kozhan through the Original Owners and to destroy BSEK's pre-emption right as shareholder of Kozhan.[175]

157. The Claimant contends especially that the District Court failed to notify BSEK or Big Sky properly of the 2009 Set-Off Proceedings so that they were unable to defend themselves.[176]

158. Furthermore, the Claimant contends that the set-off procedure, i.e., the 2009 Set-Off Ruling and its enforcement, were not in accordance with Kazakh law.[177]

159. Finally, the Claimant submits that appeal procedures against the 2009 Set-Off Ruling would have been unsuccessful because the District Court did not extend the deadline for the filing of an appeal.[178]

### *d. The 2012 Set-Off Proceedings*

160. The Claimant argues that BSEK's efforts to secure a part of the value of its investment through the IUS Award were rendered fruitless by the Respondent's courts.[179] The Specialized Inter-district Economic Court of Almaty City ordered enforcement of the IUS Award which was confirmed by the Court of Appeal.[180] The Claimant submits that Kozhan, in order to fight the enforcement, petitioned successfully in front of the District Court that it could set off the Court-ordered Debt against the IUS Award even though this Court-ordered Debt had already been used as set-off against BSEK's 10% shareholding in Kozhan

---

173 Claimant's Memorial on the Merits, ¶ 288; Exh. C-63, C-30.

174 Claimant's Memorial on the Merits, ¶¶ 275-288; Exh. C-63, C-30, C-64, C-29, C-65, C-66, C-177.

175 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 341-245; Exh. C-20, C-236.

176 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 346-348; Exh. R-50 C-30, C-66, C-64.

177 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 349-365; Exh. R-50, C-29.

178 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 366-367; Exh. C-64, R-55, C-181,

179 Claimant's Memorial on the Merits, ¶¶ 289-311; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 368-371.

180 Claimant's Memorial on the Merits, ¶ 291; Exh. C-67, C-179, C-180.

while ignoring that after the set-off Kozhan still owed USD 447,669 to BSEK.[181] The Claimant argues that this decision was rendered in violation of Kazakh law, i.e. because Big Sky and BSEK were not even notified of the ongoing proceedings.[182]

161. The Claimant submits that an appeal filed by BSEK was without success and that BSEK's arguments were not addressed by the Court of Appeal.[183] Attempts by BSEK to enforce the IUS Award allegedly failed due to a decision of the Court of Appeal dated August 17, 2012 which was also confirmed by the Supervisory Collegium on October 23, 2012.[184]

**(2) The Respondent's Position**

162. After laying down the structure of the Kazakh Court System,[185] the Respondent rejects the Claimant's contentions that Kazakh courts failed to apply Kazakh procedural and substantive law in the four proceedings which are at the center of this case.[186]

***a. The 2003 SPA Proceedings***

163. The Respondent submits that four of the Original Owners' spouses (Ms. Roza Faskhutdinova, Ms. Ranida Faskhutdinova, Mr. Shyngyskhan Seidagaliev and Ms. Zhanat Faizullayeva) filed a complaint against the 2003 SPA and against the power of attorney given to Mr. Mukashev; those complaints were consolidated in one single proceeding.[187] BSEK, Kozhan, the notary of the 2003 SPA and the Almaty Department of the MOJ filed

---

181 Claimant's Memorial on the Merits, ¶¶ 292-294; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 376-378; Exh. C-32, C-68, C-69, C70, C-181.

182 Claimant's Memorial on the Merits, ¶¶ 295-299; Exh. C-32, C-73; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 372-375.

183 Claimant's Memorial on the Merits, ¶¶ 300-303; Exh. C-72, C-73, C-71; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 379-385; Exh. C-72, C-73, C-71.

184 Claimant's Memorial on the Merits, ¶¶ 304-311; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 386-390; Exh. C-182, C-186, C-181, C-183, C-184, C-64, C-185, C-177, C-187, C-188.

185 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 79-97.

186 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 218-226.

187 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 100-104, 117; Exh. C-126, C-128, C-129, C-130, C-131, C-136, C-137, C-138, C-145, C-147, C-148, C-149, C-150, C-111, C-156, C-151, C-152, C-155.

defenses against those claims.[188] The Respondent argues that the Original Owners all stated that they did not inform their spouses of the 2003 SPA.[189]

164. The District Court decided on November 22, 2006 that the requirements for invalidation of the 2003 SPA were not met and that Kozhan's re-registration was in full compliance with Kazakh law.[190]

165. The Respondent submits that the four spouses filed an appeal against the decision of the District Court arguing that the District Court misjudged the requirement of spousal consent and its implications.[191] The Court of Appeal overturned the District Court's decision concluding that the District Court's decision was not based on sufficient evidence and missed the correct source of the spousal consent's requirement.[192] Furthermore, the Respondent asserts that the Court of Appeal could send the case back to the District Court and has the competence to determine the substantive law.[193]

166. Regarding the appeal brought before the Supervisory Collegium, the Respondent submits that the Supervisory Collegium refused to review the decision and provided sufficient reasoning.[194]

167. As a result, the District Court was supposed to hear an amended version of the spouses' claim.[195] The Respondent especially points out that BSEK did not raise any objection of limitation in these second proceedings.[196] The Respondent further submits that the fifth

---

188 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 105-106; Exh. C-139, C-41, C-140, C-145, C-142, C-146, C-50, C-143, C-144.

189 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 109-110; Exh. C-147, C-148.

190 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 115; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 227-228; Exh. C-21.

191 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 116-119; Exh. C-158, R-37, C-42.

192 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 120-124; Exh. C-22.

193 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 125-129; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 304-312; Exh. C-22.

194 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 130-135; Exh. C-43, R-38, C-23, R-39, R-40.

195 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 136-137; Exh. C-51, C-53.

196 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 138.

spouse, Ms. Tulegenova, filed a complaint as well.[197] According to the Respondent, Kazakh law allows the District Court to decide this additional claim, contrary to the Claimant's assertion.[198] The Respondent maintains that the District Court was within its rights to decline to hear Mr. Baikenov as a witness.[199]

168. The Respondent contends that the District Court issued, correctly and in accordance with Kazakh law, a decision on April 26, 2007 invalidating the 2003 SPA in accordance with the decision of the Court of Appeal, i.e. correctly recognizing the necessity of notarized spousal consent.[200] According to the Respondent, the General Prosecutor's participation in the appeal proceedings does not indicate that the judicial decisions were "patently unlawful".[201]

169. On May 10, 2007 BSEK and Kozhan submitted a first appeal against the District Court's decision, which it considered to be without grounds, and requested to be provided with the full decision.[202] On May 31, 2007 BSEK filed an amended appeal.[203] This appeal was dismissed on July 6, 2007 and the Court of Appeal confirmed that a notarization of the spouses' consent was required.[204]

170. The Respondent submits that BSEK also tried to appeal the Court of Appeal's decision through the office of the General Prosecutor. As a result, on October 5, 2007, the Almaty

---

197 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 139; Exh. C-52.

198 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 139-143; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 315-324; Exh. C-52, R-41, C-55.

199 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 144-152; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 325-326.

200 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 153-179; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 229-300; Exh. C-24, C-2, C-200, C-127, R-42, R-43, R-44, R-45.

201 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 301-303; Exh. R-211.

202 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 186-187; Exh. R-46, R-47, C-163.

203 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 188; Exh. C-57.

204 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 189; Exh. C-25.

City Prosecutor filed a supervisory protest with the Supervisory Collegium of the Almaty City Court.[205]

171. The Respondent further contends that BSEK had sought the intervention of Kazakhstan's President who then ordered the General Prosecutor to investigate.[206]

172. On October 30, 2007 the Supervisory Collegium rejected the appeal and concurred with the legal reasoning of the lower instance courts.[207]

173. The Respondent submits that BSEK continued by filing criminal charges of fraud against the Original Owners and the spouses and by lodging an appeal to the Supreme Court.[208] These proceedings were without success and the Respondent underlines that the Supreme Court applied the law correctly when not considering the withdrawal of claims by Ms. Asanova and Ms. Tulegenova.[209] According to the Respondent, the criminal proceedings were consequently and correctly terminated after the Supreme Court's decision.[210]

174. The Respondent contends that BSEK still had appeal possibilities but merely chose not to pursue them.[211]

### *b. The 2008 ABT Proceedings*

175. The Respondent submits that the Original Owners, after having regained control over Kozhan, considered that the 2004 and 2006 ABT Agreements were extremely unfavorable for Kozhan and therefore initiated proceedings to invalidate these agreements.[212] The

---

205 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 192-194, Exh. C-164, C-46, R-48.

206 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 195; Exh. C-111.

207 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 196-197; Exh. C-26, C-165.

208 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 198-200; Exh. C-166, C-27.

209 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 201-211; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 331-345; Exh. C-28, C-167, C-58, C-271, C-287, C-239, C-41, C-48.

210 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 212-213; Exh. C-170.

211 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 216; Exh. C-111; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 346-352; Exh. C-22, C-23, C-45, C-25, R-212, R-213, R-214, C-46, C-26, C-210.

212 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 216-229; Exh. C-171, C-176, C-29, C-59, C-14.

Case 25-50445-hlb Doc 57 Entered 12/05/25 12:28:51 Page 102 of 222

Respondent argues that the Claimant omitted to provide sufficient documentation regarding these proceedings in its statement of claim and that its representation of the facts regarding ABT's role is incomplete.[213]

176. The Respondent first points out that the 2008 ABT Decision was rendered after the Claimant had burdened Kozhan through the execution of the 2006 ABT Agreements and further forced Kozhan to conclude various other disadvantageous transactions.[214]

177. The Respondent argues that it is of no relevance whether the District Court's decision (agreeing with the Original Owners' claims) was correct as such and that the Claimant's contentions are merely meant to distract the Tribunal from enquiring into BSEK's actions and decisions in relation to the ABT proceedings.[215] The Respondent submits in any event that the Claimant's criticism of the 2008 ABT Decision is unfounded.[216] The Respondent argues specifically that the Claimant did not seek to enforce the return of its 15,000,000 shares from ABT which is allegedly the counterpart to the sum the Claimant owed to Kozhan, according to the District Court's decision.[217]

178. Finally, the Respondent submits that the Claimant could not provide a reasonable explanation as to why it did not lodge an appeal against the 2008 ABT Decision and it could only have been merely a strategical or tactical decision.[218]

### *c. The 2008 Set-Off Proceedings*

179. The Respondent submits that after ABT assigned the judgment debt (arising under the 2008 ABT Decision) to Kozhan, Kozhan started to enforce the debts owed to it by Big Sky.[219]

---

213 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 219-223; Exh. C-29.

214 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 354-387; Exh. C-16, C-17, C-175, R-215, C-17, R-216, R-217, C-176, R-218, R-219, R-215, R-220, C-14, R-221, R-222, C-29.

215 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 230-240; Exh. C-76; C-29 (-RUS).

216 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 389-414; Exh. C-14, C-59, C-15, C-29, R-215, R-222.

217 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 236-240; Exh. C-76, C-29.

218 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 415-432; Exh. R-215, R-225, C-29, R-226, R-227, R-288.

219 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 241-240; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 433-435; Exh. C-29, C-62, R-49, R-50,

The Respondent submits that it is impossible to determine when the Claimant learned of these proceedings in the absence of any documents from the enforcement file but considers that the Claimant must have been aware of the 2009 set-off.[220] The Respondent furthermore considers the 2009 Set-Off Ruling to be correct and in accordance with Kazakh law and rejects the Claimant's expert's criticism (Professor Abzhanov) of the set-off decision itself and of the execution of this decision.[221]

180. The Respondent asserts that – contrary to the Claimant's allegations – the Respondent's courts applied Kazakh law correctly when deciding on the set-off issue.[222] According to the Respondent, the courts correctly recognized the possibility of a set-off and also correctly assessed that the assignment from ABT to Kozhan was valid.[223] Furthermore, the Respondent contends that the District Court could correctly enforce the 2008 ABT Decision by granting a set-off; this execution was handled in accordance with Kazakh law.[224]

181. The Respondent further submits that BSEK only initiated appeal proceedings in November 2012, and that the District Court rejected a restoration of the deadline for the filing of an appeal.[225] According to the Respondent, this decision is in line with Kazakh law even if the Claimant's legal expert claims the contrary.[226]

#### *d. The 2012 Set-Off Proceedings*

182. The Respondent argues that BSEK applied for the enforcement of the IUS Award at the latest possible time.[227] The Respondent argues that when Big Sky's application to enforce

---

220 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 250-251; Exh. C-111, C-176; Exh. R-51, R-52, R-53, R-54, R-50.

221 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 252-269; Exh. C-30, C-29, C-63, C-66, C-64, C-62, R-50.

222 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 436-488.

223 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 437-449.

224 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 450-457 and 481-488.

225 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 270-271; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 478-480; Exh. C-66, R-55, C-181, C0067, C-180, C-179.

226 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 272-274; Exh. C-176, R-50.

227 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 275-277; Exh. C-20, C-178, C-67, C-179, C-180.

the IUS Award was granted, Kozhan filed a motion to set off the award against the debt owed to Kozhan.[228] The Respondent submits that on April 10, 2012, the District Court and the State Bailiff correctly granted a set-off (the "**2012 Termination Ruling**") and points out that Big Sky and BSEK had been notified of the hearing and of the decision.[229]

183. The Respondent submits that Big Sky and BSEK must have been aware of the 2012 Termination Ruling but still did not file an appeal and chose instead to try the enforcement of the entire IUS Award (which allegedly had been partially set off).[230] After enforcement was initiated, Kozhan filed a complaint with the District Court, but this complaint was rejected.[231]

184. The Respondent refers to the appeal proceedings of BSEK against the 2012 Set-Off which was dismissed by the Court of Appeal on August 2, 2012.[232] The Respondent rejects the Claimant's argument that the Court of Appeal failed to address numerous arguments of the appeal.[233]

185. The Respondent further argues that Kozhan voluntarily paid the outstanding part of the IUS Award.[234] The Respondent alleges that BSEK directed Private Bailiff Mekebayev to withdraw the writ of execution so that the amount paid by Kozhan was returned to it.[235] The Respondent submits that it cannot follow why the Claimant contends that an

---

228 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 278-279; Exh. R-56, C-68.

229 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 280-287; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 489-490, 492-501; Exh. C-32, C-70, C-68, C-72, C-73, C-71.

230 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 288-292; Exh. R-57, R-58, C-182, R-59, R-60, R-61, C-183, R-62, C-184, C-185.

231 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 288-292; Exh. R-57, R-58, C-182, R-59, R-60, R-61, C-183, R-62, C-184, C-185.

232 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 293-296; Exh. C-72, C-73, C-71.

233 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 296; Exh. C-72.

234 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 300-306; Exh. R-65, R-66, R-67, R-68, C-187, C-188, R-69, R-70.

235 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 303-305; Exh. C-187, C-188, R-69, R-70.

enforcement of the IUS Award was not possible in the Kazakh territory but considers that BSEK's intention was to have the writ of execution returned.[236]

186. Accordingly, the Respondent also notes that the Claimant continues to seek enforcement of the IUS Award in other countries, e.g. in Switzerland.[237]

### C. THE TRIBUNAL'S CONSIDERATION OF THE PARTIES' STATEMENTS OF FACTS

187. The Parties largely agree on the general facts that led to the State action at issue in this case but disagree on several aspects of how various court proceedings progressed. The relevant disagreements are noted and discussed in the context of the Claimant's specific claims below.

## IV. THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

### A. THE CLAIMANT'S REQUEST FOR RELIEF

188. In its Counter-Memorial on Preliminary Objections and Reply on the Merits, the Claimant requests "that the Tribunal render an award:

> a. ordering that the Respondent's objection to the jurisdiction of this Tribunal be dismissed in its entirety;
>
> b. declaring that the Respondent has breached Article II(1); Articles II(2)(a) and (b); Article II(6); and Article III(1) of the US-Kazakhstan BIT;
>
> c. declaring that the Respondent has breached Article 4(1) and (2) of the Kazakhstan Investment Law;
>
> d. ordering that the Respondent pay damages to the Claimant in the amount of not less than US$460.1 million;
>
> e. ordering that the Respondent pay compound interest at LIBOR + 2 percent on any amount awarded to the Claimant, such compound interest to accrue

236 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 306.

237 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 502-505; Exh. R-231, R-232.

from 60 days after the date of the Award until the date upon which payment is made;

f. ordering the Respondent to pay all the costs of the arbitration, including all the fees and expenses of ICSID and the Tribunal and all the legal costs and expenses incurred by the Claimant, with interest calculated in accordance with paragraph (e) above; and

g. ordering such other and further relief as the Tribunal deems appropriate."[238]

## B. THE RESPONDENT'S REQUEST FOR RELIEF

189. In its Reply on Jurisdiction and Rejoinder on the Merits and Quantum, the Respondent "requests that the Tribunal render an Award:

a. declaring that the Tribunal lacks jurisdiction over all of the Claimant's claims;

b. alternatively, dismissing all of the Claimant's claims;

c. ordering the Claimant to bear in full the costs of the arbitration;

d. ordering the Claimant to bear all of the Respondent's costs of legal representation and other expenses including expert and witness costs, together with interest on those costs and expenses at a rate of 12-month USD LIBOR + 2.0% compounded annually, running from the date of the Award until the date of payment; and

e. making such further or other orders for relief as the Tribunal thinks appropriate."[239]

---

238 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 837 (footnote omitted).

239 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 866.

# V. JURISDICTION

## A. THE PARTIES' POSITION ON DENIAL OF BENEFITS

### (1) The Respondent's Position

190. The Respondent invokes the denial of benefits clause of Article I(2) of the BIT, which provides:

> "Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations."

191. The Respondent considers that the dispute resolution provisions of the BIT fall within the ambit of the denial of benefits clause.[240] To this end, the Respondent interprets Article I(2) of the BIT to contain two requirements:[241]

- Nationals of any third party control the Claimant; and
- The Claimant either has no substantial business activities in the territory of the US or is controlled by nationals of a third country with which the Respondent does not maintain normal economic relations.

192. The Respondent argues that pursuant to an interpretation in accordance with Article 31 of the Vienna Convention on the Law of Treaties it is entitled to invoke Article I(2) of the BIT without temporal restrictions[242] and especially at the early stage of the proceedings.[243] The Respondent adds that this also aligns with the object and purpose of the BIT to deny

---

240 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 307-308, 310; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 117-122, 212.

241 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 309; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 119.

242 Except the temporal requirement of ICSID Arbitration Rule 41, Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 314.

243 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 311-312.

Case 25-50445-hlb Doc 52-5 Entered 12/05/25 11:23:54 Page 58 of 172

those investors the benefits of the BIT who do not "genuinely engage in the economic activities [of the BIT]."[244]

193. Referring to the *CCL v. Kazakhstan* case, the Respondent submits that the requirements of Article I(2) of the BIT need to be fulfilled on the date of the request for arbitration.[245] The Respondent further contends that other tribunals (*Ulysseas v. Ecuador, Guaracachi v. Bolivia, Generation Ukraine v. Ukraine*; all assessing different BITs) also decided in this direction.[246] The Respondent rejects the argument sometimes made in Energy Charter Treaty ("**ECT**") cases whereby the State has to notify the investor in advance of its intention to rely on the denial of benefits clause, and argues that those decisions were only made due to the "specific nature of the ECT."[247]

### *a. The Issue of Control*

194. The Respondent submits that the term "control" is to be understood as control-in-fact by a natural person in order to align this requirement with the object and purpose of the BIT (economic reciprocity and prevalence of substance over form).[248] Referring to *Ulysseas Inc. v. Ecuador*, the Respondent notes that the tribunal held with regard to an identical clause that: "the natural person who is the ultimate controller of [the claimant] and its nationality must be identified."[249]

---

244 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 313.

245 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 315; and *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22). See also Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 120-122.

246 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 316-319; *Ulysseas Inc v. The Republic of Ecuador*, PCA Case No. 2009-19, Interim Award, September 28, 2010 (RL-2), *Generation Ukraine, Inc v. Ukraine*, ICSID Case No. ARB/00/9, Award, September 16, 2003 (CL-6); *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, January 31, 2014 (RL-17).

247 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 320-322.

248 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 323-324; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 123, 125-126.

249 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 325 (emphasis omitted), *Ulysseas Inc v. The Republic of Ecuador*, PCA Case No. 2009-19, Interim Award, September 28, 2010 (RL-2).

195. The Respondent considers that the Claimant failed to substantiate that it is in fact controlled by a US national.

196. The Respondent argues that the burden of proof must be on the Claimant because all relevant facts are within its possession/control or at least the evidentiary burden would have to be shifted to the Claimant because the Respondent raised reasonable doubts.[250] To strengthen this position, the Respondent refers again to the *CCL v. Kazakhstan* case,[251] and to *Bridgestone v. Panama* and the ICJ's *Diallo* case.[252] Additionally, the Respondent submits that, according to *Amto v. Ukraine*, a Tribunal can draw adverse inferences if one party refuses to provide evidence as to who in fact has control over a company.[253]

197. The Respondent argues that the Claimant did not submit (sufficient) evidence of the ownership despite being asked to do so by the Respondent several times.[254]

198. First, the Respondent submits that Mr. Lawler is a "nominee director" and that, as such, he does not exercise control in fact over the Claimant.[255] The Respondent also notes that Mr. Lawler was not called as a witness by the Claimant to answer the question of who was Big Sky's controller-in-fact.[256] The Respondent recognizes that Mr. Lawler is and was at the date of the request a US national and the Claimant's sole director; nevertheless, the Respondent argues that Mr. Lawler takes instructions from someone else.[257] According to the Respondent, Mr. Lawler is a lawyer who works with other US registered companies

---

250 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 326-329; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 128-134, 179-181.

251 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 326-329; *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22).

252 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 129-131; *Bridgestone Licensing Services, Inc. and Bridgestone Americas, Inc. v. Republic of Panama*, ICSID Case No. ARB/16/34, Decision on Expedited Objections, December 13, 2017 (RL-14), *Case Concerning Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Merits, Judgment, ICJ Reports 2010, November 30, 2010 (RL-68).

253 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 133.

254 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 330-334; Exh. R-5.

255 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 335-341; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 135-149; Exh. C-205, C-198, R-184, C-206, C-77, C-194, R-185, R-186, R-187, R-188, R-168, R-189, R-184, R-190, R-191, R-192, R-193, R-194, R-195, R-196, R-197, C-202, R-193, R-194, R-198, R-199, R-200, R-184.

256 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 147-150.

257 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 336.

whose operations are conducted in other jurisdictions and who is signatory of SEC filings for more than 50 corporate entities.[258]

199. Whereas the Claimant argues that Mr. Lawler was appointed Sole Director just before the Board of Directors resigned, the Respondent considers the email which was produced by the Claimant in evidence thereof to be unsuitable to prove that Mr. Lawler is more than a mere nominee director. This is because (i) the documentation provided predates Mr. Lawler's appointment, and (ii) the email submitted does not address Mr. Lawler and is therefore inconclusive.[259] Therefore, the Respondent argues that the Claimant has not substantiated who benefits from the arbitration and who exercises control- in-fact over Big Sky.[260]

200. Second, the Respondent submits that the Claimant is not owned by US nationals. According to the Respondent, this is because the Claimant's most substantial shareholders are not US nationals or corporations registered under US law.[261]

201. Third, the Respondent states that the Claimant is in any event not controlled by its shareholders. According to the Respondent, even if the Claimant could argue that, legally, under Nevada law and the Claimant's bylaws, the Claimant's board of directors is controlled by its shareholders, this is not corroborated by factual evidence. This is especially because Mr. Lawler failed to call the shareholders meetings and therefore did not allow the shareholders to exercise control in fact by relying on internet submission of alleged shareholders of the Claimant.[262] The Respondent furthermore argues that it is irrelevant whether the Claimant conducts "normal business activities" and that it is uncontested that the Claimant's only current activity is the conduct of the present arbitration.[263]

---

258 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 337; Exh. R-2, R-3, R-4.

259 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 338-340.

260 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 341.

261 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 342-345; Exh. C-76.

262 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 346-351; Exh. R-71, R-72, R-6, R-7, R-8, R-9; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 156-157; Exh. R-184.

263 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 158-159; Exh. R-198.

202. The Respondent submits that the person who controls the arbitration is the person who controls in fact the Claimant because the present arbitration is its only activity.[264] According to the Respondent, this is a national of a third country. Whilst complaining that the Claimant produced only one document in the document production phase of the proceedings, the Respondent relies on the document obtained – the arbitration funding agreement between Vannin Capital PCC, Big Sky, BSEK, Big Sky Energy Atyrau Limited, Fietta LLP and Agrima Limited – to argue that the person ultimately in control is Mr. Daniel Israel, a Belgian national, the controller of Agrima Limited who is the case manager.[265]

203. In light of the above, the Respondent – relying on the tribunal in *Amto LLC v. Ukraine* – considers that the Claimant allegedly did not produce satisfying evidence regarding control and that the Tribunal should therefore infer that the Claimant is not controlled by a national of the United States.[266]

### *b. The Claimant's Substantial Activities in the United States*

204. In order to determine the meaning of the term "substantial business activities in the territory of the US" the Respondent considers it to be self-explanatory but nevertheless points out that the business activities have to refer to the Claimant itself, not any related entity.[267] The Respondent also submits that this requirement has to be met at the date of the filing of the request for arbitration.[268]

205. Based on this standard the Respondent contends that the Claimant has never had "substantial business activities" within the US.[269]

---

264 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 159-162; *B-Mex, LLC and others v. United Mexican States*, ICSID Case No. ARB(AF)/16/3, Partial Award, July 19, 2019 (RL-69).

265 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 163-181; Exh. R-5, R-73, R-74, R-167, R-174, R-168, R-167, R-170, R-171, R-167, R-207.

266 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 352-355; Exh. R-73, R-74.

267 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 356-358.

268 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 359.

269 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 360-390; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 182-211.

206. To this end, the Respondent submits that the Claimant was originally incorporated as the "Institute for Counselling, Inc.", acquired a company of the British Virgin Islands (China Broadband Corp), and had allegedly close connections to China and Chinese companies.[270] At this time, Mr. Heysel, of Canadian nationality, served as CEO of China Broadband Corp.[271] The Respondent argues that the Claimant's principal business office was located in China, its administrative office in Canada, that its assets were located outside of the US, and that it never had any physical presence in the US.[272] In 2003, the Claimant acquired BSEK and eventually became Big Sky Energy Corporation.[273]

207. The Respondent considers that the Claimant is a mere "shell company" and submits that it had no business activities in the US at the date of the filing of the Request, an assessment which it considers to be acknowledged by the Claimant's observations on bifurcation and Mr. Heysel's witness statement.[274]

208. Further, the Respondent argues that the Claimant's entire Board of Directors stepped down in 2013, and that the company has not had any business activities since 2013. In fact, according to the Respondent, Mr. Lawler is the only remaining person behind the Claimant (acting as President, Secretary, Treasurer and Director), and the only real "activity" performed by the Claimant is the pursuit of the present arbitration.[275]

209. Additionally, the Respondent submits that the Claimant never had any substantial business activities in the US but that it was merely holding shares of BSEK (for this the Respondent relies on *Pac Rim v. El Salvador*,[276] and contends that cases based on the ECT do not allow

---

270 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 361-363; Exh. C-37, R-75, R-76.

271 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 361, R-75.

272 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 361-365, C-37, R-75, R-76.

273 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 364.

274 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 367-369; Exh. C-2.

275 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 370-371.

276 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 376, *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1).

to draw parallels because of other facts/evidence and because of the ECT's structurally different denial of benefits clause).[277]

210. Therefore, according to the Respondent, the Tribunal cannot follow the reasoning of the tribunal in *Masdar v. Spain* because the Claimant allegedly never had any presence in the US.[278] The Respondent argues that the Claimant (i) never had any office in the US, (ii) its company meetings were always held somewhere else, (iii) never had a US bank account and (iv) never employed permanent staff in the US.[279] The Respondent also argues that the filing of annual reports with the US Securities and Exchange Commission (the "**SEC**"), the finance-raising in the US or the existence of a debt towards a US company is not suitable to demonstrate substantial business activities in the US.[280]

211. Additionally, the Respondent rejects the Claimant's distinction between "operations" and "business activities."[281] The Respondent also argues that the Claimant's reliance on *Amto v. Ukraine* and on *Bridgestone v. Panama* is misplaced because the facts in the respective arbitrations were different (because in the cases of reference the party had certain activities which were carried out in the State in question).[282]

212. Finally, the Respondent contends that this assessment is not influenced by the Claimant's character as a publicly traded company and its many individual shareholders. According to the Respondent, this interpretation does not find echo in the wording of the Article I(2) of the BIT, especially considering the fact that the Claimant is, for over a decade, not a

---

277 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 372-377, 387; Exh. R-5, R-10, R-11, Exh. C-79, C-37.

278 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 377-379; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 195-197, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 (RL-15).

279 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 380-384; Exh. C-79, C-37, R-12, R-13, R-1, R-14, R-15, R-16, R-17, R-18, R-19, R-20, C-79, C-37; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 186-187.

280 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 191.

281 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 188-190.

282 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 192-194, 198-200; *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85), *Bridgestone Licensing Services, Inc. and Bridgestone Americas, Inc. v. Republic of Panama*, ICSID Case No. ARB/16/34, Decision on Expedited Objections, December 13, 2017 (RL-14).

publicly listed company.[283] Further, the Respondent points out that – to its knowledge – no tribunal had to decide in the past on the applicability of the denial of benefits clause to a publicly listed company.[284] In its Reply on Jurisdiction and Rejoinder on the Merits and Quantum, the Respondent refers to *Ampal v. Egypt* to argue that – even if it was not a decisive question in those proceedings – the tribunal did not give any indication that a publicly listed company does not fall within the scope of a denial of benefits clause.[285]

213. The Respondent further submits that the activity to conduct the present arbitration, the sole activity of the Claimant, is not sufficient to meet the requirement of "substantial business activity".[286]

214. The Respondent rejects that the Claimant's activities in the US ceased due to the Respondent's conduct and that as a result the Respondent should be precluded from invoking the denial of benefit clause in the BIT. According to the Respondent, even if this was factually verified (which the Respondent refutes), the Claimant's legal argument is meritless, as it is in contradiction with the language and rationale of Article I(2) of the BIT.[287]

215. Finally, the Respondent concludes that, in any event, the Claimant had no substantial business activities on the date of the filing of the Request which is the relevant date to assess the denial of benefits clause.[288]

### (2) The Claimant's Position

216. The Claimant submits that the Tribunal has jurisdiction over the dispute and rejects the Respondent's invocation of the denial of benefits clause.[289] First of all, the Claimant

---

283 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 385-386; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 207-209.

284 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 386.

285 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 210; *Ampal-American Israel Corporation and others v. Arab Republic of Egypt*, ICSID Case No. ARB/12/11, Decision on Jurisdiction, February 1, 2016 (RL-13).

286 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 183-184.

287 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 211.

288 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 388-390.

289 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 480-483.

highlights that the requirements of Article I(2) of the BIT are cumulative and are supposed to exclude "mere shell companies" from the BIT's protection.[290]

217. As a general remark, the Claimant submits that it did produce all evidence which it was obligated to disclose with regard to the Respondent's jurisdictional objection regarding the denial of benefits clause. According to the Claimant, it disclosed the identity of its shareholders, Mr. Lawler's position and activities, the funding of the present arbitration and the absence of control by nationals of a third country.[291]

218. The Claimant contends that the burden of proof lies upon the Respondent as the party which invokes the denial of benefits clause.[292] In particular, the Claimant refers to the decisions in *Generation Ukraine v. Ukraine*, *Pac Rim v. El Salvador* and *Amto v. Ukraine* which, according to the Claimant, accepted that the Respondent bears the burden of proof for the fulfilment of the requirements of a denial of benefits clause.[293] Furthermore, the Claimant points out that proceedings initiated before the US District Court of Arizona (under section 1782 of Title 28 of the US Code) were dismissed.[294] In the alternative, the Claimant argues that it provided enough evidence to discharge the burden of proof.[295]

219. The Claimant contends that it is a publicly held Nevada corporation and that it is not controlled by any non-US person or entity.[296] It further submits that its substantial business

---

290 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 484-485; Claimant's Rejoinder on Preliminary Objections, ¶¶ 63-64; Message from the President of the United States Transmitting the Treaty Between the United States of America and the Republic of Kazakhstan Concerning the Reciprocal Encouragement and Protection of Investment, Signed at Washington on May 19, 1992, dated September 8, 1993 (CL-26).

291 Claimant's Rejoinder on Preliminary Objections, ¶¶ 9-18; Exh. C-76, C-77, C-194, C-205, C-202, C-204, C-207, R-191, R-167, R-196, C-346, C-347, C-348, C-349, C-350, C-351, C-352, C-353, C-354, C-355, C-356, C-357, C-358, C-359, C-360.

292 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 486-487; Claimant's Rejoinder on Preliminary Objections, ¶¶ 2-3, 8, 19-25.

293 Claimant's Rejoinder on Preliminary Objections, ¶¶ 20-23; *Generation Ukraine, Inc v. Ukraine*, ICSID Case No. ARB/00/9, Award, September 16, 2003 (CL-6), *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1); *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85).

294 Claimant's Rejoinder on Preliminary Objections, ¶ 24.

295 Claimant's Rejoinder on Preliminary Objections, ¶ 25.

296 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 488.

activity was raising debt and equity finance for the development of its investments in Kazakhstan, activities it only had to cease due to the Respondent's conduct.[297]

### *a. The Issue of Control*

220. According to the Claimant, the Respondent did not demonstrate that the Claimant is controlled by a national of a third country. As a general remark, the Claimant clarifies that the Tribunal must assert the requirement of control with regard to the Claimant's position "but for" the host State's conduct in dispute.[298]

221. The Claimant disagrees with the Respondent's arguments (based on *CCL v. Kazakhstan*) that the Claimant did not provide evidence that it is controlled by US nationals. It also disagrees that Mr. Lawler is a "nominee director" who does not exercise control in fact.[299] The Claimant bases its argument on two main points.

222. First, the Claimant refers to its bylaws to argue that it is in law controlled by its Directors amongst whom were two US nationals prior to March 2013 (Dr. Philip D Pardo and Mr. Daniel Caleb Feldman) and after the resignation of the Board of Directors in March 2013 by Mr. Scott Lawler, who is also of US nationality.[300] The Claimant further submits that Mr. Lawler and the Claimant can look back on a long working relationship.[301] Ultimately, the Board of Directors is under the control of the shareholders.[302]

223. Second, according to the Claimant, Mr. Lawler, the Sole Director, controls the Claimant in fact.[303] The Claimant submits that Mr. Lawler managed its activities, especially in regard to the debt owed towards Ingalls & Snyder.[304] The Claimant contends that no more than

---

297 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 488.

298 Claimant's Rejoinder on Preliminary Objections, ¶ 5.

299 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 489.

300 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 491, 501; Claimant's Rejoinder on Preliminary Objections, ¶ 5; Exh. C-198, C-111, C-199, C-202, C-396, C-343-C-344, C-345.

301 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 491; Exh. C-204.

302 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 492; Exh. C-197, C-338.

303 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 493-511; Claimant's Rejoinder on Preliminary Objections, ¶ 38; Exh. C-207.

304 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 493; Claimant's Rejoinder on Preliminary Objections, ¶ 39; Exh. C-205, C-207, C-206, R-196.

one director is currently needed because its business activities ceased due to the Respondent's conduct.[305] It was Mr. Lawler who ultimately initiated the treaty arbitration and engaged outside professionals to assist.[306]

224. The Claimant further points out that shareholder meetings were held in 2005 and in 2006.[307] In these meetings, the shareholders had – contrary to the assertions of the Respondent – the possibility to exercise their control over the Claimant and they could e.g. demand to receive the Claimant's annual report.[308]

225. Additionally, the Claimant argues that as a company listed on the US stock exchange it is subject to a multitude of regulations which allow the conclusion that the Claimant was "anchored" in the US.[309]

226. Furthermore, the Claimant submits that Article I(2) of the BIT refers to the control over the Claimant, not to the control over the arbitration (as allegedly suggested by the Respondent).[310]

227. Finally, the Claimant argues that its character as a publicly listed company opposes the denial of benefits clause because (i) this means that there is not one single controlling shareholder, and (ii) that it is in the very nature of such a company for shareholders to change over time.[311] In addition, contrary to what the Respondent argues, there was no attempt to lessen the influence of investors from the US within the Claimant's shareholding.[312]

---

305 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 494, 506; Exh. C-3, C-38.

306 Claimant's Rejoinder on Preliminary Objections, ¶¶ 40-42; Exh. R-207, C-4, C-77.

307 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 496-498; Exh. C-339, C-340.

308 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 499-504; Exh. C-340, C-111, C-199.

309 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 505.

310 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 507; Claimant's Rejoinder on Preliminary Objections, ¶ 4; Exh. R-188, R-200.

311 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 508-509; Exh. C-76, C-8, C-37, C-36, C-79, C-198, C-339, C-111, C-340, C-76.

312 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 508-509.

228. The Claimant further submits that the reasoning of the precedent on which the Respondent tries to rely (*CCL v. Kazakhstan*) cannot be applied to the present dispute.[313] First of all, the Claimant argues that the *CCL v. Kazakhstan* tribunal did not base its decision on the denial of benefits clause but rather on the lack of information provided by the investor.[314] Additionally, the cases differ because the present Claimant's shares are not held privately and by a small number of shareholders.[315]

229. In light of the above, the Claimant argues that the Respondent did not meet its burden of proof and did not demonstrate that the requirements of Article I(2) of the BIT are met.[316]

230. In its Rejoinder on Preliminary Objections, the Claimant further points out that, according to its own presentation and to *Ulysseas v. Republic of Ecuador*, the Respondent misjudges the requirement of "control". In the Claimant's view, it includes control in fact as well as control in law.[317] The Claimant submits that no third-party nationals controlled the Claimant at any moment in time in fact or in law.[318]

231. To this end, the Claimant argues that the Board of Directors was not controlled by nationals from a third country. The directors were of different nationalities and none of them could control the board.[319] As the Claimant's business had ceased due to the Respondent's disputed conduct, the Board of Directors resigned and Mr. Lawler was designated the Claimant's Sole Director.[320] The Claimant further submits on this issue that Mr. Lawler

---

313 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 510, *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22).

314 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 510.

315 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 510.

316 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 511; Exh. C-207.

317 Claimant's Rejoinder on Preliminary Objections, ¶¶ 26-27.

318 Claimant's Rejoinder on Preliminary Objections, ¶ 28; Exh. C-111.

319 Claimant's Rejoinder on Preliminary Objections, ¶¶ 29-31; Exh. C-111, C-268, C-269, C-361, C-204, R-191.

320 Claimant's Rejoinder on Preliminary Objections, ¶¶ 32-37; Exh. C-362, C-363, R-191, R-192, R-193, C-364, C-178, C-67, C-365, C-366, C-367, C-368, C-369, C-370, C-371, R-207, R-199, R-194, C-372, C-202, C-194, R-176, R-177, R-178, C-373, C-374, C-375, C-376, C-377, C-378.

was the controller in law and in fact and had only to answer to the shareholders. There was however never one or several shareholders that had control over the Claimant.[321]

232. The Claimant also stresses that, first, the criterion of control over the present arbitration is not relevant for Article I(2) of the BIT and, second, that this control lies with Mr. Lawler.

233. In any event, the Claimant submits that Article I(2) of the BIT refers to the control over the Claimant (i.e. not over the arbitration) and not to the person that ultimately benefits from the arbitration.[322] The person responsible for the conduct of the arbitration is Mr. Lawler.[323]

234. Additionally, the Claimant rejects the Respondent's reliance on *CCL v. Kazakhstan* and argues that the cases are different, especially that the tribunal in *CCL v. Kazakhstan* lacked evidence regarding the control over the claimant-investor (which it alleges is not the case in the present arbitration).[324] Moreover, the Claimant argues that *CCL v. Kazakhstan* was not followed by other tribunals.[325]

235. Finally, the Claimant considers it not unusual to resort to a third party for financial support in the arbitration and refers in this respect to ICSID precedents, including *Abaclat v. The Argentine Republic*; *Ambiente Ufficio v. The Argentine Republic*, *Giovanni Alemanni and Others v. The Argentine Republic*.[326]

#### ***b. Substantial Activities in the United States***

236. The Claimant again rejects the Respondent's contentions.[327] In its Rejoinder on Preliminary Objections, the Claimant points out that the parties to the dispute disagree with

---

321 Claimant's Rejoinder on Preliminary Objections, ¶¶ 43-46; Exh. C-77, C-194, C-197, C-338, C-76, C-207, C-339, C-340, C-198, C-197, C-178, C-67, C-38.

322 Claimant's Rejoinder on Preliminary Objections, ¶¶ 47-62.

323 Claimant's Rejoinder on Preliminary Objections, ¶¶ 47-49; Exh. C-379.

324 Claimant's Rejoinder on Preliminary Objections, ¶¶ 51-57; Exh. C-379, R-167, C-76.

325 Claimant's Rejoinder on Preliminary Objections, ¶ 52.

326 Claimant's Rejoinder on Preliminary Objections, ¶¶ 58-60, *Giovanni Alemanni and Others v. Argentine Republic*, ICSID Case No. ARB/07/08, Decision on Jurisdiction and Admissibility, November 17, 2014 (CL-181), *Abaclat and others v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, August 4, 2011 (CL-4), *Ambiente Ufficio S.P.A. and others (formerly Giordano Alpi and others) v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, February 8, 2013 (CL-180).

327 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 512-514.

regard to the date on which the Claimant must have had substantial business activities and the notion of substantial business activities.[328] The Claimant rejects the Respondent's argument that the relevant moment is only the date of the filing of the request for arbitration and argues that the relevant timeframe is broader.[329]

237. The Claimant asks the Tribunal again to decide on a "but for" analysis to prevent the Respondent from invoking the denial of benefits clause after "destroying" the investment.[330] The Claimant argues that prior to 2008, when it lost its investment, it had substantial business activities in the US.[331]

238. The Claimant submits that its activity consisted in the raising of equity for the investment in Kazakhstan and that it was subject to several potential liabilities due to its reporting obligation towards the SEC.[332]

239. The Claimant submits further that it raised – under the lead of Mr. Heysel – capital for its investment operation from 2000 to 2006, in particular by attracting US investors, and had a market capitalization of over USD 350 million by 2006 and planned to continue to do so once it is listed again.[333] Additionally, the Claimant used private placements.[334] Furthermore, the Claimant referred to its multitude of SEC filings.[335]

240. Moreover, the Claimant explained that it resorted to debt financing with a US investment firm (Ingalls & Snyder, represented by Mr. Thomas Boucher, a US national).[336]

---

328 Claimant's Rejoinder on Preliminary Objections, ¶ 6.

329 Claimant's Rejoinder on Preliminary Objections, ¶¶ 65-66.

330 Claimant's Rejoinder on Preliminary Objections, ¶ 7.

331 Claimant's Rejoinder on Preliminary Objections, ¶ 7.

332 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 514, 522; Exh. C-340; Claimant's Rejoinder on Preliminary Objections, ¶¶ 67-68; Exh. C-380, C-381, C-382, C-383, C-384, C-385, C-386, C-387; C-37.

333 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 515-518, 521, 523; Claimant's Rejoinder on Preliminary Objections, ¶ 68; Exh. C-36, C-37, C-111, C-75, C-38.

334 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 519.

335 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 520; Claimant's Rejoinder on Preliminary Objections, ¶¶ 69-70; Exh. C-36, C-79, C-37, C-111, C-75, C-388, C-389, C-390, C-391, C-392, C-393, C-394, C-395.

336 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 524-525; Claimant's Rejoinder on Preliminary Objections, ¶ 72; Exh. C-207, C-111.

241. Additionally, the Claimant submits that it did hire US advisers and US service providers for its business in the US.[337]

242. The Claimant points out that the Respondent did not submit jurisprudence applying a denial of benefits clause to publicly listed companies.[338] Furthermore, the Claimant argues that the Respondent's reference to *Pac Rim v. El Salvador* is not fitting because in the present arbitration the Claimant exercises an activity beyond mere asset holding.[339] The Claimant refers to the *Amto v. Ukraine* and the *Masdar v. Spain* arbitrations in support of its argument that a substantial activity does not necessarily have to be a large activity.[340] As it raised over USD 80 million on US markets and increased its market capitalization to over USD 350 million, the Claimant considers its financing activities to be material and of "great magnitude."[341] With reference to *Bridgestone v. Panama*, the Claimant contends that the requirement of substantial activities is also fulfilled by activities which are a significant part of the Claimant's business.[342]

243. Ultimately, the Claimant submits that only the financing operations in the US allowed the realization of its investment in Kazakhstan.[343]

244. Moreover, the Claimant argues that the Respondent cannot rely on an objection to jurisdiction which results from its own conduct and that – for the same reason – the Respondent should not be allowed to argue that the relevant date is the one of the filing of

---

337 Claimant's Rejoinder on Preliminary Objections, ¶ 71; Exh. C-204, C-111, C-207.

338 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 526; Claimant's Rejoinder on Preliminary Objections, ¶ 73.

339 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 527-528; *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1).

340 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 527-528, *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85), *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 (RL-15).

341 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 529-530; Claimant's Rejoinder on Preliminary Objections, ¶¶ 73-74; Exh. C-38, C-204, C-207.

342 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 531-532; *Bridgestone Licensing Services, Inc. and Bridgestone Americas, Inc. v. Republic of Panama*, ICSID Case No. ARB/16/34, Decision on Expedited Objections, December 13, 2017 (RL-14).

343 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 532.

the request for arbitration.[344] According to the Claimant, its business activities ceased due to the Respondent's conduct.[345] The Claimant refers to Article 31(1) of the Vienna Convention on the Law of Treaties (the "VCLT") and its rule of interpretation in good faith to argue that the Respondent is not allowed to invoke the denial of benefits clause because, if the requirement of lack of substantial business were to be fulfilled, this would only result from the Respondent's actions.[346]

245. To conclude, the Claimant submits that the requirements of Article I(2) of the BIT are not met in the present arbitration.[347]

## B. THE TRIBUNAL'S ANALYSIS

246. To recall, the denial of benefits clause contained in Article I(2) of the BIT provides:

> "Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations."

247. As indicated by both Parties, the denial of benefits issue under Article I(2) of the BIT concerns two levels of analysis – control and substantial business activities.

### (1) Control by Nationals of a Third Country

248. For the Respondent to successfully invoke Article I(2) of the BIT, it must establish that the Claimant was controlled by nationals of a third country.

249. Both Parties address the concept of control from a legal and factual perspective, and thus both are addressed below.

---

344 Claimant's Rejoinder on Preliminary Objections, ¶¶ 75-85.

345 Claimant's Rejoinder on Preliminary Objections, ¶ 75.

346 Claimant's Rejoinder on Preliminary Objections, ¶¶ 76-85.

347 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 533-534; Claimant's Rejoinder on Preliminary Objections, ¶ 86.

### *a. Controller-in-Law*

250. While the Respondent's jurisdictional arguments focus on the control of the Claimant as of the date of filing the request for arbitration, it is worth noting that before Mr. Lawler became Sole Director, the Board was controlled by individuals of mixed nationalities (including two from the US) and there was no third country controlling shareholder that could arguably be described as having control for the purpose of Article I(2).[348]

251. Since 2013, Mr. Lawler has served as Sole Director and it is the Claimant's position that he has thus been the controller-in-law, subject only to possible shareholder control, which has failed to exist because of the lack of any definitive individual or group of shareholders wielding such control over Mr. Lawler in his position as Sole Director.

252. The Respondent calls into question Mr. Lawler's legal ability to control the Claimant as the Claimant's bylaws specify a minimum of three directors.[349] While Mr. Lawler's position as the Sole Director would appear to be at odds with this highlighted section of the bylaws, the Respondent fails to demonstrate that Mr. Lawler subsequently lacked legal control over the Claimant as a result. In reality, regardless of whether the Claimant should, by its own bylaws, work with a minimum of three directors, there is no doubt that Mr. Lawler has indeed been operating as the Sole Director with the legal powers that accompany such a position. Further, even if this Tribunal were to delve deeper into this issue, such a discrepancy fails to establish legal control from nationals of a third country, but rather questions the Claimant's decision to operate in such a manner. The Tribunal is therefore satisfied that Mr. Lawler was the controller-in-law.

### *b. Controller-in-Fact*

253. The Respondent dedicates most of its argument to the issue of controller-in-fact, which is arguably more complex than the controller-in-law analysis. The Respondent's argument is primarily two-fold: (1) the Claimant's contention that Mr. Lawler controls the Claimant is unconvincing; and (2) as manager of this arbitration, the Claimant's only current activity, Agrima, through Mr. Daniel Israel, a Belgian national who resides in the Democratic

---

[348] Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 13, 508; Exh. C-76.

[349] Respondent's Closing Presentation, p. 45; Exh. C-198.

Republic of the Congo, is the controller-in-fact of the Claimant. The Respondent further alleges that the Claimant's shareholders do not exercise control over the Claimant, but this point is not determinative as the Claimant also acknowledges that, despite the theoretical control of shareholders, no predominant group exists that could qualify as controller-in-fact. In that sense the Parties are in agreement and the nationalities of the shareholders is not the dispositive issue here.

254. Concerning the first point, the Respondent argues that, for the purpose of Article I(2) of the BIT, it is insufficient for the Claimant to merely point to the individual who is formally vested with the power of control over the Claimant.[350] Specifically, although Mr. Lawler is registered as the Claimant's Sole Director, the Respondent contends that the available evidence suggests that Mr. Lawler is a nominee director who takes his instructions from another entity or individual.[351] The Respondent highlights the lack of evidence provided in this arbitration concerning the Claimant's desire to vest Mr. Lawler with actual control, or Mr. Lawler's exercise of said control.[352]

255. While it admittedly could have been helpful to hear from Mr. Lawler at the hearing concerning the details of his position, the Tribunal finds that it has enough information before it to rule on this issue.

256. Importantly, the Respondent has failed to establish that Mr. Lawler is a nominee director who takes instructions from another entity or individual, as alleged. In examining the footnote that accompanies this general argument in the Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, it can be seen that the Respondent fails to provide any evidence that definitively supports this position,[353] but rather primarily relies on its contention that the Claimant has failed to provide evidence establishing that Mr. Lawler is not merely such a nominee director.[354] This of course relates to his role

350 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 335.

351 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 336.

352 Respondent's Closing Presentation, p. 43; Exh. R-190, R-193, R-194, R-198, R-199.

353 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 336, fn. 536.

354 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 336, fn. 536.

generally, and is distinct from the Respondent's position concerning control over this arbitration which is addressed below.

257. While the Tribunal does acknowledge the Claimant's failure to provide thoroughly compelling evidence concerning Mr. Lawler's role in the company, the Claimant has managed to provide enough support to withstand an argument which is primarily based on the allegation that the Claimant has failed to meet its initial burden. Prior to their resignation in March 2013, the Board of Directors, empowered with controlling the business activities of the Claimant, appointed Mr. Lawler as the Sole Director, President, Secretary and Treasurer.[355] As the Claimant correctly highlights, Mr. Lawler has had a long-standing relationship with the Claimant, having been appointed its US General Counsel in 2006.[356] The Tribunal is not willing to characterize Mr. Lawler as a mere "nominee director". In his role, the Tribunal sees no evidence suggesting that anyone other than Mr. Lawler manages the Claimant's activities at the Board level, which is the role of the Sole Director.[357] Absent any compelling evidence that Mr. Lawler takes instructions from someone else in his capacity as the Sole Director, the Tribunal is satisfied that Mr. Lawler's execution of this role is sufficient to withstand scrutiny.

258. Aside from the general contention that Mr. Lawler fails to display actual control-in-fact over the Claimant, the Respondent specifically alleges that control over the Claimant has been exercised by Agrima through Mr. Daniel Israel, a Belgian national who resides in the Democratic Republic of the Congo.[358] The Respondent's theory relies on the fact that Agrima is the "Claim Manager" in the Arbitration Funding Agreement governing the Claimant's dispute before this Tribunal.[359] Specifically, the funding agreement provides that Agrima, as the Claim Manager, "must (i) use its best endeavors to give Counsel prompt and regular instructions on behalf of [the] Claimant[], that allow Counsel to do their work

355 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 491; Exh. C-202.
356 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 491; Exh. C-204.
357 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 493; C-205-207.
358 Respondent's Closing Presentation, p. 44.
359 Exh. R-167.

properly; and (2) [on] behalf of the Claimant not ask Counsel to work in an improper or unreasonable way."[360]

259. With respect to Mr. Israel's direct control, the Respondent highlights ICIJ Offshore Leaks Database documents demonstrating Mr. Israel's control of Agrima, as well as a December 5, 2012 email to Mr. Lawler, among other recipients, in which the arbitration at hand is referred to as the "Daniel Israel international investment treaty arbitration".[361]

260. Ultimately the Respondent takes the position that while the Claimant may secure funding from a third party, it must do so "without entirely divesting its board and its shareholders of control over both itself and the resulting proceedings."[362] On that note, the Respondent comments that (1) it may be the case that Agrima is set to receive all the benefits from these proceedings (which is unknown because of the Claimant's decision to redact the relevant provision of the funding agreement); and (2) the evidence reveals that Agrima is the controller and the entity standing to benefit from the advantages of the treaty within the meaning of Article I(2) of the BIT.

261. The Tribunal is not convinced that an arbitration funding arrangement necessarily transfers control-in-fact of a party to the claim manager. While such a transfer is in theory possible and could be contractually provided for, that is not the case here and instead the Respondent relies on merely presumed control present in a standard relationship between a claim manager and a party.

262. There is a stark difference between control-in-fact of an entity and having an active role in how that entity pursues legal claims in an arbitration. As lawyers act on behalf of parties in such proceedings, Agrima here, pursuant to the funding agreement, also acts on behalf of the Claimant, not as its controller.[363]

---

360 Exh. R-167, ¶¶ 20.1.1-20.1.2.

361 Exh. R-170, R-171, R-207.

362 Hearing Transcript, Day 9, 106:3-8.

363 Exh. R-167, ¶ 20.1.1.

263. In this respect, the Tribunal finds the *Ambiente Ufficio S.p.A. v. Argentine Republic* ("***Ambiente***") case particularly helpful. In *Ambiente*, the tribunal noted that the respondent's concern was not the funding arrangement as such, but that a third party (NASAM) "*was the driving force behind the present arbitration and that it has full control over it.*"[364]

264. The *Ambiente* tribunal then observed:

> "The Tribunal considers that, while NASAM has, without doubt, played a crucial role not only in financing the present proceedings on the Claimants' side, but also in bringing them together and coordinating them to conduct the proceedings against the Respondent, this does not amount to putting NASAM in a position to "control" the present proceedings. The lawyers acting in this case are bound by the Power of Attorney which legally links them to the Claimants, and to the Claimants only. At the same time, these lawyers are not bound by the NASAM Mandate which is a contract between NASAM and the Claimants. Hence, the Tribunal cannot conclude that NASAM is more than a third party which has a special relationship to the Claimants. It is not a party to the present proceedings. The NASAM Mandate does not interfere with the ability of the Claimants to conduct the present proceedings in their best interest and to instruct their counsel accordingly."[365]

265. Here the Tribunal is faced with a similar scenario. It does not question that there is a relationship between Agrima and the Claimant, or that Mr. Israel, as a Belgian national, is involved in such a relationship. Further, the Tribunal does not question that this relationship concerns this very arbitration and the proceeds that may come from it. The Tribunal rejects, however, that such a relationship amounts to putting Agrima in "control" of the proceedings, let alone the Claimant, to an extent relevant for the purpose of analyzing the denial of benefits clause present in Article I(2).

266. Simply put, the Respondent fails to articulate a viable legal theory whereby the Claimant, through Mr. Lawler, surrendered control-in-fact of the Claimant by entering into a funding

---

[364] *Ambiente Ufficio S.P.A. and others (formerly Giordano Alpi and others) v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, February 8, 2013 (CL-180), ¶ 276.

[365] *Ambiente Ufficio S.P.A. and others (formerly Giordano Alpi and others) v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, February 8, 2013 (CL-180), ¶ 277.

agreement whereby an outside claim manager has an active role in managing the arbitration.

267. The Respondent relies heavily on *CCL v. Republic of Kazakhstan* ("***CCL***") for its position, but that case is quite distinguishable to the case at hand.

268. As noted by the Claimant, in *CCL* the tribunal was faced with a lack of evidence to properly determine who in fact was in charge of the claimant-investor. Specifically, the *CCL* tribunal noted that (i) reasonable doubt had been raised as to the actual ownership of and control over the company seeking protection under the treaty; (ii) by [Mr. X]'s own admission, the sole activity of the claimant since the termination of the relevant agreement, and the sole asset of the claimant, was the arbitration; (iii) that the arbitration was financed solely by a group of shareholders allegedly owning 49 per cent of the shares in the holding company; and (iv) that the economic outcome of the arbitration was fixed with 5/6 to the shareholder group and 1/6 to [Mr. X]. This scenario led to the *CCL* tribunal concluding that the claimant had the burden of proving that [Mr. X] was in control of the decisions to be made in the arbitration or generally in control, directly or indirectly, of the claimant, as [Mr. X]'s nationality was being invoked for the purposes of the treaty.[366]

269. The *CCL* tribunal ultimately found that the claimant had failed to provide information and evidence concerning ownership and control despite repeated requests to do so, and therefore the tribunal determined that the claimant had not provided sufficient proof that US citizens or companies had any degree of control, directly or indirectly, over the claimant.[367]

270. Here, as noted by the Claimant, neither the funder nor the claim manager is a shareholder of the Claimant, unlike in *CCL*, eliminating a crucial layer of possible control at issue in that case. In the dispute at hand, the Claimant has provided a list of shareholders, who are diverse and thus do not represent control by nationals of a third country, and the shares are

---

366 *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22), p. 152.

367 *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22), p. 152.

not privately held by unknown shareholders in a shell company, which was at issue in *CCL*.[368]

271. Further, aside from the focus on Mr. Israel as the controller-in-fact, the Respondent focuses generally on the lack of involvement seen from Mr. Lawler, questioning the assertion that he is the relevant controller for the purpose of this analysis. However, in this arbitration the Tribunal has before it a claimant-investor with a clearly identified Sole Director of US nationality, entering into a funding agreement whereby the assistance of an outside claim manager has been procured for an undisclosed percentage of possible future proceeds. This scenario is simply not comparable to that of *CCL*.

272. On the basis of the above analysis, the Tribunal concludes that, for the purpose of Article I(2) of the BIT, it has not been established that the Claimant was controlled by nationals of a third country.

273. While the Respondent's failure to establish the first prong of the denial of benefits clause is enough for the Tribunal to dismiss the Respondent's invocation of Article I(2) of the BIT, the Tribunal provides additional analysis below concerning substantial business activities.

**(2) Substantial Business Activities**

274. Before examining the business activities at issue, it is important to understand the nature of the activities, or lack thereof, necessary for the application of the denial of benefits clause.

275. First, the Tribunal must address the relevant date. The Claimant correctly points out that the denial of benefits clause is designed primarily to exclude from treaty protection certain "mailbox" companies that have no meaningful connection to the country whose nationality is invoked.[369] Accordingly, the denial of benefits clause permits a state from denying protection to such companies.

368 Claimant's Rejoinder on Preliminary Objections, ¶¶ 56-57; C-76.

369 Claimant's Rejoinder on Preliminary Objections, ¶ 64.

276. For this purpose, it does not logically follow that the only relevant date for examining such activities would be the date of a request for arbitration. It is quite a common characteristic of investment treaty arbitrations that by the time a request for arbitration is filed, a claimant-investor is fairly or completely inactive aside from the arbitration itself, in large part because of the negative business effects it attributes to a host State. Because of this, if the only relevant date was the start of an arbitration, then, in theory, a respondent State could assure itself of protection under the denial of benefits clause as long as it took such significant action against a claimant-investor as to completely rid it of any current business activities (e.g., a complete and total expropriation). This simply cannot be the proper analysis under such a clause, which is why tribunals have analyzed business activities more broadly with respect to the relevant date.[370]

277. The Respondent spends considerable effort highlighting the lack of certain qualities displayed by the Claimant that one might expect from a typical business conducting activities in the US. While the absence of certain examples of what could be considered "typical" business activities (e.g., the presence of a physical office) may be relevant for an overall view of how a business was operating, in the context of a "substantial business activity" under Article I(2) of the BIT, this is not the proper means of analysis. Rather, since a threshold of activities must be met, it is instead more helpful to examine the allegations before us concerning business activities and to then weigh whether they are sufficiently "substantial" to avoid a denial of benefits clause.

278. The analysis begins with the meaning of "substantial", as no definition is provided for in the BIT. There is no clear test for fulfilling this requirement, but the Parties have both provided language helpful for establishing the burden here.

279. As the Claimant highlights, having "substantial business activities" in a particular jurisdiction has been clarified not to refer solely to the jurisdiction with the most substantial connections, but rather includes jurisdictions where sufficiently substantial business

---

370 Claimant's Rejoinder on Preliminary Objections, ¶ 65; *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, January 31, 2014 (RL-17); *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, May 31, 2019 (RL-71).

activity is seen.[371] The test for substantial business activities takes its color from the nature of the business.[372] In this respect, the Claimant submits that arbitral tribunals have determined that:

> "'[s]ubstantial' in this context means 'of substance, and not merely of form.' It does not mean 'large,' and the materiality not the magnitude of the business activity is the decisive question";[373]
>
> "[s]ince it is the quality and not just the quantity of the activities that is relevant, whether the term 'important' or the term 'substantial' is used does not make a difference";[374]
>
> "tribunals that have found such activities to exist have been prepared to do so on the basis of a relatively small number of activities both in terms of quantity and quality";[375] and that
>
> "[a] business activity may not be cursory, fleeting or incidental, but must be of sufficient extent and meaning as to constitute a genuine connection by the company to its home state. That genuine connection is necessary to ensure that the company is one that the home State has an interest to protect, and which the host State would consider it appropriate for the home State to protect. The connection between the company and its home State cannot be merely a sham, with no business reality whatsoever, other than an objective of maintaining its own corporate existence."[376]

---

371 Claimant's Closing Statement, p. 10; *Gran Colombia Gold Corp. v. Republic of Colombia*, ICSID Case No. ARB/18/23, Decision on the Bifurcated Jurisdictional Issue, November 23, 2020 (CL-187), ¶ 136.

372 Claimant's Closing Statement, p. 11; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, May 31, 2019 (RL-71), ¶ 182.

373 Claimant's Closing Statement, p. 12; *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85), ¶ 69. See also, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 (RL-15), ¶¶ 253-254.

374 Claimant's Closing Statement, p. 13; *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, March 12, 2019 (CL-172), ¶ 257.

375 Claimant's Closing Statement, p. 13; *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, March 12, 2019 (CL-172), ¶ 257.

376 Claimant's Closing Statement, p. 14; *Gran Colombia Gold Corp. v. Republic of Colombia*, ICSID Case No. ARB/18/23, Decision on the Bifurcated Jurisdictional Issue, November 23, 2020 (CL-187), ¶ 137.

280. The Respondent agrees that the focus must be placed on the materiality of the business activities,[377] and adds the clarification that the "substantial business activities" at issue must be those of the Claimant itself, and not of any related group companies or entities.[378]

281. The presence of certain "activities" is not at issue here, but whether they cumulatively qualify as "substantial". They are primarily, but not exclusively, as follows:[379]

- The Claimant filed annual reports with the SEC for the years 2003, 2004 and 2005 and overall the Claimant submitted more than 100 filings with the SEC after its acquisition of Kozhan.

- The Claimant raised over USD 80 million on US markets and the Claimant's market capitalization eventually grew to over USD 350 million. This included raising equity from American investment companies and funds managed by US companies.

- Mr. Heysel arranged face-to-face meetings in the US each quarter, met with potential new US investors, and engaged US-licensed stockbrokers.

- The Claimant regularly used a US law firm for preparing and filing compliance documents with the SEC, in addition to corporate governance.

- In 2006, the Claimant secured debt financing under the unsecured convertible note with Ingalls & Snyder, a US investment firm, and the note is still in force, with the Claimant abiding by its restrictive covenants as described in one of Claimant's SEC filings.

- The Claimant engaged a US law firm for financing arrangements pursuant to the USD 15 million convertible note.

- The Claimant engaged a US accounting firm to advise on corporate risk.

---

377 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 357; *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85), ¶ 69; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 (RL-15), ¶¶ 253-254.

378 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 358; Exh. C-1.

379 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 516-524; Claimant's Closing Statement, pp. 15-24.

- Between 2000 and 2006, the Claimant's stock was traded on the OTC-BB in the US.

282. The Respondent argues that this case is analogous to *Pac Rim Rayman L.L.C. v. Republic of El Salvador* ("***Pac Rim***") in which a similar holding company was found to lack substantial business activities in the US.[380] That case is, however, distinguishable from the dispute at hand.

283. In *Pac Rim*, the Tribunal determined that the claimant was nothing beyond a mere holding company, with its activities as a holding company not directed at business activities in the US. In addressing its activities in the US before and after a nationality change, the tribunal noted that it was:

> "not possible from the evidence . . . for the Tribunal to identify any material difference between the Claimant's activities as a company established in the Cayman Islands and its later activities as a company established in the USA; the location (or non-location) of the Claimant's activities remained essentially the same notwithstanding the change in nationality, and such activities were equally insubstantial."[381]

284. Based on the above, the *Pac Rim* tribunal found that, specifically, as a holding company first in the Cayman Islands and then in the US, the claimant's activities were principally to hold shares in El Salvador, with such activities seemingly unchanged even as the claimant's nationality changed.[382]

285. Here, the Claimant is not comparable to the type of claimant seen in *Pac Rim*. While the claimant in *Pac Rim* lacked even a board of directors, the Claimant in this arbitration was a publicly traded company with several business activities directed at the US. It thus cannot accurately be characterized as merely a "shell company with no geographic location for its

[380] Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 376; *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1).

[381] *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1), ¶¶ 4.73-74.

[382] *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1), ¶¶ 4.73-74.

nominal, passive, limited and insubstantial activities."[383] Unlike in *Pac Rim*, the Claimant here has highlighted a number of US-specific activities, and while they may lack what would constitute more convincing evidence of substantial business activities (e.g., permanent US staff, physical offices, US bank accounts, etc.), the activities present in this case nonetheless far exceed those at issue in *Pac Rim*. The Tribunal is not convinced that the *Pac Rim* analysis is comparable here.

286. Under the Respondent's own description of "substantial business activities", the focus is on "substance" and not "form" and on materiality rather than on magnitude of the business activity. The Tribunal is convinced that the Claimant fulfils this requirement. While it is undisputed that the Claimant lacks more traditional components of what a US business may be expected to demonstrate, the Respondent has failed to demonstrate that such characteristics are necessary for an entity to be considered to have "substantial business activities" in a given jurisdiction. The fact is that a publicly listed company raising tens of millions of US dollars on US markets, including raising equity from US investment companies and funds managed by US companies, whilst engaging US law firms, filing numerous SEC reports and arranging consistent face-to-face meetings in the US with US investors and stockbrokers, can hardly be characterized as a company merely engaging in activities "of form" as opposed to "of substance".

287. The activities in the US were quite material to the Claimant's purpose and went well beyond those displayed by traditional "mailbox" or "shell" companies.

288. The Tribunal repeats here that it need not find the existence of substantial business activities to deny the Respondent's denial of benefits position because it finds that the Claimant was not controlled by nationals of a third country. However, for the sake of completeness, the Tribunal also concludes that the Claimant engaged in sufficiently substantial business activities in the US.

---

383 *Pac Rim Cayman LLC v. The Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1), ¶ 4.75.

289. Accordingly, the Respondent may not successfully invoke the denial of benefits clause in Article I(2) of the BIT.

## VI. LIABILITY

### A. THE CLAIMANT'S POSITION ON THE MERITS

290. As a general remark, the Claimant points out that the present arbitration concerns more than a mere allegation of misconduct of the Respondent's courts and differs greatly from *Liman v. Kazakhstan*.[384] To argue this point, the Claimant states that all the Respondent's organs, including the courts, were obligated to protect the Claimant's investment vis-à-vis the Original Owners and the Three Oligarchs.[385]

291. Also, the Claimant submits that under international law the conduct of all the Respondent's organs, especially its courts, is imputable to the Respondent and refers to Article 4 of the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts and the Commentary thereto.[386]

292. Furthermore, the Claimant submits that the Respondent had a duty of due diligence and this duty is not limited to the prohibition of a denial of justice.[387] The Claimant refers to the International Law Association's study regarding the content of the due diligence standard under international law and points out the role of due diligence when determining the Fair and Equitable Treatment ("**FET**") and the Full Protection and Security ("**FPS**") standards.[388] According to the Claimant, the duty of due diligence requires States to take

---

384 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 535-541; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of the Award, June 22, 2010 (CL-69).

385 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 537-540; Exh. C-267.

386 Claimant's Memorial on the Merits, ¶¶ 335-359.

387 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 542-557.

388 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 544-546, 553. See also ¶¶ 547-552 regarding the Claimant's description of the historic development of the due diligence standard.

appropriate steps to prevent harm and to conduct effective investigations into alleged wrongdoing..[389]

293. Generally, the Claimant considers that the BIT standards of protection are not limited to the denial of justice standard which exists under international law.[390]

### (1) Article III(1) of the BIT – Expropriation

294. Article III(1) of the BIT provides:

> "Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for public purpose; in a nondiscriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II(2). Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable."[391]

295. The Claimant argues that the Respondent violated Article III(1) of the BIT and unlawfully expropriated the Claimant because none of the actions addressed below were for a public purpose and the Claimant received no prompt, adequate and effective compensation.[392] Furthermore, the Claimant explains that the Respondent's organs collectively failed to protect the Claimant's investment.[393]

296. The Claimant refers to the *Caratube II* Tribunal[394] which defined the notion of expropriation under the US-Kazakhstan BIT as "(i) the unreasonable substantial

---

389 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 553-556.

390 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 560.

391 C-1.

392 Claimant's Memorial on the Merits, ¶¶ 360-391; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 558-609.

393 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 563-565, 574, 577-579; Exh. C-270, C-273.

394 Claimant's Memorial on the Merits, ¶ 361; *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, September 27, 2017 (CL-20).

deprivation of existing rights, (ii) of a certain duration and (iii) caused by a sovereign act of the host State."[395] The Claimant further argues that an expropriation can also consist in the abrogation of the investor's contractual rights by State courts.[396] Also, the Claimant argues that the BIT includes indirect expropriation.[397]

297. The Claimant further clarifies that the protection against expropriation cannot be limited to a denial of justice standard and that its complaint is not centered around judicial misconduct.[398] The Claimant submits that the BIT does not distinguish which organ is at the origin of the expropriation.[399]

298. The Claimant's argument is that the Respondent expropriated the Claimant's investment through the court decisions at the heart of this dispute.[400]

299. The first branch of the Claimant's argument centers around the alleged unlawful expropriation of its 100% interest in the charter capital of Kozhan through the court proceedings regarding the 2003 SPA and the cancellation of the re-registration of Kozhan.[401]

300. The Claimant submits that the Kazakh courts issued legally flawed decisions and denied BSEK due process.[402] The Claimant argues that BSEK's defenses were not heard and that crucial elements such as the withdrawal of claims by two of the spouses were not addressed.[403]

301. According to the Claimant, following the 2003 SPA decisions, it only owned 10% of Kozhan's shares due to the 2005 SPA but was denied the ownership rights in that

---

395 Claimant's Memorial on the Merits, ¶ 361; *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Award, September 27, 2017 (CL-20), at ¶¶ 825-826; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 572.

396 Claimant's Memorial on the Merits, ¶ 362.

397 Claimant's Memorial on the Merits, ¶¶ 363-364.

398 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 566-568.

399 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶567-568.

400 Claimant's Memorial on the Merits, ¶¶ 365-371.

401 Claimant's Memorial on the Merits, ¶¶ 372-382; Exh. C-157, C-21, C-171, C-30, C-64, C-66.

402 Claimant's Memorial on the Merits, ¶¶ 374, 377.

403 Claimant's Memorial on the Merits, ¶¶ 375-376.

shareholding.[404] Due to the 2009 Set-Off, BSEK finally lost all participation in Kozhan.[405] The Claimant complains in particular that BSEK was not duly notified of the court proceedings.[406] According to the Claimant, the 2009 Set-Off cannot be characterized as a mere error.[407]

302. The second branch of the Claimant's argument concerns the Respondent's conduct regarding the 2006 Agreements because the Claimant considers that the Respondent's courts unlawfully expropriated its rights under those agreements.[408] The Claimant especially points out that it was under no obligation to exhaust all local remedies.[409]

303. The Claimant's third line of argumentation alleges that the Respondent's courts expropriated the Claimant's rights resulting out of the IUS Award and the 2004 Line of Credit Agreement by allowing the 2012 Set-Off.[410] The Claimant submits that these decisions were legally flawed and not in accordance with Kazakh law and led to the enforcement of the allegedly fabricated debt a second time.[411] The Claimant contends again that BSEK was not duly notified of the proceedings.[412]

304. Finally, the Claimant submits that previous decisions of arbitral tribunals cited in its Memorial are relevant to the present arbitration.[413] In particular, the Claimant refers to *CCL*

---

404 Claimant's Memorial on the Merits, ¶ 379.

405 Claimant's Memorial on the Merits, ¶¶ 380-382; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 597-603; Exh. C-66, C-64, R-55; C-295.

406 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 601.

407 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 601-603; Exh. C-295.

408 Claimant's Memorial on the Merits, ¶¶ 383-385; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 594-596; Exh. C-29, C-15.

409 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 596.

410 Claimant's Memorial on the Merits, ¶¶ 386-389; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 604-609; Exh. C-20, C-32, C-68, C-73, C-72.

411 Claimant's Memorial on the Merits, ¶¶ 387-389; Exh. C-32.

412 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 605.

413 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 569-579.

*v. Kazakhstan*,[414] in which the tribunal established the criteria for expropriation which the Claimant says should be applied in this case.[415]

305. On this issue, the Claimant rejects the Respondent's allegation that its complaint mainly regards the substantive correctness of the 2003 SPA decisions.[416] The Claimant refers again to the alleged failures that the Respondent's courts committed when deciding on the Claimant's disputes.[417] The Claimant insists on the alleged fact that the Respondent's courts violated a number of procedural rules, especially that the courts failed to address numerous arguments of BSEK and ignored the withdrawal of the complaints by two of the spouses as well as Mr. Baikenov's potential witness status.[418]

**(2) Article II(2)(a) of the BIT – FET**

306. The Claimant alleges a violation of the FET standard contained in Article II(2)(a) of the BIT.[419] Article II(2)(a) provides:

> "Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law."[420]

307. The Claimant points out that the FET standard as contained in the BIT includes lack of arbitrariness and as a result covers due process and the predictability of the legal framework.[421] According to the Claimant, a blatant misapplication of the law can also amount to a denial of justice and, as a result, a breach of FET.[422] Finally, the Claimant

---

414 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 570-571; *CCL v. Republic of Kazakhstan*, SCC Case No. 122/2001, January 1, 2004 (CL-22).

415 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 570-571.

416 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 580-586.

417 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 583-586.

418 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 587-591.

419 Claimant's Memorial on the Merits, ¶¶ 392-475; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 610-629.

420 C-1.

421 Claimant's Memorial on the Merits, ¶¶ 395-399, 401-402.

422 Claimant's Memorial on the Merits, ¶ 400.

points out that multiple acts or omissions which do not constitute an FET violation *per se* can amount to a violation when considered together.[423]

308. Further, the Claimant rejects the Respondent's contentions that the FET standard is limited to denial of justice.[424] The Claimant refers for example to the *Crystallex v. Venezuela*[425] decision on the interpretation of the FET standard according to the ordinary meaning of the terms.[426] On this basis, the Claimant submits that the Respondent's conduct does not need to be "outrageous" or "egregious," even though it qualifies the conduct of the Respondent's courts as manifestly unjust.[427]

309. Furthermore, the Claimant refers to the most-favored nation ("**MFN**") clause in Article II(1) of the BIT, which provides:

> "Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to make or maintain exceptions falling within one of the sectors or matters listed in the Annex to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Annex. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Annex, and to limit such exceptions to a minimum. Any future exception by either Party shall not apply to investment existing in that sector or matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Annex, be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country."

310. The Claimant relies on this clause to argue the applicability of Article 4(2) of the Kazakhstan Investment Law which provides a right of foreign investors to be reimbursed

---

423 Claimant's Memorial on the Merits, ¶ 403.

424 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 612-621.

425 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 612-621, *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, April 4, 2016 (CL-53).

426 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 613-614, 616-617.

427 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 618.

for damages caused to them in case of the "enactment by a state body of an act conflicting with legislative acts of the Republic of Kazakhstan or as a result of an illegal action (a failure to act)".[428]

311. More precisely, the Claimant argues that the Court of Appeal's decision seriously violated Kazakh procedural and substantive law, especially by omitting to address BSEK's defenses and by prejudging the merits.[429] The Claimant further argues that the Supervisory Collegium's decision was equally flawed, especially because it did not address BSEK's arguments in defense.[430] With regard to the second 2003 SPA Decision, the Claimant complains in particular that the court allowed Ms. Tulegenova to join the proceedings and did not allow Mr. Baikenov to appear as a witness.[431] The Claimant argues that the District Court failed to address the issue of limitation even though the Supervisory Collegium had directed it to consider it.[432] Furthermore, the Claimant argues that it did not receive the District Court's decision, thereby being hindered in safeguarding its interests by filing an appeal.[433] Finally, the Claimant submits that the Kazakh courts failed to award BSEK any compensation for the shares that were handed back to the Original Owners.[434]

312. Additionally, the Claimant submits that the rejection of its appeal by the Court of Appeal and by the Supervisory Collegium was unfounded and points out that its appeal was supported by the Almaty City Prosecutor (according to the Claimant this is noteworthy because it was an organ of the Respondent who supported the Claimant's cause).[435]

313. The Claimant also argues that the Supreme Court's decision was equally flawed with regard to procedural and substantive law considerations, particularly with regard to its own

---

[428] Claimant's Memorial on the Merits, ¶¶ 404-408; The Law of Republic Kazakhstan from January 8, 2003 No. 373-II on Investments (with amendments and additions as of the February 20, 2012) (CL-77).

[429] Claimant's Memorial on the Merits, ¶¶ 409-412; Exh. C-158, C-51, C-53, C-22.

[430] Claimant's Memorial on the Merits, ¶¶ 413-414; Exh. 43.

[431] Claimant's Memorial on the Merits, ¶¶ 415-419; Exh. C-56, C-162, C-44, C-24, C-53, C-21.

[432] Claimant's Memorial on the Merits, ¶ 420; Exh. C-22, C-23, C-49, C-50, C-51.

[433] Claimant's Memorial on the Merits, ¶ 422; Exh. C-45, C-163.

[434] Claimant's Memorial on the Merits, ¶ 421.

[435] Claimant's Memorial on the Merits, ¶¶ 423-428; Exh. C-45, C-57, C-25, C-163, C-164, C-46.

prior jurisprudence.[436] The Claimant especially submits that the Supreme Court neglected to take into account that two of the spouses withdrew their complaints and did not address the consequences of such a withdrawal.[437] The Claimant also argues that – in execution of the Supreme Court's decision – the MOJ annulled not only the 2003 SPA but also the 2005 SPA and this allegedly without any legal basis.[438]

314. With regard to the 2006 Agreements, the Claimant argues that the Respondent breached the FET standard.[439] The Claimant submits that the Respondent's conduct is not only a further FET standard violation but also a piece of the Respondent's unlawful "conduct as a whole."[440] According to the Claimant, the conduct with regard to the 2006 Agreements does not impact the overall compensation.[441] The Claimant contends - again relying on its legal expert Professor Abzhanov – that this conduct is contrary to Kazakh law and that there was no basis under Kazakh law for the debt that the Respondent's court allegedly fabricated in the 2008 ABT Decision.[442]

315. The Claimant also argues that the 2009 Set-Off Proceedings, which destroyed the Claimant's remaining 10% participation in Kozhan, violated the FET standard.[443] According to the Claimant, the 2009 Set-Off Proceedings were legally flawed, especially because the District Court failed to duly notify BSEK and Big Sky of the hearing.[444] Furthermore, the Claimant contends that the Bailiff's conduct was contrary to the FET standard and Kazakh law, especially because the Bailiff allegedly omitted to value the 10% interest in Kozhan as it was required to do.[445]

---

436 Claimant's Memorial on the Merits, ¶¶ 429-441; Exh. C-27, C-89, C-46, C-47, C-48, C-58, C-28, C-22, C-24, C-26, C-25, C-171, C-27.

437 Claimant's Memorial on the Merits, ¶¶ 430-436; Exh. C47, C-48, C-58.

438 Claimant's Memorial on the Merits, ¶ 438; Exh. C-171.

439 Claimant's Memorial on the Merits, ¶¶ 442-454; Exh. C-29, C-59, C-15.

440 Claimant's Memorial on the Merits, ¶ 442.

441 Claimant's Memorial on the Merits, ¶ 442.

442 Claimant's Memorial on the Merits, ¶ 443-454; Exh. C-29, C-59, C-15.

443 Claimant's Memorial on the Merits, ¶¶ 455-462; Exh. C-30, C-64, C-66, C-11, C-29, C-63, C-29.

444 Claimant's Memorial on the Merits, ¶¶ 456-458, 461; Exh. C-64, C-66, C-11, C-29.

445 Claimant's Memorial on the Merits, ¶¶ 459-460; Exh. C-63, C-29.

316. Finally, the Claimant submits that the Respondent also breached the FET standard with regard to the 2012 Set-Off Ruling and the IUS Award.[446] Again, the Claimant alleges that the 2012 Set-Off Ruling is not based on Kazakh law and violated basic procedural guarantees,[447] and proceeds to list the various reasons for which the 2012 Set-Off Proceeding was illogical, unreasoned and procedurally unfair.[448]

317. To conclude, the Claimant argues that the four proceedings in question in this arbitration were run in contradiction of the Claimant's basic procedural rights,[449] displayed a manifest lack of transparency,[450] and eventually resulted in decisions that were "arbitrary, unfair, unjust and idiosyncratic, and manifestly contrary to settled Kazakh law."[451]

**(3) Article II(2)(b) of the BIT – Arbitrary or Discriminatory Measures**

318. The Claimant also argues that the Respondent violated its obligation not to take any arbitrary or discriminatory measures,[452] as provided in Article II(2)(b) of the BIT:

> "Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a Party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party."[453]

319. As the Claimant points out, referring *inter alia* to *LG&E v. Argentina*, the prohibition of arbitrary measures is closely linked to the requirement of due process and the FET standard.

446 Claimant's Memorial on the Merits, ¶¶ 463-475; Exh. C-20, C-72, C-70, C-181.

447 Claimant's Memorial on the Merits, ¶¶ 465-467, 469-471; C-70, C-72.

448 Claimant's Memorial on the Merits, ¶¶ 464-473.

449 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 624-626.

450 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 627-628; Exh. C-167, C-319, C-58, C-270, C-264, C-255.

451 Claimant's Memorial on the Merits, ¶ 474.

452 Claimant's Memorial on the Merits, ¶¶ 476-489; see also Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 671-672.

453 C-1.

As such, arbitrary measures may be described as measures affecting investors or investments "without engaging in a rational decision-making process."[454]

320. The Claimant argues that the Respondent's conduct leading to the alleged violation of the FET standard amounts to discriminatory and arbitrary measures.[455] The Claimant also submits that these measures further violated the Respondent's obligation not to discriminate against foreign investors.[456]

**(4) Article II(6) of the BIT – Effective Means**

321. The Claimant alleges a violation of the effective means provision contained in Article II(6) of the BIT.[457] Article II(6) of the BIT provides:

> "Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations."[458]

322. The Claimant rejects the Respondent's allegation that the effective means provision is limited to a denial of justice protection.[459] Referring to *Chevron-Texaco v. Ecuador*,[460] the Claimant submits that effective means provisions in BITs generally prohibit host-States from interfering with the exercise of the investor's rights.[461] The Claimant contends, with reference to *AMTO v. Ukraine*, that an effective means provision includes the guarantee of effectiveness of the judicial system.[462] According to the Claimant, based on this standard,

---

454 Claimant's Memorial on the Merits, ¶¶ 478-482; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, October 23, 2006 (CL-54).

455 Claimant's Memorial on the Merits, ¶¶ 483-486.

456 Claimant's Memorial on the Merits, ¶ 487.

457 Claimant's Memorial on the Merits, ¶¶ 490-500.

458 C-1.

459 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 630-631, 634-637.

460 Claimant's Memorial on the Merits, ¶¶ 491-492; *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. The Republic of Ecuador [I]*, PCA Case No. 34877, Partial Award on the Merits, March 30, 2010 (CL-84).

461 Claimant's Memorial on the Merits, ¶¶ 491-492; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 631-633.

462 Claimant's Memorial on the Merits, ¶ 493; see also Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 638; *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85).

foreign investors are entitled to expect that "a domestic court will (i) fairly and impartially consider their arguments and evidence; (ii) render its decision on the basis of the rule of law and without undue delay; and (iii) make the decision in an honest, independent, and impartial way."[463]

323. The Claimant further submits that the Respondent's courts blatantly failed to meet this requirement throughout the four proceedings in dispute.[464]

**(5) Article II(2)(a) of the BIT – FPS**

324. The Claimant argues that the Respondent breached the FPS standard,[465] protected under Article II(2)(a) of the BIT.

325. The Claimant contends that the FPS standard functions as a minimum standard,[466] and that it includes legal protection and not merely physical protection.[467] Even though the Claimant acknowledges that there is a divide among investment tribunals on this question, it submits that the Tribunal should – by applying normal interpretation standards – consider legal protection as a part of the FPS standard in order to guarantee "full" protection.[468] The Claimant submits that such an interpretation would also align with the purpose of the BIT.[469] Finally, the Claimant points out that the FPS standard is meant to protect the investor from an infringement of its rights,[470] which includes the necessity of legal security.[471]

326. The Claimant argues that the Respondent – even after being notified of the alleged fraudulent conduct – failed to take action to protect the Claimant's investment. According

---

463 Claimant's Memorial on the Merits, ¶ 494.

464 Claimant's Memorial on the Merits, ¶¶ 495-499; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 638-639; Exh. C-267.

465 Claimant's Memorial on the Merits, ¶¶ 501-524; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 640-670.

466 Claimant's Memorial on the Merits, ¶ 502.

467 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 641-663.

468 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 643-651.

469 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 652-661.

470 Claimant's Memorial on the Merits, ¶¶ 506-509.

471 Claimant's Memorial on the Merits, ¶¶ 512-515.

to the Claimant, the General Prosecutor, its National Security Committee, its Ministry of Foreign Affairs, its President and its Supreme Court, all knew about the alleged illicit scheme involving the Three Oligarchs and failed to take action. On the contrary, the Respondent allowed the Claimant's investment to be negatively impacted by the court proceedings in dispute.[472]

327. Hence, the Claimant argues that "the facts demonstrate a total abrogation of Kazakhstan's collective responsibility […] to exercise vigilance and due diligence to protect the Claimant's investment."[473]

**(6) Denial of Justice**

328. Finally, the Claimant addresses the Respondent's denial of justice arguments. The Claimant considers that it is erroneous to argue, as the Respondent does, that the Claimant has to establish a denial of justice no matter which treaty provision it relies upon.[474] The Claimant alleges in this regard that the Respondent's argument would dilute the different treaty protections.[475] If the Tribunal were to follow the Respondent's argument, the Claimant considers that this deprives the treaty provisions of their *effet utile*.[476] Referring to *Saipem v. Bangladesh* and *Tatneft v. Ukraine*, the Claimant dismisses the arbitral decisions the Respondent relies upon, and in particular *Jan de Nul v. Egypt*, and submits instead that acts or omissions of State organs may violate treaty protections even without being qualified as a denial of justice.[477]

---

472 Claimant's Memorial on the Merits, ¶¶ 519-523; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 664-670; Exh. C-27, C-170.

473 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 665.

474 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 675-712.

475 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 675-676.

476 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 677-679.

477 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 680-695, *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt,* ICSID Case No. ARB/04/13, Award, November 6, 2008 (CL-68), *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award, June 30, 2009 (CL-24), *OAO Tatneft v. Ukraine*, UNCITRAL, Award on the Merits, July 29, 2014 (CL-33).

329. Nevertheless, the Claimant submits that even if the standard of denial of justice were to be the applicable standard, the Respondent would also have breached it.[478]

330. In particular, the Claimant submits that a denial of justice may occur under international law in case of (i) a clearly improper and discreditable court judgment, (ii) a discreditable decision which is offensive to judicial propriety, or (iii) where major procedural errors were committed during the proceedings.[479] The Claimant refers especially to the importance of due process in this context.[480]

331. The Claimant argues that numerous organs of the Respondent denied the Claimant justice.[481] The Claimant especially complains about the violation of its procedural rights during the court proceedings in dispute in the present arbitration.[482]

332. The Claimant contends that it exhausted local remedies against the disputed decisions as far as reasonably possible.[483]

## B. The Respondent's Position on the Merits

### (1) Standards of Protection

#### *a. The Necessity for the Claimant to Establish a Denial of Justice*

333. The Respondent argues that the applicable standard of protection against acts of the host State's judicial organs is the standard of denial of justice and that otherwise such a complaint cannot succeed.[484] Hence, the Respondent argues that the Claimant must establish a denial of justice, whichever treaty protection is invoked.[485]

478 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 696-712.
479 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 697.
480 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 700-703.
481 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 705-709.
482 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 708-709.
483 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 712.
484 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 393-405.
485 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 393-405.

Case 25-50445-hlb Doc 52 Entered 12/05/25 11:21:51 Page 146 of 220

334. The Respondent refers to *Liman v. Kazakhstan* and *Jan de Nul v. Egypt* which considered denial of justice as a category of the FET protection.[486] According to the Respondent, these tribunals considered that a FET claim because of judicial conduct must also meet the requirements of a denial of justice in order not to circumvent this standard.[487]

335. The Respondent further argues that the Claimant failed to exhaust all possible local remedies even though, in accordance with ICSID case law, and in particular in accordance with *Loewen v. United States*, it should demonstrate that it did so in order to establish a denial of justice.[488]

### ***b. Article II(2)(a) of the BIT – FET***

336. The Respondent notes that denial of justice should be considered as part of the FET standard.[489] Looking at the nature of the denial of justice standard under international law, the Respondent asserts that denial of justice is necessarily procedural and does not include the substantive correctness of a court decision.[490] Therefore the Respondent submits that a denial of justice must meet high requirements, i.e. it must be shown that there was a manifest injustice and a lack of due process so that the outcome of the proceeding offends judicial propriety.[491]

337. The Respondent argues that because the Claimant cannot demonstrate that these requirements are satisfied, it tries to "re-characterize" its claims by referring to other standards of protection under the BIT.[492] Yet, as the Respondent submits, the Claimant

---

486 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 394-399; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of the Award, June 22, 2010 (CL-69), *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt,* ICSID Case No. ARB/04/13, Award, November 6, 2008 (CL-68).

487 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 394-401; *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, June 26, 2003 (RL-25).

488 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 402-405.

489 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 406-425.

490 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 406-408; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 547-551.

491 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 409-412.

492 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 419; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 518-521, 545-563.

essentially claims a denial of justice.[493] Therefore, the Respondent asserts that the case law cited by the Claimant on the general interpretation of the FET standard in the BIT is not applicable because it allegedly does not concern FET violations by judicial misconduct.[494] The Respondent refers to *Jan de Nul v. Egypt* to argue that the requirements of the denial of justice cannot be circumvented by referring to general violations of the FET standard (or other BIT protections for that matter).[495]

338. The Respondent submits that the Claimant was not able to establish a denial of justice and therefore there cannot be any breach of the FET standard.[496] The Respondent rejects the Claimant's argument that it is of little relevance to distinguish between a procedural and a substantive aspect for a denial of justice.[497] The Respondent emphasizes that a tribunal may not act as a court of appeal for decisions of domestic courts.[498]

339. Additionally, the Respondent emphasizes that the denial of justice standard includes the requirement of exhaustion of local remedies by the investor, i.e. that the judicial system has failed as a whole, and submits that the Claimant failed to meet this requirement.[499]

340. The Respondent argues that the numerous irregularities which the Claimant advances regarding domestic law are not sufficient to establish a denial of justice.[500]

341. Furthermore, the Respondent submits that the FET standard cannot be used for the Claimant's due diligence argument.[501] The Respondent argues that the notion of due diligence is frequently invoked at the charge of the investor.[502] Insofar as a due diligence

---

493 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 420; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 521-529.

494 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 523-529.

495 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 527; *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, November 6, 2008 (CL-68).

496 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 545-563.

497 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 547-551.

498 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 551.

499 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 552-556.

500 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 558-561.

501 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 530-538

502 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 534-535.

duty is invoked regarding the State, the Respondent considers that there is no jurisprudence which supports the Claimant's allegations.[503]

### *c. Article III(1) of the BIT – Judicial Expropriation*

342. The Respondent rejects the Claimant's allegations regarding expropriation.[504] According to the Respondent, a judicial expropriation can only be established when the requirements of a denial of justice are also met, especially in the present case in which the Claimant complains about an alleged misapplication of domestic law.[505]

343. The Respondent argues that the jurisprudence on which the Claimant relies does not support the Claimant's case.[506] In particular, the Respondent considers the Claimant's reference to the *Caratube II* decision unsuitable because the cited passage concerned not the BIT clause but the Kazakhstan 1994 Foreign Investment Law.[507] Furthermore, the Respondent submits that the Claimant is also wrong to refer to *CCL v. Kazakhstan* which, according to the Respondent, concerns the application of a domestic investment law and a case in which the decisions were appealed.[508] Additionally, and on similar grounds, the Respondent attacks the Claimant's reliance on the *Saipem v. Bangladesh* decision.[509] The Respondent also rejects the comparison with the *Sistem v. Kyrgyz Republic* because the claimants in these proceedings did not complain about the regularity of the domestic proceedings nor did they address the distinction between denial of justice and expropriation.[510]

344. Finally, the Respondent argues that the jurisprudence referred to by the Claimant to argue the existence of an expropriation, independently from a denial of justice, is not relevant for

---

503 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 536-537.

504 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 426-429; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 599-619.

505 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 429; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 600-602, 617-619.

506 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 604-611.

507 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 428; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 608.

508 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 604-605.

509 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 606-607.

510 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 609.

the present arbitration, since these decisions did not rule on the relationship between expropriation and denial of justice.[511]

345. Ultimately, the Respondent submits that the Claimant failed to establish an expropriation and allegedly did not even demonstrate that it was deprived of its investments.[512] In any event, the Respondent asserts that an investor may only complain about an expropriation if it has exhausted all local remedies beforehand.[513]

### *d. Article II(6) of the BIT – Effective Means*

346. The Respondent furthermore rejects the Claimant's allegations that it was not granted effective means to enforce its rights.[514] The Respondent submits that Article II(6) of the BIT does not contain a standard of protection with lower requirements than the denial of justice provision.[515] Therefore, the standard of effective means includes the establishment of national rules and structures to guarantee due process but no further standard.[516]

347. The Respondent points out in particular that the decisions relied on by the Claimant (*Chevron v. Ecuador (No. 1)* and *White Industries Australia Ltd. v. Republic of India*) should not be followed because they did not address the question whether allowing a Claimant to plead a standard other than denial of justice could be considered to lower the requirements of the respective standard of protection.[517]

### *e. Article II(2)(a) of the BIT – FPS*

348. The Respondent also rejects the Claimant's contentions regarding the FPS standard and considers that it corresponds basically to the FET submissions and must therefore also be

---

511 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 429; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 604-611.

512 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 612-613.

513 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 614-619; R-231.

514 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 430-439; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 587-594.

515 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 431; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 590.

516 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 432-439; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 588, 593-594.

517 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 435-438; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 591-592.

Case 25-50445-hlb Doc 375 Entered 11/05/25 11:31:51 Page 150 of 220

rejected on the same grounds.[518] The Respondent argues that the FPS standard includes physical protection but not legal protection and refers in support of this view to the *Suez v. Argentina* decision.[519] The Respondent further argues that the invocation of other provisions via the MFN clause is not possible for the reasons explained regarding the FET standard, i.e. that those further provisions do not include an independent guarantee.[520]

349. Furthermore, the Respondent addresses the Claimant's allegations of due diligence and submits that the FPS standard does not include an absolute guarantee.[521] The Respondent considers that it fulfilled its due diligence duty because it provides a functioning judicial system.[522]

#### *f. Article II(2)(b) of the BIT – Arbitrary or Discriminatory measures*

350. The Respondent considers that the protection against arbitrary or discriminatory measures does not include any protection other than the FET standard and is also limited by the denial of justice requirements.[523]

### (2) Application of the Law to the Facts

351. The Respondent argues that, applying the above-mentioned standards, it did not breach any BIT protection standards.[524]

#### *a. The 2003 SPA Proceedings*

352. The Respondent submits that the Claimant's claim consists essentially of a complaint regarding the substantive correctness of the 2003 SPA decision.[525] The Respondent argues that the procedural irregularities alleged by the Claimant did not hinder the Claimant in

---

518 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 440-445.

519 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 442, 445

520 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 444.

521 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 573-577.

522 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 578-582.

523 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 446-447; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 595-598.

524 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 448-475.

525 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 450-455.

lodging an appeal and therefore, the Claimant had the ability to pursue its claims.[526] There was accordingly, as the Respondent submits, no violation of the principle of due process.[527] The substantive correctness of the court decisions cannot, according to the Respondent, constitute a BIT breach.[528]

### *b. The 2008 ABT Proceedings*

353. The Respondent also rejects the Claimant's contentions regarding the 2008 ABT Proceedings and considers that this decision does not violate any BIT provisions.[529] The Respondent submits that the Claimant refused to participate in the proceedings and could therefore not have been denied justice.[530]

354. Furthermore, the Respondent argues that even if BSEK participated in the proceedings, it did not advance the arguments on which the Claimant relies in the present arbitration.[531]

### *c. The 2009 Set-Off Proceedings*

355. The Respondent considers that the allegations regarding the 2009 Set-Off Proceedings are equally unfounded.[532] The Respondent submits again that the Claimant and BSEK decided not to participate in the proceedings.[533] The Respondent submits that no breach of international law can be argued because the Claimant failed to exhaust local remedies.[534]

356. Furthermore, the Respondent argues that even though it considers that the decision was legally correct, the correctness of the decision is of no relevance for the question of a breach of the BIT.[535]

---

526 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 451-452.
527 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 453.
528 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 454.
529 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 456-463; Exh. C-29.
530 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 457-459.
531 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 460-461.
532 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 464-470; Exh. C-30.
533 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 465-467; Exh. C-66.
534 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 468; Exh. R-55.
535 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 469-470.

### *d. The 2012 Set-Off Proceedings*

357. The Respondent argues again that the Claimant essentially complains about the alleged incorrectness of the 2012 Set-Off Proceedings with regard to Kazakh law.[536] The Respondent submits again that the Claimant failed to participate in the proceedings.[537] The Respondent also argues that with regard to the appeal proceedings Big Sky and BSEK appeared interchangeably in front of Kazakh courts.[538] Finally, the Respondent submits that the decision was in accordance with Kazakh law but that the correctness of the decision is of no relevance for the question of a violation of the BIT.[539]

## C. THE TRIBUNAL'S ANALYSIS

### (1) Denial of Justice

358. Because of its relevance to the other claims, the Tribunal chooses to begin with the allegation of denial of justice.

359. This case, as articulated by the Claimant, boils down to relevant court decisions and their ultimate effect on the Claimant's investment. The issue here is not whether the Tribunal is simply convinced of the merit of the underlying allegations in such legal proceedings. While the merit is of course at issue, in that the underlying proceedings are certainly relevant to analyzing whether the applicable court decisions amounted to a denial of justice, the Tribunal stresses that it is not an international court of appeal established to review the determinations made by the Kazakh courts.

360. Instead, as the Claimant highlights, the applicable test has been described as when:

> "at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and

536 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 471-475; Exh. C-32.
537 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 472-473.
538 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 474.
539 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 475.

discreditable, with the result that the investment has been subjected to unfair and inequitable treatment."[540]

361. The Claimant has provided alternate formulations, but the core principles remain consistent.[541]

362. The inquiry then is not whether this Tribunal is of the view that the Kazakh courts arrived at incorrect conclusions of law in the relevant proceedings. Instead, the Claimant's burden requires to convince the Tribunal that the proceedings displayed such impropriety as to render them null as a matter of international law.

363. Throughout the arbitration, in the written submissions and at the Hearing, the Claimant provided numerous examples of judicial conduct that it considered flawed. The Tribunal below individually addresses acts that form the basis of the Claimant's arguments. The alleged wrongful conduct that is addressed in this section includes:

- Whether the Appellate Collegium improperly prejudged the merits when it remitted the 2003 SPA case back to the District Court;
- Whether the Supervisory Collegium violated the requirement to state reasons when it declined to open a supervisory review of the Appellate Collegium's decision allegedly prejudging the case for the District Court in the second phase of the 2003 SPA Proceeding;
- The District Court's decision to take jurisdiction over Ms. Tulegenova's claim and to add Mr. Baikenov as a new defendant;
- The District Court's refusal to summon Mr. Baikenov as a witness;
- Reaching a final, non-appealable, judgment in the 2003 SPA Proceeding despite the withdrawal of the claims by the plaintiff spouses Ms. Tulegenova and Mr. Seidagaliev;

540 *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, October 11, 2002 (CL-41), ¶ 127; Claimant's Closing Statement, p. 48.

541 *Case Concerning Elettronica Sicula S.p.A. (ELSI) (United States v. Italy)*, Judgment, ICJ Reports 1989, p. 15 (CL-135), ¶ 128; *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, April 8, 2013 (CL-72), ¶¶ 447, 464, Paulsson, J., *Denial of Justice in International Law*, (CUP 2005) (RL-31), p. 253; Claimant's Closing Statement, p. 49.

- Failing to consider or decide dispositive evidence and arguments submitted to the court demonstrating that the plaintiff spouses had failed to prove that BSEK knew or should have known of their alleged disagreement to the 2003 SPA;

- Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was brought in bad faith;

- Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was time-barred;

- The District Court's failure to send BSEK a copy of the Second 2003 SPA Decision in a timely manner;

- The 2008 ABT Proceedings;

- Failing to notify the Claimant of hearings in the 2009 or 2012 Set-Off Proceedings;

- Setting off debts purportedly owed by Big Sky US against assets held by its subsidiary, BSEK, and failing to give any legal basis for the lifting of the corporate veil;

- The Bailiff's failure to obtain an independent and serious valuation of BSEK's 10% shareholding in Kozhan; and

- The Bailiff's failure to make any attempt to sell the 10% shareholding at a public auction.

364. The Claimant's denial of justice claim concerns the totality of the various alleged acts by the Respondent's judicial system, as opposed to each individual allegation.

***a. Whether the Appellate Collegium improperly prejudged the merits when it remitted the 2003 SPA case back to the District Court***

365. The Claimant relies on Article 363(2) of the Civil Procedure Code, which states that:

> "[t]he court hearing the case in the appellate proceeding shall not prejudge the issue on credibility or non-credibility of a particular piece of evidence,

> on the priority of one evidence over the other, as well as on what decision shall be made on a new hearing of the case."[542]

366. Relying on the wording of this statute, the Claimant contends that the Court of Appeal improperly reached fresh merits findings that: (i) the 2003 SPA was subject to mandatory notarization and thus required notarized spousal consent; (ii) the 2003 SPA was subject to mandatory state registration and thus required notarized spousal consent; and (iii) BSEK could not rely on the statutory presumption of consent to the 2003 SPA by spouses of the Original Owners.[543]

367. Professor Abzhanov opines that:

> "when there has been a breach of substantive law by the lower court, the court of appeal shall not remand the case for a new hearing but rather shall itself decide it on the merits by applying correct substantive law. However, when there has been a violation of procedural law, the court of appeal shall remand the case for a new hearing and give the lower court specific procedural instructions without, however, prejudging the merits. It is obvious that when there have been both procedural and substantive law violations, the court of appeal shall follow the route for procedural violations because the first instance court has priority for dealing with procedural matters and hearing evidence. Indeed, if the court of appeal were allowed in these circumstances to apply the substantive law itself, remanding the case for a new hearing on procedural grounds would become moot because, regardless of the procedural actions taken by the first instance court, the result on the merits would be already prejudged based on the rules of substantive law."[544]

368. The Tribunal finds some flaws in this reasoning. Professor Abzhanov does not contest that the court of appeal can make decisions on the merits by applying the correct substantive law. In fact, he claims this is mandated. He suggests, however, that in the presence of procedural errors as well as violations of substantive law, the court of appeal must refrain from coming to conclusions on the substantive law because doing so would prejudge the merits. There is an inherent contradiction in this reasoning. If the goal was truly for the

---

542 Claimant's Memorial on the Merits, ¶ 169; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 126; Exh. R-90; Exh. AA-0016.

543 Claimant's Memorial on the Merits, ¶ 170.

544 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 220; Abzhanov Second Legal Expert Report, ¶ 105.

court of appeal to refrain from making pronouncements on the correct application of substantive law, it would be prohibited from doing so in all cases, instead of being affirmatively required to do so, at least in the absence of procedural violations. Professor Abzhanov therefore appears to be criticizing the court of appeal for doing what he admits is a regular duty of the court. Now, one could perhaps argue that remanding the case for a new hearing on procedural grounds when the correct application of substantive law has been clarified by the Court of Appeal could amount to a potential waste of time, if the result on the merits would be prejudged by such a ruling on the substantive law, as Professor Abzhanov claims. But this is hardly the same as the Court of Appeal going beyond its proper role in addressing such substantive law issues.

369. It is understandable why the Respondent makes the argument that:

> "it is impossible as a matter of common sense to see how any appellate court could in practice provide a reasoned judgment setting aside a decision of the lower court for violation or misapplication of the law without explaining the basis for its findings by reference to the proper interpretation of that law."[545]

370. Whether it is "impossible" or not, the Tribunal understands that it would certainly not be the norm, as again, Professor Abzhanov admits that the Court of Appeal, at least in cases without procedural violations, shall indeed clarify the proper application of the substantive law in the case of a substantive law violation.

371. In any way, the fact that the Court of Appeal reached conclusions on the merits while also making rulings on procedural errors does not amount to a violation of international law. Therefore, the Tribunal finds no issue with the Supervisory Collegium's actions in this respect.

---

[545] Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 311.

#### b. *Whether the Supervisory Collegium violated the requirement to state reasons when it declined to open a supervisory review of the Appellate Collegium's decision allegedly prejudging the case for the District Court in the second phase of the 2003 SPA Proceeding*

372. In its Counter-Memorial on the Merits, the Respondent provided a lengthy excerpt from the relevant Supervisory Collegium decision declining supervisory review.[546] It need not be repeated here. In the decision, the Supervisory Collegium quite clearly rejects the presence of improper prejudgment.[547] The Claimant seems to contend that a statement rejecting the presence of improper prejudgment is an insufficient reason for the Supervising Collegium's decision to decline review for alleged prejudgment.[548]

373. The Tribunal understands that the Claimant perhaps desired a lengthier discussion of the legal issues, but it has failed to provide evidence establishing such a requirement. As highlighted by the Respondent, the Supervisory Collegium, through its statement, demonstrated that it considered and rejected the allegation of improper prejudgment. The Tribunal finds this sufficient.

374. Further, the Respondent notes that the Claimant could have appealed this ruling to the Supervisory Collegium of the Supreme Court but failed to do so. As is the theme in a few aspects of the Claimant's case (discussed in more detail for certain claims), the failure to exhaust local remedies is quite detrimental to a case based on improper court action, whether or not it is under the denial of justice prong of a particular dispute.

#### c. *The District Court's decision to take jurisdiction over Ms. Tulegenova's claim and to add Mr. Baikenov as a new defendant*

375. The Claimant contends that the District Court's decision to allow Ms. Tulegenova to file a third-party claim against her husband, Mr. Baikenov, violated procedural norms.[549]

---

546 Respondent's Memorial on Jurisdiction on Counter-Memorial on Merits, ¶ 134; Exh. C-23.
547 Exh. C-23.
548 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 223.
549 Claimant's Memorial on the Merits, ¶ 451.

Specifically, the Claimant contends that Ms. Tulegenova's third party claim was "nothing more than a repetition of the other spouses' existing claims with her own tagged on."[550]

376. There are three possible requirements necessary for the court to have taken jurisdiction over Ms. Tulegenova's claim. These are discussed below.

(i) Pursuant to Article 52 of the Civil Procedure Code, a third party can only file a claim in relation to an already-existing subject-matter

377. A primary disagreement under this factor is whether the 2003 SPA should have been treated as a unitary transaction or as five separate transactions.[551] In this respect the Tribunal finds convincing the Respondent's focus on the structure of the agreement, [552] which suggests it should properly be taken as a single unitary transaction. It is correct that Ms. Tulegenova's claim would have necessarily concerned only the 18% commonly owned by her and her husband. However, with the overall transaction already at the heart of the dispute, it can hardly be said that filing a claim concerning that 18% fails to relate to an already existing subject-matter of the dispute.

(ii) The third-party claim may be filed only against one or both of the already existing parties to the dispute

378. Here, the Claimant's contention is that by adding Mr. Baikenov as a defendant, Ms. Tulegenova necessarily made a claim against someone who was not an already existing party to the dispute. In other words, she added a party.

---

550 Claimant's Memorial on the Merits, ¶ 451; Abzhanov First Legal Expert Report, ¶ 99.

551 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 228; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 318.

552 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 318 ("(a) the Parties to the transaction are the Buyer and Seller. The "Seller" is defined as the five Original Owners; (b) the consideration amount is payable from the Buyer to the "Seller" (with no provision for separate payments to each of the Original Owners); (c) the 2003 SPA makes clear that the subject matter of the transaction is the 90% of the interest and not the individual 18% interests of each Original Owner; (d) the 2003 SPA does not provide for a mechanism where the "*Purchase Price*" is refundable *pro rata* by each of the Original Owners in the event of a breach of its terms").

Case 25-50445-hlb Doc 375 Entered 11/05/25 11:31:51 Page 160 of 220

379. The Parties disagree as to whether, under this rule, a third-party claim must be filed against an already existing party or whether the third-party claim can *only* be filed against an already existing party.

380. While Professor Abzhanov suggests the latter is true, the Respondent is correct that Professor Abzhanov fails to point to any legal authority when making this claim.[553] The Respondent's experts endorse the former theory, and to support this position highlight Article 52 of the Code of Civil Procedure which they indicate guarantees a third party the same rights and obligations as a plaintiff, including the right to file a claim against a new defendant.[554]

381. Neither Party has produced definitive evidence concerning the proper application of this limitation to third-party claims. Accordingly, the Tribunal finds the Respondent's interpretation plausible. More importantly, the Tribunal concludes that this requirement was met as, in addition to adding a defendant, Ms. Tulegenova clearly filed claims against already-existing parties.

(iii) The third-party claim must exclude the claims of other parties

382. There is disagreement over the extent to which this is an actual requirement. It is undisputed that it was not met, as even the Respondent's expert has acknowledged as such.[555]

383. Professor Abzhanov points to the Commentary to the Code of Civil Procedure, which reads, "The Plaintiff's claim and the claim of the third party having an independent claim to the subject matter of dispute do not coincide but exclude each other."[556]

384. In response, Professor Tlegenova and Dr. Mukhamedshin contend that "it is wrong to accept the limitation set out in the Commentary to the Code of Civil Procedure as a rule which would apply to all possible situations," instead arguing that, "[w]hen considering

---

553 Abzhanov Second Legal Expert Report, ¶ 117; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 322.

554 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 322; Expert Report of Professor Tlegenova, ¶ 80; Joint Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 78.

555 Expert Report of Professor Tlegenova, ¶ 73.

556 Abzhanov First Legal Expert Report, ¶ 95; Exh. AA-4.

Case 25-50445-hlb Doc 3-5 Entered 12/05/25 13:31:55 Page 161 of 222

the issue of third parties joining proceedings for the invalidation of a transaction, the conditions and specifics of the transaction should be taken into account."[557]

385. In making this claim, the Respondent's experts submit as an exhibit a note concerning third parties joining proceedings of the Arbitrazh Court of Voronezhskaya.[558] While not controlling, the note highlights a practice in a system that is obviously quite influential on the Respondent's practice. The note reads, in part:

> "[i]n essence, the claims of third parties having independent claims to the subject matter of the dispute are aimed as "substituting" the claims of the plaintiff and (or) the counterclaims of defendants. In some cases, such claims may supplement the original claims. For example, if the protection of the plaintiff violated rights under the original claim does not constitute the grounds for the claims to be satisfied in full, a third party having independent claims to the subject matter of the dispute joining the case can ensure full satisfaction of the claims. A corporate dispute where the plaintiff (member of a corporation) disputes the decision of the corporation in its entirety while his rights and legitimate interests are affected only by part of the decision can serve as an example. In this situation, another member of the corporation joining the proceedings as a third party having independent claims to the subject matter of the dispute whose rights and legitimate interests have been affected by a different part of the impugned decision is a prerequisite for the claims to be satisfied in full."[559]

386. The Respondent's experts thus claim that various situations can occur which would not fit into the limiting interpretation provided by the Commentary to the Code of Civil Procedure relied upon by Professor Abzhanov.[560]

387. The Tribunal is hesitant to rely on a legal note concerning a Russian practice in the face of limiting language contained in Kazakh legal commentary. However, the Tribunal once again is not in a position to review Kazakh court decisions in an appellate capacity and is instead tasked with determining whether certain determinations fall astray of international law. Here, the commentary provided by the Respondent's experts, while from a different, yet comparable legal system, does appear to provide a logical justification for permitting

---

557 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 80.

558 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 80; Exh. R-476.

559 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 80; Exh. R-476.

560 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 80.

third party claims in some scenarios that do not fully exclude the claims of other parties. Like the example provided for in the excerpt quoted by Professor Tlegenova and Dr. Mukhamedshin, here it would appear that permitting a third party having independent claims to the subject-matter, whose rights and interests are separate than those of the other plaintiffs, would best permit the claims of the dispute to be satisfied in full.

388. Accordingly, without definitively ruling on whether meeting this requirement was necessary for taking jurisdiction over Ms. Tulegenova's claim, the Tribunal finds insufficient evidence establishing that the court's judgment was fatally flawed in permitting her claim despite the fact that it did not exclude all other claims.

***d. The District Court's refusal to summon Mr. Baikenov as a witness***

389. The Claimant contends that the Court of Appeal expressly directed the District Court to hear from Mr. Baikenov personally, and thus it became mandatory to call him as a witness.[561] In doing so, the Claimant relies on the following two excerpts from the Court of Appeal's ruling (the first one also being referred to by the Respondent):

> "K.K. Baikenov and his spouse were denied the possibility to participate in the proceeding which directly affected their rights and interests protected by the law. In particular, those not joined persons could have provided additional information to the court regarding the circumstances of entering into and (or) performance of the sale and purchase agreement, the existence or lack of consent of K.K. Baikenov's spouse to entering into the impugned transaction, etc."[562]

> "At the new hearing, the court shall rectify the abovementioned violations of […] the rules of procedural law committed in this case, give proper legal consideration to the evidence collected, and resolve the dispute in accordance with the rules of substantive and procedural law."[563]

---

561 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 239; Abzhanov First Legal Expert Report, ¶ 108.

562 Exh. C-22, p. 4, referred to in the Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits (at ¶ 146) and, in part, in the Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits (at ¶ 241).

563 Exh. C-22, p. 5, referred to the Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits (at ¶ 241).

Case 25-50445-hlb Doc 3575 Entered 12/05/25 13:28:51 Page 164 of 220

390. While the excerpts of course indicate there was the possibility that Mr. Baikenov could have provided additional, relevant information, the Tribunal is not convinced that these excerpts constitute a mandate for the District Court to call Mr. Baikenov as a witness. To the contrary, as highlighted by the Respondent, these excerpts appear primarily concerned with protecting the rights of Mr. Baikenov and Ms. Tulegenova, as opposed to forcing the participation of Mr. Baikenov in a manner considered desirable by BSEK.

391. The next point of contention concerns the appropriateness of calling Mr. Baikenov as a witness considering his position as a defendant. This area of dispute is complicated by its relation to the Claimant's overall allegation of the illicit scheme to use the court system to deprive it of its investment, with Mr. Baikenov being inappropriately labelled as a "defendant."

392. The Respondent's expert focuses primarily on Mr. Baikenov's status as a defendant in the sense that this procedural manoeuvre granted Mr. Baikenov "much wider rights than that of a witness." Professor Tlegenova further stresses that:

> "[t]he status of a defendant enables a person to actively seek a favourable outcome of a case by using the whole spectrum of available procedural rights. I do not see how the status of witness could improve Mr. Baikenov's procedural opportunities compared to those which are provided with the status of defendant."[564]

393. The Claimant is correct in that this justification misses the point. BSEK was clearly not concerned with Mr. Baikenov's ability to defend himself but rather that Mr. Baikenov had knowledge that BSEK considered crucial to its own defence. To imply that Mr. Baikenov's increased ability to defend himself was relevant to BSEK's defence, especially considering the overarching allegations of this case, is disingenuous. To argue that, as a result of Mr. Baikenov's position as a defendant, "[i]t follows that there were no procedural benefits to be gained (for either Big Sky Canada or Mr. Baikenov) from summoning Mr. Baikenov as a witness" lacks credibility.[565] BSEK quite justifiably did not consider its interests to be

---

564 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 146; Expert Report of Professor Tlegenova, ¶ 87.

565 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 151.

Case 25-50445-hlb Doc 57 Entered 11/05/25 11:31:54 Page 153 of 210

aligned with those of Mr. Baikenov and was thus focused on potential testimony that would support its position in court. The Tribunal thus finds this justification for failing to call Mr. Baikenov unconvincing.

394. Finally, the Parties dispute whether BSEK actually requested that the court summon Mr. Baikenov as a witness. The Tribunal also finds this justification unconvincing. BSEK undoubtedly requested that it be permitted to interrogate Mr. Baikenov as a witness.[566] This attempt was unsuccessful. The court subsequently had the opportunity to call Mr. Baikenov as a witness and chose not to. Accordingly, while BSEK has failed to produce evidence that it again tried to request that Mr. Baikenov testify as a defendant, the Tribunal is not convinced this is the reason the court failed to do so.

395. Ultimately, it is quite obvious why BSEK wished to call Mr. Baikenov as a witness, and the subsequent Joint Statements revealing the questionable nature of the claims present in the case demonstrate that the desire was quite justified. However, the Claimant has failed to produce evidence establishing more than a very questionable use of the court's discretion. The Tribunal is of the opinion that Mr. Baikenov could have provided crucial testimony, but it is unconvinced that as a clear matter of law, the District Court was necessarily required to summon him to testify let alone that the failure to fulfil such a requirement amounts to a violation of international law.

***e. Reaching a final, non-appealable, judgment in the 2003 SPA Proceeding despite the withdrawal of the claims by the plaintiff spouses Ms. Tulegenova and Mr. Seidagaliev***

396. The Claimant's position here is twofold: (1) the withdrawal of claims should have been accepted by the court; and (2) even if the withdrawal had not been accepted, the withdrawal statement should have served as convincing evidence on the merits.

397. Concerning the first issue, the Joint Expert Report of Professor Tlegenova and Dr. Mukhamedshin describes the issue of withdrawal of claims as follows:

> "The supervisory instance is only concerned with verifying the lawfulness and justiciability of lower courts' decisions, and the only grounds for

566 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 245; Exh. C-54.

applying to the supervisory instance are significant violations of substantive or procedural law. A party that has lodged an appeal with the Supreme Court is permitted to withdraw the appeal, in which case the decision of the lower court will stand. However, it is not possible to withdraw the claim at the supervisory level as, of course, the claim itself will, by this stage, have already been determined by the lower court, and a judgment given and entered into legal force. The party would have to apply for the setting aside of the judgment."[567]

398. Further, Professor Tlegenova and Dr. Mukhamedshin conclude that "even if the Joint Statements could have been regarded as a withdrawal of the claims properly filed with the court of first or appellate instance, no court would have accepted them since they were filed in breach of the procedural law by an unauthorised person."[568] Professor Tlegenova and Dr. Mukhamedshin come to this conclusion based on the understanding that proper powers of attorney were not issued by Ms. Tulegenova and Mr. Seidagaliev to the representative of BSEK, as required under CPC Article 61.[569]

399. Professor Abzhanov provided a different view, namely that:

> "each party has a fundamental right at any stage of the proceeding to 'choose [its] position, means and instruments of its protections independently and separately from the court, other organs and persons.' Therefore, if the plaintiff decides to withdraw its claim and thus confirms that, from its perspective, there is no 'violat[ion] or dispute[]' concerning the rights, freedoms and legitimate interests of that person, the court has no business to act on the claim because there is nothing more to 'protect[]' in the first place."[570]

400. It is not the Tribunal's role to interpret the Respondent's procedural requirements for withdrawal of claims and to apply such interpretation. Again, the Claimant must show that the relevant proceedings displayed such impropriety as to render them problematic as a matter of international law. The Tribunal questions the Respondent's experts' contention that it is not possible to withdraw a claim at the supervisory level. However, the Tribunal

---

567 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 115 (emphasis omitted).

568 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 118.

569 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 118.

570 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 295; Abzhanov Second Legal Expert Report, ¶ 139 (emphasis omitted).

is not persuaded that the Court's failure to allow the withdrawal of the claim amounts to a violation of international law.

401. The Claimant further stresses that such an interpretation would make it impossible for the plaintiff to settle a claim after the first court decision entered into force.[571] Professor Tlegenova and Dr. Mukhamedshin clarify that as soon as a court decision enters into force, the plaintiff and defendant become creditor and debtor, and thus "[t]he parties can […] enter into a settlement agreement in relation to the judgment and terminate the enforcement proceedings (as opposed to the termination of court proceedings aimed at resolving the dispute)."[572] The Tribunal finds this interpretation reasonable and certainly not "clearly improper and discreditable."

402. With respect to whether the withdrawal statements should have been considered as evidence on the merits, the Respondent does seem to admit that such a procedure was at least permissible,[573] and evidence provided by the Respondent's experts appears to confirm this. Specifically, the "Normative Regulation of the Supreme Court of the Republic of Kazakhstan dated 20 March 2003 No. 2: On the Application of Some Rules of Civil Procedure Legislation by Courts" provides in part:

> "A supervisory instance court cannot amend or annul a court act, which was entered into legal force, based on the evidence submitted by a party, that was not examined by a court of first or appellate instance. Subject to the existence of relevant grounds, **such court act can be reviewed based upon discovery of new circumstances**."[574]

403. The issue thus turns to whether the Supreme Court improperly chose not to.

404. Professor Tlegenova and Dr. Mukhamedshin first focus on the general premise that the Supreme Court is obligated to examine only the materials in the case file and does not have the right to change or overturn the relevant judicial act that has come into force on the basis

---

571 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 296.

572 Joint Expert Report of Tlegenova and Mukhamedshin, English translation, ¶ 114.

573 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 209.

574 Exh. R-107/FT-1, ¶ 30 (emphasis added).

of evidence submitted by a party that was not examined by the lower court.[575] The Tribunal does not find this convincing, as again (i) the Normative Regulation cited by Professor Tlegenova and Dr. Mukhamedshin provides for the use of newly-discovered evidence/circumstances, as admitted by the Respondent;[576] and (ii) BSEK did not initially have access to the testimony of Mr. Seidagaliev and Ms. Tulegenova. The Tribunal agrees with Professor Abzhanov that it cannot reasonably be the case that the Supreme Court was unable to evaluate evidence that was prevented by the lower court from being obtained, precisely because it was not obtained and submitted to the lower court.[577]

405. Professor Tlegenova and Dr. Mukhamedshin attempt to resist this interpretation by arguing that it was not BSEK who produced this "new evidence" but rather Ms. Tulegenova, Mr. Seidagaliev, Mr. Baikenov and Ms. Asanova, and these four individuals had never asked the lower court for any help in obtaining evidence and provided no explanation as to why such statements could not have been provided in the lower court.[578] The Tribunal does not find this argument convincing either. As highlighted by Professor Abzhanov, BSEK lacked access to the testimony of Ms. Tulegenova and Mr. Seidagaliev and their spouses, despite petitioning the lower court to secure their attendance at the hearing and to call Mr. Baikenov for examination as a witness.[579] While the Joint Statements of course could have theoretically been submitted to the lower court had the declarants made and submitted such statements, that is not the issue. BSEK, through no discernible fault of its own, lacked access to such evidence and was thus unable to present it to the lower court. After procuring such new evidence, it argues the Supreme Court should have evaluated it in the confines of the merits, which the Respondent admits was at least in theory permitted.

406. While the Tribunal is unsure why the Supreme Court would fail to consider and discuss the Joint Statements as evidence on the merits, it cannot come to the conclusion that the Supreme Court's decision was so clearly flawed as to constitute a violation of international

575 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 123.
576 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 209; Exh. R-107/FT-1, ¶ 30.
577 Abzhanov Second Legal Expert Report, ¶ 147.
578 Joint Expert Report of Tlegenova and Mukhamedshin, ¶ 125.
579 Abzhanov Second Legal Expert Report, ¶¶ 147-148 (and accompanying footnotes).

law. The Claimant has successfully convinced the Tribunal that the Supreme Court *could* have used such evidence, and the Tribunal sees the value in such evidence, but the Tribunal is not convinced that the Tribunal had an obligation to accept, analyze and discuss the Joint Statements in its evaluation of the merits of this case, such that the failure to fulfil this obligation would amount to a violation of international law. Based on the views expressed by the experts, it does appear to be the exception to the norm that new evidence is highlighted in such a proceeding, as the Supreme Court generally evaluates cases based on the lower court record. The Supreme Court would have had to have been convinced (i) that under the applicable rules it *could* use the Joint Statements as evidence on the merits; that (ii) with all circumstances accounted for it *should* use such statements; and (iii) that any such evaluation renders it necessary to openly discuss how such statements play into its ultimate ruling. There are undoubtedly subjective aspects to this multi-layered analysis, and the Tribunal is not prepared to characterize the Supreme Court's judgment in this respect as fatally flawed.

***f. Failing to consider or decide dispositive evidence and arguments submitted to the court demonstrating that the plaintiff spouses had failed to prove that BSEK knew or should have known of their alleged disagreement to the 2003 SPA***

407. A major part of this arbitration comes down to the application of Article 33(2) of the Matrimony Law to the spousal consent at issue in this case. There are two main issues within this analysis, which are whether: (i) Article 33(3) of the Matrimony Law applies to the spousal consent in this case; and (ii) even if Article 33(3) does apply, the presumption of spousal consent contained in Article 33(2) applies.

(i) Application of Article 33(3) of the Matrimony Law

408. The Tribunal heard from the Parties at considerable length on this point, in written submissions and by way of oral testimony at the Hearing.

409. The issue has two layers of analysis: (i) whether the agreement became subject to mandatory spousal consent under Article 33(3) as a result of the decision of the parties to the 2003 SPA to notarize the agreement; and (ii) whether the 2003 SPA was subject to mandatory registration.

Case 25-50445-hlb Doc 27 Entered 12/05/25 11:21:54 Page 108 of 220

410. On the first issue, the Tribunal finds the correct application of Article 33(3) to be quite unclear. Both Parties have provided plausible expert testimony and relevant legal authority supporting their conflicting legal theories.

411. The Claimant is quite correct that the plain text of the statute would suggest that voluntary notarization of an agreement would not result in mandatory spousal consent, as such voluntary notarization of the agreement would not appear to alter the nature of the underlying transaction. Article 33(3)'s requirement that "transactions subject to mandatory notarisation" be subject to notarized spousal consent would appear to concern the nature of such transaction. In other words, the plain meaning of the text would suggest that whether notarized spousal agreement is required would depend on the type of transaction at issue, not how such a transaction is ultimately executed.

412. Further, Professor Abzhanov has provided numerous examples, from court decisions to legal opinions, suggesting that the voluntary notarization of a transaction, or even a notary's decision to notarize a transaction out of an abundance of caution, does not transform the underlying transaction into one requiring notarization under Article 33(3).[580]

413. Now while it is true that the Respondent spends significant time going through the examples listed by Professor Abzhanov to challenge his claim that there is generally universal acceptance of the position that voluntary notarization of a transaction does not render it a transaction subject to mandatory notarization, the Tribunal need not comb through such arguments at this time. Suffice it to say that Professor Abzhanov has provided ample reason for the Tribunal to conclude, absent contradicting authority, that Article 33(3) may well operate in the way he suggests.

414. An in-depth discussion of the Respondent's challenges to Professor Abzhanov's authorities is not necessary because, as is often stressed in this award, the Tribunal is not here to act as a court of appeal to definitively rule on the proper application of Article 33(3) under Kazakh law. Accordingly, if it is sufficiently convinced by the Respondent's case in the affirmative on the proper application of Article 33(3), that is, to the point where the

---

580 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 252; Abzhanov Second Legal Expert Report, ¶ 57.

Tribunal cannot conclusively rule that the Respondent's courts' application was so flawed as to constitute a violation of international law, the relative persuasiveness of Professor Abzhanov's sources becomes less important as the Tribunal can reject the Claimant's position even while accepting the Claimant's significant authority on this particular aspect of the legal dispute.

415. With that the Tribunal moves to the Respondent's interpretation.

416. Professor Zhanaidarov and Dr. Daulenov argue that Article 154(1) of the Civil Code requires notarization of a transaction if the parties agree to notarize this transaction.[581] Article 154(1) provides:

> "In cases established by the legislative acts or by an agreement of the parties, written transactions are considered to be completed only after their notarization. Failure to comply with the requirement of notarization shall entail invalidation of the transaction with the consequences provided for by paragraph 3 of Article 157 of this Code."[582]

417. According to the Respondent's experts, pursuant to this statute, by agreeing that a transaction be notarized, the transaction is therefore not completed until such notarization is obtained. If the transaction cannot be completed without such notarization, it has consequently been transformed into an agreement requiring notarization. Therefore, Article 33(3) would apply despite the fact that the nature of the underlying agreement may not be of the type that would ordinarily be subject to mandatory notarization.

418. The Respondent's experts also note that pursuant to Article 220(3) of the Civil Code, "[w]hen making transactions requiring notarization […], the consent of other participants in joint ownership of the transaction shall be notarized."[583]

419. The Tribunal is not convinced that by agreeing to notarize an agreement, parties to that agreement transform the agreement into one requiring notarization. This would especially appear to be the case considering that the parties, after having agreed amongst themselves

---

581 Joint Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 38, Exh. R-84.

582 Joint Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 39.

583 Joint Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 46; Exh. R-84.

to notarize, could have just ignored this internal agreement or could have even forgotten about such a plan, and the transaction would have been legitimately executed because of no external requirement to notarize. Because of this theoretical possibility, it would seem that even the decision or intention of the parties to voluntarily notarize fails to transform it into a transaction requiring such notarization, absent an explicit executed agreement to mandate such notarization. Now, the Respondent could disagree with this hypothesis by arguing that it is not the agreement or intention to notarize that transforms the nature of the agreement, but the actual moment of voluntary notarization. But this position would be an even weaker argument, as a transaction would be considered to require notarization exclusively after such notarization would have taken place.

420. The Tribunal is mindful of Professor Abzhanov's additional criticisms of the Respondent's theory,[584] and finds convincing the basic premise that the plain meaning of Article 33(3) seems to suggest that the mandatory nature of the notarization of certain transactions relates to the nature of the type of transaction at issue – here, the transfer of interest in an LLP.

421. However, the authority put forth by the Respondent prevents the Tribunal from arriving at a definitive view of the proper application of Article 33(3) to transactions voluntarily notarized, and thus ultimately prevents the Tribunal from arriving at such a definitive view in favour of the Claimant's interpretation as to characterize such an application of Article 33(3) as flawed to an extent to trigger international law concerns.

422. Further, while not presented by either Party as a legal expert, the Tribunal takes note of testimony given by Mr. Ogai that suggests, despite his opinion that such practice was legally incorrect, Kazakh courts had fairly regularly been willing to invalidate these types of transactions when spouses later complained of a lack of consent:

> "We had a lot of internal discussions and fights about this, or disputes within our group about this in particular, whether there was a mistake or not. There were opinions of lawyers who are specialists in Kazakh law who say that when there is an interest in a company, that the notarised spousal consent is not required. Unfortunately, judicial practice has shown a different path, and in actual fact the courts have all taken the same position, which is that

---

584 Abzhanov First Legal Expert Report, ¶¶ 42-53; Abzhanov Second Legal Expert Report, ¶¶ 52-66.

supposedly the spouses had been deceived. And in spite of the consequences, in spite of the reasons, they therefore decided to withdraw those agreements and to declare them invalid. So that's what the practice has shown. In this particular case we felt that those who were claimants, they knew about this judicial practice. And it's possible they said, 'Hey, we could take a look at this, and we could do this too and get our property back.' We felt -- and I at that time, as a lawyer, felt -- that a notarised spousal consent was not necessary. And even if the spouse had some kind of complaint or some kind of claim -- so let's say my wife sold something, and I'm her spouse, I wouldn't have anything to do with that. It's my own personal opinion. But practice at the time, the practice was the other way. Now the practice may have changed a bit, but at that time the practice was solidly on the other side."[585]

423. This testimony adds at least an additional layer of credibility to the view that, prior to the Normative Resolution of July 10, 2008, the courts' approach to this legal issue was in a sense inconsistent and unclear. This makes it more difficult for the Tribunal to come to a definitive conclusion as to the proper application of Article 33(3). The Tribunal agrees with the Claimant that the timing of the Normative Resolution seems odd, with the Supreme Court seeming to clarify/confirm a legal issue in a manner inconsistent with a recent ruling of its own, but this does not change the fact that the pre-Normative Resolution application of Article 33(3) was not uniform.

424. Further, it should be noted that Mr. Heysel testified that there was even a discussion at the board level about filing legal action against their own legal representation for their failure to obtain the notarized spousal consent.[586] While Mr. Heysel ultimately testified that they chose not to pursue legal action because of the belief that such notarized consent was unnecessary,[587] the discussion about such a possibility highlights the fact that, given the legal environment at the time, it could have arguably been foreseen that failing to obtain such notarized consent could be problematic.

425. Because the Tribunal does not consider the application of Article 33(3) due to the voluntary notarization of the 2003 SPA to be fatally flawed, it need not inquire as to whether the 2003

585 Hearing Transcript, Day 3, 124:5-125:6.

586 Hearing Transcript, Day 3, 85:20-86:3.

587 Hearing Transcript, Day 3, 85:20-86:3.

Case 25-50445-hlb Doc 357 Entered 11/07/25 11:31:51 Page 172 of 220

SPA was subject to mandatory registration. Such analysis is further unnecessary as the Claimant correctly highlights that the relevant court decision alleged to have expropriated the Claimant's investment made no finding on this issue.[588]

(ii) Whether Article 33(2) applies to transactions falling under Article 33(3) of the Matrimony Law

426. The Claimant contends that even if Article 33(3) applied to the 2003 SPA, Article 33(2) still applied and thus the plaintiffs still had to prove that BSEK knew or should have known of their alleged disagreement to the 2003 SPA.[589]

427. While the Tribunal acknowledges that the Kazakh courts have not appeared to treat this issue uniformly, it finds at least plausible the rather basic line of reasoning provided by the Respondent and its experts. That is, if Article 33(3) explicitly requires notarized spousal consent, such a requirement would appear to be inconsistent with the presumption of spousal consent contained in Article 33(2) (i.e., unless it can be proven that the other party knew or should have known of the disagreement).[590] It would not appear to follow that it must be proven that the other party to a transaction lacked knowledge of spousal consent if the applicable statute affirmatively requires notarized spousal consent. The mere lack of the required notarized consent would seem sufficient to put the other party to the transaction on notice that a consent issue is present.

428. This interpretation is bolstered by the remedy provided for in Article 33(3): "[t]he spouse whose notarized consent to the said transaction was not obtained has the right to claim invalidation of the transaction by court within a year from the day when he or she knew or should have known about the transaction."[591] Such a remedy is based on the presence of the required notarized consent and the spouse's knowledge of such a transaction. This remedy does not concern the knowledge of disagreement of the other party or the

---

588 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 261.

589 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 208; Abzhanov First Legal Expert Report, ¶¶ 66, 75, 81.

590 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 267-268; Joint Report of Professor Zhanaidarov and Dr. Daulenov, ¶¶ 95-98.

591 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 269; Exh. R-89.

Case 25-50445-hlb Doc 37 Entered 11/07/25 11:31:51 Page 173 of 220

transaction. Importantly, the plain language of the statute does not even require such a disagreement – merely the lack of notarized consent.

429. Overall, the Respondent's interpretation follows a logical flow – (i) notarized consent is required; (ii) if no notarized consent it present, there is no issue of whether the other party is aware of possible disagreement because the explicitly-required notarized consent is lacking; and (iii) the spouse, whose notarized consent is required, can claim invalidation of the transaction due to the lack of such notarized consent, within a specified period upon learning of the transaction. The Tribunal finds this interpretation plausible.

430. Professor Abzhanov's description of this interplay is not as persuasive. He contends that:

> "Article 33(2) of the Matrimony Law is designed to protect the good faith acquirer of property from the spouse's claims. That protection comes in the form of the presumption of the spouse's consent to the transaction made by the other spouse. When the spouse who disposed of the jointly owned property failed to obtain spousal consent, including in the notarized form of certain types of transactions stated in Article 33(3) of the Matrimony Law, that does not automatically mean that the acquirer of that property shall bear the adverse consequences. The acquirer can always rely on the presumption of consent. It is only when the plaintiff spouse proves that the acquirer in fact knew or should have known of the spouse's disagreement to the transaction (i.e. that the acquirer was not acting in good faith) that the presumption of consent is not available (and consequently the transaction can be invalidated by the court)."[592]

431. The fundamental flaw in this reasoning is that the acquirer should be able to rely on the presumption of consent despite the lack of notarized consent that is explicitly required by statute. This is a far cry from the scenario where no such notarized consent is required and an acquirer perhaps lacks any means of confirming spousal consent. In such a scenario, it seems reasonable to permit the acquirer to presume consent, and to only risk having the transaction invalidated if the acquirer knew or should have known the consent was lacking. With Article 33(3) applying, the acquirer does not lack the means to determine whether the requisite consent was present or lacking. If notarized spousal consent is provided, the statute is fulfilled, and the acquirer does not risk having the transaction later invalidated on

592 Abzhanov First Legal Expert Report, ¶ 65.

these grounds. If notarized spousal consent is not provided, the acquirer is fully aware of the risk – that the spouse from whom notarized consent was not obtained can seek invalidation of the transaction within a year of discovering the transaction (or a within a year from when the spouse should have learned of the transaction).

432. It thus does not follow that the presumption under Article 33(2) should also be a factor when such a presumption is unnecessary due to the presence, or lack of, clear, affirmative consent.

433. The Tribunal does note that the Kakazh courts have been inconsistent in their application of the above principles. Professor Abzhanov highlights multiple cases where the court did indeed apply Article 33(2) even when notarized consent was required under Article 33(3).[593] This was confirmed by the Respondent's experts.[594]

434. Importantly, the Respondent's experts highlight court decisions that came to the opposite conclusion.[595] The Respondent's experts thus properly characterize the pre-2008 Normative Resolution case law on the application of Article 33 as involving "difficulties, mistakes and misinterpretation."[596] Clarification of the law was the purpose of the Normative Resolution.

435. While it is certainly not ideal for courts of a state to fail to apply a particular statute uniformly, this is not unusual in a given legal system and is often the purpose of a subsequent resolution, higher court decision, etc. When the application of a particular law is unclear, and courts display varying means of interpretation, it cannot be said that one side of the legal debate violates international law in its attempt to apply the relevant statute, especially when there is at least some merit to the particular means of interpretation.

436. Here, the application of Article 33(2) in cases where notarized consent was required by Article 33(3) was hardly clear during the relevant proceedings. While the Tribunal is not

593 Abzhanov First Legal Expert Report, ¶ 66, Appendix 2.

594 Joint Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶¶ 106-109.

595 Joint Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 107, Annex 2.

596 Jojnt Expert Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 109.

called upon to interpret this particular statute, it is convinced that, at the very least, the Respondent courts' application of these articles contained sufficient merit as to prevent the Tribunal from characterizing them in a manner as to violate international law.

***g. Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was brought in bad faith***

437. While the Claimant's overall case is quite multifaceted, this particular point strikes at the heart of the narrative of this dispute – whether the plaintiffs acted in bad faith in bringing the claim. Ironically, however, the argument on bad faith was virtually absent from the Claimant's written submissions, as highlighted by the Respondent.

438. The Tribunal acknowledges that there is significant evidence in this arbitration suggesting that the 2003 SPA Proceeding was indeed brought in bad faith. As summarized by Mr. Ogai, whom the Tribunal found to be a credible witness:

> "We were receiving information, and myself and the General Prosecutor's Office have come to understand that indeed the claims were unlawful. Moreover, they were submitted with ill-intent, malicious intent, because there were circumstances pointing to the fact that the spouses that took part in this, the ones that submitted claims, had absolutely no involvement, together with the nominal shareholders, in the management of the company. They were not owners. And at the same time, I believe it was in 2006 or 2007, they have provided powers of attorney to one company – Mr. Mukashev, if I am not mistaken – for him to file any claims on their behalf. And subsequently it was used, and claims were filed about declaring the transaction invalid. So when the discussion with my management was taking place about the interim results of this inspection, we decided that in all of this situation there were the indicia of the crime, the signs of crime committed."[597]

439. Mr. Ogai also highlighted during his testimony that:

> "[the] spouses, their wives, were saying that they knew nothing at all about the dispute. They said they were asked to sign a power of attorney to Mr. Mukashev, they signed the power of attorney, and now they haven't got a clue what the dispute is about. So on the basis of this information, I concluded that we are possibly dealing with a planned action that somebody

[597] Hearing Transcript, Day 3, 100:10-101:2.

> might be using the spouses to intentionally appeal the sales and purchase agreements and deals to annul them"[598]

440. Mr. Ogai further confirmed that the Joint Statements had been intended to show the court that the claims had been brought in bad faith.[599]

441. The issue before the Tribunal is not, of course, whether it believes the plaintiff spouses did indeed act in bad faith, but rather the role of the Respondent's courts in dealing with this matter.

442. At the Hearing, the Respondent highlighted not only the lack of focus on bad faith in the written submissions of this arbitration, but also the minimal role bad faith played in the 2003 SPA Proceedings:

> "Both Professor Abzhanov (Day 5, page 23, lines 6 to 17) and Professor Tlegenova (Day 6, page 115, lines 1 to 10) confirmed that bad faith was not raised by Big Sky in the 2003 SPA proceedings, with the sole reference to bad faith being, of course – as you see on slide 26 – in the few paragraphs set out in the prosecutor's protest to the Supreme Court (C-210), themselves without any reference to relevant law or evidence. It's very important that in due course the Tribunal focuses on those paragraphs, because the case on bad faith here, such as it is, bears no resemblance to the bad faith case now advanced by the Claimant at this hearing."[600]

443. While the Respondent notes the presence of only three paragraphs from the prosecutor's protest dealing with bad faith, one of those paragraphs can sum up the position. It reads,

> "Thus, decision in favour of the plaintiffs will result in deprivation of Company's entitlement to the fruit (income) of investment and in transfer of this entitlement to Mukashev, B., Faskhutdinov R., Kashchapov T., Asanova T., Baikenov K., which indicates that there is bad faith in the action of plaintiff in making present claim. Meanwhile, according to paragraph 4, Article 8 of the Civil Code of the Republic of Kazakhstan, citizens should act in good faith, reasonably and fairly when exercising their rights, and comply with requirements of law and moral rules of society. Non-

598 Hearing Transcript, Day 3, 106:9-18.

599 Hearing Transcript, Day 3, 159:15-20.

600 Hearing Transcript, Day 9, 94:3-17.

> compliance with the aforementioned requirements may serve as a ground for denial of legal protection of the right due to a citizen."[601]

444. While the Respondent incorrectly claimed in the Hearing that this discussion on bad faith lacked any reference to relevant law, as Article 8 of the Civil Code was explicitly cited, there was not any in depth legal analysis of this issue. Instead, the prosecutor notes that the relevant actions indicate the presence of bad faith.

445. The Tribunal is ultimately convinced that there is a fairly strong argument in this case that the spouses brought their claims in bad faith. Mr. Ogai's description of his views, and the subsequent attempt to obtain the Joint Statements to correct what he viewed as a wrong, has credibility in the Tribunal's opinion. The theory that a potential legal loophole was sought (the interpretation of which was questionable) and that the spouses were used to expose that loophole despite having no knowledge of what was being claimed on their behalf, seems believable to this Tribunal. This is especially the case if the Joint Statements are indeed considered.

446. However, the Tribunal's role again is not to impose its interpretation of the events, or to officially endorse or criticize Mr. Ogai's theory. Ultimately, the role of bad faith in the 2003 SPA Proceeding was not emphasized in any fashion. With the discussion limited to a brief note in the prosecutor's protest expressing the indication of bad faith, absent any substantial legal analysis under Kazakh law, it can come as no surprise that the Kazakh courts' disposition of the case ultimately did not depend on this theory.

447. The primary issue at hand was spousal consent, specifically whether notarized consent was required and, regardless of whether notarized consent was required, whether invalidation on the basis of lack of consent requires that the other party knew or should have known of such a lack of consent. While the issue of bad faith was highlighted during this hearing, it was simply not pressed in the 2003 SPA Proceeding, and thus the Tribunal is unable to come to the conclusion that a failure of the court to dismiss the 2003 SPA Proceeding due to bad faith was so flawed as to constitute a violation of international law.

---

601 Exh. C-210, p. 4.

Case 25-50445-hlb Doc 327 Entered 11/05/25 13:31:54 Page 120 of 220

448. Further, the Respondent correctly notes that the Claimant could have submitted its own appeal against the lower court's decisions to the Supreme Court, rather than relying on the prosecutor's protest, but chose not to.[602] If it had chosen to do so, which Mr. Heysel

449. confirmed was an option that had been discussed, it would have permitted the Claimant to present its case on bad faith based on what it discovered during the preliminary investigation.[603]

450. Additionally, as highlighted by the Respondent, the Claimant could have requested reconsideration under Articles 404-406 of the Code of Civil Procedure.[604] In doing so, the Claimant could have sought access to the relevant criminal file, and such evidence (if obtained), together with the Joint Statements, could have been filed with the District Court for reconsideration based on new circumstances, and this would have permitted Big Sky to push the bad faith theory it emphasized in the hearing.[605]

451. The Claimant's failure to exhaust local remedies is quite detrimental to its denial of justice claim. Whether such remedies would have been successful is not the issue, and of course cannot be known, and therein lies the problem. The Claimant now claims to be denied justice when it failed to properly exhaust the local means by which it could have obtained such justice.

#### *h. Failing to consider or rule on dispositive evidence and arguments submitted to the court demonstrating that the 2003 SPA Proceeding was time-barred*

452. A primary factor for this contention was whether the District Court was required to consider the statute of limitation issue despite BSEK admittedly failing to raise it in Part II of the 2003 SPA Proceedings. The Claimant's position is that the District Court was

---

602 Hearing Transcript, Day 9, 94:23-25.

603 Hearing Transcript, Day 9, 95:1-8; Hearing Transcript, Day 3, 53:7-10.

604 Hearing Transcript, Day 9, 95:9-15; Respondent's Closing Statement, p. 28.

605 Hearing Transcript, Day 9, 96:16-23; Respondent's Closing Statement, p. 29 (citing Hearing Transcript, Day 4, 33:3-8 and 34:12-17; Hearing Transcript, Day 6, 193:10-24).

required to consider this issue on its own motion, even if BSEK failed to repeat it in the second set of proceedings.[606]

453. The Respondent, on the other hand, contends that the District Court cannot be criticized for choosing not to consider, *sua sponte*, an issue that BSEK chose not to raise in the second set of proceedings.[607] The Respondent also stresses that BSEK failed to raise this issue in the appeal it filed against the Second 2003 SPA Decision.[608]

454. After reviewing the expert reports, the Tribunal is not sufficiently convinced one way or the other whether, under Kazakh law, the District Court should have considered the statute of limitation argument in the second proceedings despite the issue not being raised. Since the Tribunal is again not acting as a court of appeal, it need not arrive at such a legal conclusion. The Tribunal *is*, however, convinced that there is enough merit in the Respondent's position as to reject the Claimant's characterization of this aspect of the proceedings as a violation of international law.

455. The Tribunal finds merit in the Respondent's contention that, having been asked by the District Court to file its statement of defense in the second proceeding, which was filed on April 25, 2007, BSEK should have raised the statute of limitation issue if it in fact planned to rely on this legal position. It is also reasonable to have expected BSEK to have raised such an issue during the oral submissions on April 25 and 26, 2007. For whatever reason, it failed to do so.

456. Further, the Claimant admits that the statute of limitation issue was not raised in the appeal, arguing that the higher courts should have reviewed it anyway, as it was still an issue pending before the District Court. The Tribunal does not find this argument convincing. Again, the Tribunal is not asserting that the lower and appellate courts by law should not have addressed the statute of limitation issue. However, with the statute of limitation issue being omitted from the statement of defense in the second proceedings as well as from the

---

606 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 275.

607 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 184.

608 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 185.

subsequent appeal, the Tribunal finds the courts' lack of dismissal based on such statute of limitations at least reasonable enough to withstand scrutiny in this context.

***i. District Court's failure to send BSEK a copy of the Second 2003 SPA Decision in a timely manner***

457. The Claimant alleges that it did not receive the Second 2003 SPA Decision in a timely manner, requiring it to submit a "blind appeal" before the Court of Appeal on May 10, 2007.[609] The Claimant admits, however, that it was permitted to file an amended appeal after it claims to have received the decision.[610] Because the Claimant acknowledges that it was permitted to file an amended appeal, even if the Tribunal were to find that a copy of the Second 2003 SPA Decision was not sent to the Claimant in a timely manner, there appears to have been no injury and thus the Tribunal need not delve further into this allegation.

***j. The 2008 ABT Proceedings***

458. The Claimant contends that multiple aspects of the 2008 ABT Proceedings ran afoul of the BIT. As summarized during the Hearing, the Claimant primarily contends: (1) the District Court's decision to invalidate the 2004 Agreements and the 2006 Agreements on the basis that the parties had failed to obtain MEMR approval for the transfer of the 45% interest in the Morskoye field had no basis in Kazakh law;[611] (2) the District Court's conclusion that there had been "malicious collusion" was unfounded in fact and had no basis in Kazakh law;[612] (3) the District Court's failure to explain on what basis it reached its conclusions was a major procedural violation rendering the decision unlawful;[613] (4) the District Court's decision to allow ABT's claim that the Claimant had materially misled it regarding the value of the 15 million Big Sky US shares issued by the Claimant under the 2006

609 Claimant's Memorial on the Merits, ¶ 423; Exh. C-45.

610 Claimant's Memorial on the Merits, ¶ 423; Exh. C-57.

611 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶¶ 261-262; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 321-328.

612 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶¶ 263-270; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 329-323.

613 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶ 453; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 174.a., 180, 183.a.

Agreements had no basis in Kazakh law and was not supported by evidence;[614] (5) the District Court should have applied the proper law to the invalidation of the 2006 Stock Issuance Agreement;[615] and (6) the District Court's decision to order Big Sky US to pay USD 27,150,000 to ABT as a refund of the real value of the 15 million shares had no basis in evidence or Kazakh law.[616]

459. The Tribunal need not engage in any in-depth analysis of the substance of the 2008 ABT Proceedings because the Claimant admittedly failed to appeal the decision.

460. In its Reply, the Claimant "does not deny that no appeal of the 2008 ABT Decision was made."[617] It attempts to justify this failure to exhaust local remedies by three means: (i) the 2003 SPA Proceeding had destroyed the Claimant's trust in the Kazakh legal system; (ii) the Claimant may have had little concern about the 2008 ABT Decision at the time; and (iii) the 2008 ABT Decision's lack of basis in Kazakh law should have prompted the Respondent's prosecutor to exercise his power to appeal it.[618] These justifications will be discussed in turn.

461. The Claimant argues that its lack of trust in the Kazakh legal system led it to "reasonably conclud[e] that the commitment of any further of its (limited) resources to appealing the 2008 ABT Decision would be futile."[619] The Tribunal does not find this argument persuasive. To permit investors to successfully pursue investment treaty claims on what they *assume* would have occurred had they pursued available local remedies would open the floodgates to speculative claims based on what courts *might* have done if asked to address alleged legal wrongs.

---

614 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶ 271; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 333-334.

615 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶ 271; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 339-340.

616 Claimant's Opening Statement on Law and Breach, p. 32; Claimant's Memorial on the Merits, ¶¶ 258, 269; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 335-340.

617 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 317.

618 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 317.

619 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 317.

462. As the Respondent quotes from *Amto v. Ukraine*, "[t]he investor that fails to exercise his rights within a legal system, or exercises its rights unwisely, cannot pass his own responsibility for the outcome to the administration of justice, and from there to the host State in international law."[620] The Tribunal agrees with this view, and does not agree that the Claimant can justify a failure to pursue local remedies because of its assumptions regarding the anticipated rulings. The Claimant must show that an appeal would have been futile; the Claimant has not provided sufficient evidence to support such a contention.

463. Concerning its second justification, the Claimant argues that the 2008 ABT Decision "only became of concern to the Claimant when the Kazakh courts later (and unbeknownst to the Claimant) issued the shocking rulings that it could be enforced against Big Sky US's subsidiary (i.e., BSEK's) remaining assets in Kazakhstan (namely, its 10% interest in Kozhan and its interest in the IUE Award)."[621]

464. While the Tribunal can understand the Claimant's thought process at the time, it was still ultimately the Claimant's decision not to appeal the 2008 ABT Decision. The Tribunal does not find it persuasive that a claimant should be permitted to challenge local court proceedings in an investment arbitration when it strategically decided not to exhaust such available local remedies. The importance of pursuing such local remedies before submitting a dispute to investment arbitration is not based on a party's subjective view as to the importance of a particular decision/appeal at that time. This would also impermissibly allow investors to pursue actions based on decisions that were not challenged at the time due to a subjective analysis as to whether such challenges were strategically called for.

465. Lastly, the Claimant argues that "the 2008 ABT Decision's 'manifest[]' lack of basis in Kazakh law should have prompted the Respondent's prosecutor to exercise its power to

620 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 458; *Limited Liability Company AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, March 26, 2008 (CL-85), ¶ 76.

621 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 317.

Case 25-50445-hlb Doc 3-5 Entered 11/05/25 11:21:51 Page 183 of 220

appeal it. Unlike the Claimant, the Prosecutor would not have to have paid the state duty for filing an appeal."[622]

466. The Tribunal also finds this justification unconvincing. A party whose case relies on the challenge of court proceedings cannot excuse the failure to pursue legal remedies on the basis that someone else should have done so. The Claimant acknowledges it could have appealed and chose not to. The fact that the Respondent's prosecutor could have also appealed is irrelevant.

467. In challenging the decisions made in the 2008 ABT Proceedings, the Tribunal finds fatal to the Claimant's case that it intentionally chose not to appeal those decisions with which it disagreed. The Respondent's courts were the proper forum for at least the initial attempt to challenge those decisions. The Claimant cannot merely skip those available remedies and expect the Tribunal to instead act as the appellate court.

#### *k. Failing to notify the Claimant of the hearings in the 2009 or 2012 Set-Off Proceedings*

468. The Respondent correctly notes that these issues were given little attention by the Claimant at the Hearing,[623] and the Tribunal fails to find any violation of international law as concerns the notice at issue.

469. First, the Tribunal finds convincing the Respondent's reliance on Article 134 of the Code of Civil Procedure, which requires the court to be informed of any change of address while relevant proceedings are pending before the court. While the Claimant contends that this does not apply, as it abandoned its office before the 2009 Set-Off Proceedings had begun, the Respondent is correct that as of the alleged abandonment date of August 2008, the 2005 SPA Proceedings were ongoing, with the 2008 ABT Decision, which led to the 2009 Set-Off Proceedings, being issued in September 2008.[624]

---

622 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 317.

623 Hearing Transcript, Day 9, 146:4-7.

624 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 464; Exh. C-29; Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 210.

470. Importantly, even if service was deemed insufficient with respect to the 2009 and/or 2012 Set-Off Proceedings, the effects of such defects do not constitute violations of international law.

471. Concerning the 2009 proceedings, the evidence establishes that, at the very latest, the Claimant was aware of the 2009 Set-Off Ruling in December 2011.[625] Accordingly, the Claimant waited at least 10 months before seeking to restore the time period for filing an appeal against the ruling in November 2012.[626] This is despite the fact that the normal time period for submitting an appeal is 10 days.[627]

472. Professor Abzhanov takes the position that this considerable delay is inconsequential, as there is no definitive timeline for the filing of an appeal of this nature when service is deficient and the relevant party was unaware of the initial proceedings, even if the normal timeframe is clearly defined.[628] The Tribunal is hesitant to adopt Professor Abzhanov's view that "such time periods do not exist", as this could lead to rather concerning scenarios where a party, being improperly served in the first instance, could wait several years after learning of the relevant proceedings before deciding to appeal, even if the normal timeframe is a matter of days or weeks. This is perhaps why, under questioning from Judge Tomka, Professor Abzhanov ultimately conceded that "one must bear in mind that the court should be reasonable, sensible" in determining the proper time allotted.[629]

473. Even if Professor Abzhanov's opinion is accepted, that there is no set timeframe but that courts should be reasonable and sensible, the Tribunal finds it unreasonable that the Claimant waited approximately 10 months after discovering the ruling before seeking to restore the time period for filing an appeal against the ruling, when the time period for submitting such appeals is 10 days.

---

625 Exh. R-227.

626 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 348.

627 Exh. C-66, R-90.

628 Hearing Transcript, Day 5, 56:23-58:18.

629 Hearing Transcript, Day 5, 57:22-58:3.

474. Further, BSEK admits to failing to appeal the November 2012 Ruling, but justifies this failure by arguing that any such appeal would have been bound to fail on the merits, and that it would have been futile given the involvement of the Three Oligarchs who stood behind Kozhan and manipulated the courts for their benefit.[630] This statement does not amount to sufficient evidence, as merely expecting failure is not an excuse for failing to exhaust local remedies.

475. With respect to the 2012 Set-Off Proceedings, the Tribunal agrees with the Respondent that since BSEK's application to restore the time period for appeal on the basis that it had not been notified of the proceedings was granted, any alleged lack of proper notice was inconsequential.[631]

***l. Setting off debts purportedly owed by Big Sky US against assets held by its subsidiary, BSEK, and failing to give any legal basis for lifting of the corporate veil***

476. The Claimant's main concerns on this issue are threefold: (1) the Bailiff's petition to change the method and order of the execution of the 2008 ABT Decision; (2) the principle of corporate separateness; and (3) the Court's failure to exclude USD 27,150,000 from the set-off under the 2009 Set-Off Ruling on the ground that it had not been validly assigned by ABT to Kozhan.

(i) Bailiff's petition to change the method and order of execution

477. The Claimant argues that it was improper for the District Court to rely on Article 240(1) of the Code of Civil Procedure when, upon the petition of the bailiff, it changed the method of execution, ordering that the court-ordered debt be used to offset BSEK's 10% interest in Kozhan.[632] Professor Abzhanov argues that such a change in the method or order of execution has no basis under Kazakh law, contending that no such change and order is permitted with respect to decisions for payment of money, as "(i) they do not provide for any specific method or order of performance and there is thus nothing to change in the first

630 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 367.

631 Exh. C-73.

632 Claimant's Memorial on the Merits, ¶ 277.

place; and (ii) the bailiff is already authorised by law to execute such decisions against any property of the debtor, so there is simply no need to substitute the ordered payment of money with another method or order of execution."[633] Accordingly, he concludes that there could be no change to the method and order of execution when the bailiff discovered that Big Sky US had no cash or other property in Kazakhstan.[634]

478. The Respondent highlights that Professor Abzhanov primarily relies on a Normative Resolution of the Supreme Court dated June 29, 2009 in making his claims concerning the legitimacy of the method and order of execution, meaning that he relies on a Normative Resolution that was first published and entered into force on August 14, 2009, six weeks *after* the 2009 Set-Off Ruling.[635] The Claimant contends that this is irrelevant, as the District Court would have seen a draft of the Normative Resolution before it was published, and the Normative Resolution had merely summarized already existing court practice.[636]

479. The fact that the District Court *may* have been sent a *draft* of a normative resolution which could then theoretically undergo further discussions, amendments, etc. before eventually coming into force[637] does not, in the Tribunal's view, render such a normative resolution binding in this scenario. At most, the Tribunal could grant that such a theoretical review of the draft resolution could have provided guidance to the District Court as to what rules may come down in the future, thus arguably providing guidance as to how the process should work currently. Failing to adhere to a draft, before its finalization and publication, does not, in the Tribunal's opinion, amount to a violation of international law arising out of the decision of the District Court.

480. Further, the Tribunal finds at least plausible Professor Tlegenova's opinion that neither the law preceding the Normative Resolution nor the Normative Resolution itself are clear, arguing that the "[c]ourts consider and, if appropriate, allow bailiffs' petitions for changing

---

633 Claimant's Memorial on the Merits, ¶¶ 277-278; Abzhanov Legal Expert Report, ¶¶ 162-163, 165.

634 Claimant's Memorial on the Merits, ¶¶ 277-278; Abzhanov Legal Expert Report, ¶ 165.

635 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 254-255; Abzhanov Legal Expert Report, ¶¶ 162-165.

636 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 351.

637 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 224.

the method and order of execution of a court decision from collecting money to levying execution against other property."[638]

481. Ultimately, with the Normative Resolution post-dating the relevant acts, and the lack of clarity preceding such Normative Resolution (and possibly of the Normative Resolution itself), the Tribunal does not find the bailiff's petition to change the method and order of execution to be manifestly flawed.

(ii) Lifting the corporate veil

482. The Claimant contends that the District Court:

> "failed to adhere to the principle of corporate separateness in using shares held by BSEK to pay off a debt purportedly owed by Big Sky US. The only debtor under the 2008 ABT Decision was the Claimant. BSEK had no obligations arising from the 2008 ABT Decision. As a result, the 2008 ABT Decision could be executed only against the Claimant, not the assets of BSEK."[639]

483. The Claimant supports its position with analysis from Professor Abzhanov:

> "Kazakh law expressly recognizes separate legal personality of a subsidiary (here, BSEK) from its parent (here, Big Sky US). The assets of the former are legally separate from the assets of the latter. Furthermore, Kazakh law clearly provides that a subsidiary, even if 100% owned and controlled by the parent company, is not liable for the parent's debts."[640]

484. In response, the Respondent focuses more on the theoretical possibility of lifting of the corporate veil in the manner prescribed under Article 8 of the Civil Code. Specifically, the Joint Report of Professor Zhanaidarov and Dr. Daulenov states:

> "The liability of the subsidiary for the debts of the parent company is also based on Article 8 of the Civil Code, which (inter alia), establishes the principle of good faith and the prohibition of abuse of civil rights. At the same time, the general rule that 'a subsidiary company is not liable for the debts of its parent organisation' (Article 94(1)(2) of the Civil Code) applies

---

638 Expert Report of Professor Tlegenova, ¶ 137.

639 Claimant's Memorial on the Merits, ¶ 279.

640 Abzhanov First Legal Expert Report, ¶ 169.

> only if this does not contradict the express norms and principles established by Article 8 of the Civil Code [. . .]."[641]

485. Despite this theoretical means of lifting the corporate veil in the manner witnessed in the set-off proceedings, the Respondent and its experts fail to provide any analysis demonstrating that such a lifting was actually appropriate here or point to any justification from the court. In fact, the Claimant is correct in highlighting that the Respondent's own expert, Dr. Daulenov, admitted that based on the available documents, he was "unable to arrive at a conclusion as to the grounds on which the execution of the 2008 ABT Decision against BSEK's 10% interest in Kozhan was permitted under Kazakh law."[642]

486. Instead, the Respondent merely notes the possible lifting under Article 8 of the Civil Code and then states the blanket conclusion that "the Kazakh courts were entitled to set off the debt of Big Sky US against Big Sky Canada's 10% interest in Kozhan."[643]

487. Absent any actual connection between the set-off here and Article 8 of the Civil Code, the Tribunal does not find this leap in reasoning particularly persuasive and has serious doubts as to the appropriateness of these set-offs by the Kazakh courts. The possible lifting of the corporate veil under Article 8 does not appear to be a routine legal maneuver, the legitimacy of which should simply be assumed. This is especially the case without any legal analysis even attempted.

488. However, the Tribunal again notes the significant gap between an arbitral tribunal having doubts, even serious ones, about the ruling of a local court, and the tribunal characterizing such a ruling as so flawed as to constitute a violation of international law.

489. The Tribunal acknowledges the contention made by Professor Zhanaidarov and Dr. Daulenov that the set-off in this case is at least possible under the laws of Kazakhstan, and the Tribunal lacks sufficient evidence before it to affirmatively declare that such a lifting of the corporate veil in this manner is a legal impossibility. Accordingly, rather than dealing

---

641 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 438; Joint Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 199.

642 Expert Report of Dr. Miras Daulenov, ¶ 162.

643 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 440.

with a court ruling that can perhaps (or even likely) be labelled as objectively incorrect, the Tribunal is in a position where, to find a denial of justice, it would have to substitute its own interpretation for the local court's subjective implementation of its own laws. This is not the appropriate role of an international tribunal. As a result, while the Tribunal certainly questions the strength of the supposed legal reasoning behind the decisions to set off debts purportedly owed by Big Sky US against assets held by its subsidiary, BSEK, the Tribunal does not find such decisions to constitute a denial of justice.

(iii) The exclusion of USD 27,150,000 from the set-off

490. The Claimant argues that the District Court should have excluded USD 27,150,000 from the set-off under the 2009 Set-Off Ruling on the ground that it had not been validly assigned by ABT to Kozhan.[644]

491. First, the Claimant contends that the 2008 ABT Decision only partially invalidated the 2006 ABT Agreement, failing to invalidate Article 9.9, which prohibited a party (ABT) from assigning any of its rights and liabilities arising thereunder without prior written consent from the other party (Big Sky US). The 2008 ABT Decision arose pursuant to the 2006 ABT Agreement, and thus ABT required Big Sky US's written consent to this assignment agreement.[645]

492. The Parties agree that the 2008 ABT Decision arose from the 2006 ABT Agreement.[646] While the Claimant contends that the 2008 ABT Decision only partially invalidated the 2006 ABT Agreement, leaving Article 9.9 intact, the Respondent's experts argue:

> "Big Sky US's obligation to pay the sum of US$ 27,150,000 to ABT results directly from the ABT Decision, not from the 2006 ABT Agreement. It follows that the requirement to obtain written consent under Article 9.9 of the 2006 ABT Agreement does not apply. Professor Abzhanov's statement that the 2008 ABT Decision cannot be viewed separately from the 2006 ABT Agreement from which it arose has no basis in Kazakh law and we

---

644 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 335-340; Abzhanov Second Legal Expert Report, ¶¶ 244-245; Exh. C-62.

645 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 358.a; Abzhanov Second Legal Expert Report, ¶¶ 171-173.

646 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 358.a; Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 444.

> noted previously that Professor Abzhanov does not refer to any law or commentary to support this statement."[647]

493. In essence, the Respondent's experts argue that because the debt arose from the 2008 ABT Decision, the language in Article 9.9 of the 2006 ABT Agreement concerning the relevant assignment, as well as the language in Articles 339(2) and 345(1) of the Civil Code which govern the assignment of a creditor's rights in the presence of limiting contractual language, do not apply.[648]

494. The Claimant and Professor Abzhanov have failed to provide a convincing legal basis for clearly requiring adherence to Article 9.9 when dealing with a debt that, while connected with the 2006 ABT Agreement in that the 2008 ABT Decision arose from it, is at least reasonably framed as resulting directly from the ABT Decision.

495. The Tribunal instead finds plausible the following explanation by Dr. Daulenov:

> "Big Sky US's obligation to pay the sum of US$27,150,000 to ABT results directly from the 2008 ABT Decision, not from the 2006 ABT Agreement. […] Article 9.9 of the 2006 ABT Agreement does not therefore apply. According to Article 76(3) of the Constitution, decisions, sentences and other rulings of the courts are binding throughout the territory of Kazakhstan. Moreover, Article 21(2) of the Code of Civil Procedure stipulates that all judicial acts, including judgments, which have entered into force, are binding on all state bodies, local governments, public associations, other legal entities, public officials and citizens and are subject to rigorous execution throughout the territory of Kazakhstan. Therefore, once the 2008 ABT Decision had entered into force, it became binding on all parties to the dispute; Big Sky US's prior written consent to the Assignment Agreement was not required and Article 9.9 of the 2006 ABT Agreement did not apply."[649]

496. At the very least the Tribunal finds this position plausible enough to prevent any characterization of the District Court's decision as legally problematic under international law.

---

647 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 444; Joint Report of Professor Zhanaidarov and Dr. Daulenov, ¶ 206.

648 Expert Report of Dr. Miras Daulenov, ¶¶ 164-165.

649 Expert Report of Dr. Miras Daulenov, ¶¶ 164-165 (footnotes omitted).

***m. The Bailiff's failure to obtain an independent and serious valuation of BSEK's 10% shareholding in Kozhan***

497. The Claimant's position here revolves around what it finds to be an improper valuation of BSEK's 10% shareholding in Kozhan. However, this issue is two-fold: (1) whether an independent valuation was necessary; and (2) if so, whether the valuation in this case was proper.

498. Regarding the first point, the Claimant contends that as part of any execution process, the bailiff is required to arrange for an independent valuation of the debtor's property.[650]

499. The Respondent's expert, however, argues that after the bailiff filed a petition for changing the method and order of execution of the 2008 ABT Decision, the court ruled in the 2009 Set-Off Ruling for another method for order and execution of the 2008 ABT Decision, namely "by transferring […] the property in kind being the 10 per cent interest in order to offset the debt obligations of the debtor [BSEK] to [Kozhan]."[651] The Respondent thus contends that unlike when property is sold at public auction, with the proceeds to be paid to the creditor, "where the creditor is awarded specific property pursuant to the writ of execution, the bailiff shall seize the debtor's property and transfer it to the debtor."[652]

500. The Tribunal is skeptical of the Respondent's position that no valuation was necessary, as the Respondent admits that the bailiff was correct in obtaining a valuation before the 2009 Set-Off Ruling "because the court had to be presented with evidence to confirm that the amount awarded under the 2008 ABT Decision would be repaid fully or in part by transferring 10% interest of Big Sky Canada in Kozhan."[653] The Respondent therefore acknowledges that the valuation of the 10% interest is relevant for execution of the 2008 ABT Decision, even if there is a discrepancy as to when the valuation should have taken

---

650 Abzhanov Second Legal Expert Report, ¶ 250; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 362.

651 Expert Report of Professor Tlegenova, ¶ 142; Exh. C-30.

652 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 482; Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 238

653 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 483.

place. This of course makes sense as the value of property being used to satisfy a debt is quite relevant.

501. Thus, assuming that an independent valuation was necessary, the Tribunal will consider whether one was properly obtained.

502. The Claimant argues that the valuation obtained from Mirnykh Valuation was improper as it was requested by Kozhan, a clearly biased party with an obvious interest in securing a low valuation which would allow it to seek subsequent enforcement of the court-ordered debt against additional BSEK assets (i.e., against the IUS Award, which it duly did).[654]

503. In response to the Claimant's contention that the valuation was improper, the Respondent argues that the Claimant should have challenged the valuation in a separate set of proceedings and/or appealed the 2009 Set-Off Ruling within 10 days of learning of its existence.[655] The Claimant, however, contends that no notice of the Mirnykh Valuation had been given to BSEK, and BSEK had been unable to challenge it in the 2009 Set-Off Proceeding.[656]

504. The Claimant does not seem to doubt the Respondent's claim that in the event of disagreement with the valuation, it in theory had the right to file a claim challenging the valuation carried out.[657] Instead, the Claimant's position is that its failure to receive notice of the valuation precluded it from filing the available challenge. For this contention, the Claimant refers to Professor Abzhanov's Second Expert Report, which merely notes that the bailiff's resolution dated July 20, 2009 fails to mention any notice of the Mirnykh Valuation being given to Big Sky or BSEK.[658] This does not necessarily establish that the Claimant was unaware of the valuation at the time.

---

654 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 363.a.

655 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 484; Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 244.

656 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 363.c; Abzhanov Second Legal Expert Report, ¶ 251(ii).

657 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 484; Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 244.

658 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 363.c; Abzhanov Second Legal Expert Report, ¶ 251(ii).

505. This argument appears insufficient for the Claimant to be excused for having failed to challenge the valuation at any stage. Even if the Claimant had been unaware of the valuation at the time it was completed before the 2009 Set-Off Ruling, it could have subsequently attempted to challenge that aspect in a timely appeal of that ruling. Instead, as discussed above, the Claimant unnecessarily waited at least 10 months after learning of the 2009 Set-Off Ruling before commencing its appeal attempt.

506. The Tribunal acknowledges that on its face, the Mirnykh Valuation does appear to be highly questionable, and there is no doubt that there are credible arguments to be made concerning the valuation itself and the fact that a clearly biased party was involved in the selection of those responsible for the questionable findings. However, as is the case with other aspects of the relevant proceedings, the Tribunal is unwilling to simply impose its own judgment in place of the Kazakh court's, especially when the Claimant has failed to properly utilize local appellate remedies.

#### *n. The Bailiff's failure to make any attempt to sell the 10% shareholding at a public auction*

507. The Claimant argues that the bailiff's execution of the 2009 Set-Off Ruling failed to comply with Kazakh law because such laws mandated that the bailiff first attempt to sell the 10% shareholding at a public auction.[659] Specifically, Professor Abzhanov contends that pursuant to a 2005 Normative Resolution of the Supreme Court the transfer of attached property to the execution creditor without any attempt to sell that property at a public auction was unlawful.[660]

508. The Respondent's position relies primarily on two arguments: (1) that the 2009 Set-Off Ruling expressly called for the transfer of property in kind; and (2) that the 2005 Normative Resolution explicitly permits this.

509. Concerning the first point, Professor Tlegenova and Dr. Mukhamedshin argue that pursuant to Article 35(5) of the 1998 Enforcement Law, "where the creditor is awarded specific

659 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 365.

660 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 365; Abzhanov Second Legal Expert Report, ¶ 257.

property as specified in the execution document, the bailiff shall seize the debtor's property and transfer it to the creditor."[661] A review of Article 35(5) reveals the following language: "If creditor was awarded certain items under the execution document, the court bailiff seizes such items from the debtor and transfers them to the creditor under act of transfer."[662]

510. The Tribunal finds this language to be supportive of the Respondent's position and would appear to follow the logical sequence of events of a court ordering a specific transfer of property in kind and the bailiff executing such a transfer.

511. Concerning the 2005 Normative Resolution, Professor Tlegenova and Dr. Mukhamedshin argue that paragraph 8 of the Normative Resolution, on which Professor Abzhanov relies, calling for the sale of interest in Kozhan "on the commission basis through trading organizations or at auctions" would necessarily contradict the express order present in the 2009 Set-Off Ruling.[663] Instead, they contend that paragraph 10 is the appropriate paragraph to reference, which calls for the transfer of property when such property is awarded to the creditor.[664]

512. The Tribunal finds at least plausible the position that paragraph 8 more appropriately concerns "general issues of the sale of property when executing court decisions to recover money",[665] as opposed to those explicit orders for the transfer of property in kind. Applying paragraph 8 to such orders would necessarily present an unworkable contradiction.

513. With respect to the applicability of paragraph 10 of the Normative Resolution, the Tribunal has its doubts. Paragraph 10 reads as follows:

> "When hearing complaints on the actions of bailiffs related to the transfer of property in kind, the court shall take into account that the debtor's property over which the bailiff has levied execution may be transferred to the execution creditor in kind when:

---

661 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 250.

662 Exh. R-104.

663 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 250.

664 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 250; Exh. R-501.

665 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 250.

- certain items were awarded to the execution creditor as specified in the execution document;

- it was impossible to sell the attached property at an auction within two months at the price of the property set at the time the action was announced;

- an auction was declared ineffective, then at the price reduced by twenty per cent from the initial appraised price;

- a repeated auction was declared ineffective, then at the last announced price which shall not be less than fifty per cent from the initial appraised price;

- the court approves a settlement agreement between the execution creditor and debtor which provides for the transfer of the property in kind."[666]

514. Professor Tlegenova and Dr. Mukhamedshin rely on the first sub-point, which would indeed appear to support their position.[667] However, the Tribunal notes the lack of any inclusive "or" following the penultimate sub-point and finds it unclear whether the list is indeed meant to be inclusive. Instead, the argument could be made that the sub-points comprise a list of procedures to be carried out before execution of the transfer (i.e., the attempted sale at full price, an ineffective auction at a 25% discount, an ineffective auction at a 50% discount and an approved settlement). Because of the lack of clarity, the Tribunal does not find that paragraph 10 of the Normative Resolution explicitly permits the transfer in kind absent a public auction.

515. Despite this, the Tribunal finds sufficiently plausible the Respondent's position that Article 35(5) of the 1998 Enforcement Law, which the Tribunal importantly acknowledges predates the 2005 Normative Resolution, calls for the transfer in kind when the applicable order calls for such a transfer. Because this law predates the 2005 Normative Resolution, the Tribunal must also find at least plausible the Respondent's position that paragraph 8 more appropriately applies to issues of sales of property to execute orders to recover money as opposed to orders explicitly calling for the transfer of property in kind. Accordingly, the

666 Exh. AA-22.

667 Joint Report of Professor Tlegenova and Dr. Mukhamedshin, ¶ 250.

Tribunal does not consider the failure to attempt a sale at auction of the 10% shareholding to be legally problematic from the perspective of international law.

516. While the Tribunal admittedly finds questionable some of the numerous court actions at issue in this case, it fails to find any of the relevant judicial conduct sufficiently flawed as to constitute a denial of justice.

**(2) Article III(1) of the BIT – Judicial Expropriation**

517. To recall, Article III(1) of the BIT provides:

> "Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for public purpose; in a nondiscriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II(2). Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable."[668]

518. As a factual matter, the Claimant's judicial expropriation concerns the same conduct discussed above with respect to the Claimant's denial of justice claim. The Respondent argues that the Claimant's expropriation claim necessarily must fail if its denial of justice claim fails. The Tribunal does not necessarily agree with this proposition as a matter of law. On the facts of the case, however, which include the same factual allegations as the allegations advanced under the denial of justice claim, the Tribunal arrives at a similar conclusion – namely that the Claimant has failed to establish expropriation based on the judicial conduct at issue in this case.

519. As detailed above, the Tribunal acknowledges that some of the substantive and procedural decisions made by the Kazakh courts are questionable. On some of the challenged actions or alleged failures to act, the Claimant and Professor Abzhanov have presented credible

---

668 Exh. C-1.

critiques. However, as the Tribunal noted in its discussion of denial of justice, it was not convinced that the conduct of the Kazakh courts was flawed to such an extent as to trigger violations of international law.

520. To succeed on an expropriation claim based on the same judicial conduct, the Claimant would have to convincingly articulate how the judicial conduct here that failed to amount to a denial of justice could constitute unlawful expropriation. The Claimant has failed to provide such a theory and has instead relied on its characterization of the judicial conduct as wrongful.

521. The Claimant primarily relies on two arguments to support its expropriation claim in the face of a potentially unsuccessful denial of justice finding: 1) that its case is not centred on judicial misconduct;[669] and (2) that the Tribunal is permitted to view its allegations in the context of expropriation without reference to any standard relevant in a denial of justice context.[670]

522. With respect to the first point, the Tribunal disagrees with the Claimant's contention that its case is not centered on judicial misconduct. A review of the Claimant's allegations, as laid out extensively above, makes it quite apparent that the Claimant's case indeed focuses on acts taken, and not taken, by the Kazakh courts. While it may be true that certain factual allegations include State organs aside from the judiciary, such allegations are merely supportive in nature to what is a court-based narrative of alleged treaty breaches.

523. As concerns the second point, the Tribunal acknowledges that the Claimant is free to allege BIT violations other than denial of justice even if such allegations revolve around acts of the judiciary. The Tribunal does not doubt that acts of the judiciary can amount to expropriation. For judicial acts to amount to unlawful expropriation, however, the Claimant must establish, as in the denial of justice context, that such acts were wrongful in such a manner so as to constitute a treaty breach. Simply framing allegations as breaches other than denial of justice does not satisfy that burden.

---

669 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 566.

670 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 566-577.

Case 25-50445-hlb Doc 27 Entered 11/07/25 13:31:51 Page 198 of 220

524. Here, while the Tribunal has questioned certain acts taken by the Kazakh courts, it has failed to find any such acts to be wrongful as a matter of international law. It therefore follows that the Claimant's expropriation case fails unless it clearly articulates how acts of the Kazakh judiciary can constitute an unlawful expropriation while failing to constitute demonstrably wrongful acts or omissions. To be clear, within the denial of justice section of this Award, the Tribunal obviously worked under the applicable burden for such a theory of breach, but importantly it was not the case that the Tribunal found the relevant judicial conduct wrongful, yet insufficiently wrongful to constitute a denial of justice. Instead, while some of the judicial conduct was admittedly questionable, the Tribunal did not find any of the alleged acts or omissions to be flawed to an extent actionable by an arbitral tribunal on the plane of international law.

525. The Claimant has also failed to effectively place the role of the courts within a larger alleged expropriation scheme involving other state organs in a manner that would permit the Tribunal to find expropriation without labelling the conduct of the judiciary alone as unlawful under international law.

526. Now, while not clearly articulated by the Claimant, the Tribunal notes that in distinguishing between denial of justice and judicial expropriation, perhaps the argument could be made that due to a flawed legal structure, the judiciary could expropriate an investment while failing to engage in any "wrongful" conduct in its application of relevant laws. The Claimant has not clearly articulated such a theory and the Tribunal in any case has been provided no evidence that such a scenario existed here.

527. Accordingly, the Tribunal finds that the Claimant has not established any judicial expropriation.

**(3) Article II(2)(a) of the BIT – FET**

528. To recall, Article II(2)(a) of the BIT provides:

> "Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law."[671]

529. The Claimant's FET claim too relies on the same alleged acts and omissions of the judiciary that have already been discussed within the denial of justice framework and referenced in the expropriation analysis. Specifically, the Claimant's submissions highlight that its FET contention is based on:

- The Court of Appeal's February 6, 2007 decision in the 2003 SPA Proceeding;[672]
- The Supervisory Collegium's February 19, 2007 decision in the 2003 SPA Proceeding;[673]
- The Second 2003 SPA Decision;[674]
- The Court of Appeal's rejection of BSEK's appeal;[675]
- The decision of the Supervisory Collegium of the Almaty City Court;[676]
- The Supreme Court's decision in the 2003 SPA Proceeding;[677]
- The 2008 ABT Decision;[678]
- The 2009 Set-Off Proceeding;[679]
- The 2012 Set-Off Proceeding, including setting off the 2008 ABT Decision against the IUS Award;[680]

671 Exh. C-1.
672 Claimant's Memorial on the Merits, ¶ 409-412.
673 Claimant's Memorial on the Merits, ¶ 413-414.
674 Claimant's Memorial on the Merits, ¶ 415-422.
675 Claimant's Memorial on the Merits, ¶ 423-424.
676 Claimant's Memorial on the Merits, ¶ 425-428.
677 Claimant's Memorial on the Merits, ¶ 429-441.
678 Claimant's Memorial on the Merits, ¶ 442-454.
679 Claimant's Memorial on the Merits, ¶ 455-462.
680 Claimant's Memorial on the Merits, ¶ 463-475.

530. The Claimant supports its FET contention by noting that this standard prohibits arbitrariness and therefore due process and the predictability of the legal framework are relevant for such analysis, while, unlike in the denial of justice context, such actions need not be considered "outrageous" or "egregious". In doing so, the Claimant labels the relevant judicial conduct as "seriously flawed",[681] "unjust",[682] representing material violations of procedural norms,[683] representing a disregard of facts and evidence,[684] etc. In essence, the Claimant again challenges the legitimacy of the Respondent courts' actions.

531. In doing so, it is important to again review the "number of constitutive elements" of the FET claim, apart from the denial of justice analysis. The seven elements listed by the Claimant include: (i) the host State must act with procedural propriety and due process vis-à-vis an investor; (ii) the host State must act in good faith towards an investor; (iii) the host State's conduct towards an investor cannot be arbitrary, unfair, unreasonable, unjust, or idiosyncratic; (iv) the host State must not commit a "denial of justice" against the foreign investor; (v) the host State must act consistently vis-à-vis the investor; (vi) the host State must act transparently vis-à-vis an investor; and (vii) the host State must provide a stable legal and business environment for an investor.[685]

532. The Tribunal need not "conflate what the Respondent calls the 'threshold for establishing a denial of justice' with the autonomous treaty-based FET standard"[686] to find that the

---

681 Claimant's Memorial on the Merits, ¶ 409.

682 Claimant's Memorial on the Merits, ¶ 411.

683 Claimant's Memorial on the Merits, ¶ 413.

684 Claimant's Memorial on the Merits, ¶ 436.

685 Claimant's Memorial on the Merits, ¶ 394; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, July 29, 2008 (CL-21), *OAO Tatneft v. Ukraine*, UNCITRAL, Award on the Merits, July 29, 2014 (CL-33), *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, July 24, 2008 (CL-38), *International Thunderbird Gaming Corporation v. The United Mexican States*, UNCITRAL (Ad hoc), Award, January 26, 2006 (CL-39), *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, October 11, 2002 (CL-41), *Waste Management, Inc. v. United Mexican States* ("Number 2"), ICSID Case No. ARB/AF/00/3, Award, April 30, 2004 (CL-42), *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, December 7, 2011 (CL-45), *Occidental Exploration & Prod. Co. v. The Republic of Ecuador*, UNCITRAL, LCIA Case No. UN3467, Final Award, July 1, 2004 (CL-57); Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 621 (and accompanying footnotes).

686 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 617 (citing Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 409).

conduct at issue fails to constitute a breach of FET. Even if a "holistic" approach is taken in reviewing whether the Respondent's conduct was fair and equitable, as advocated by the Claimant,[687] its case still relies on the Tribunal declaring the relevant conduct to be "arbitrary",[688] lacking in procedural fairness and due process,[689] lacking in transparency [690] or lacking in good faith.[691] Crucially, the Claimant's FET claim still necessitates a finding that the Respondent's conduct was "wrongful" in one of these ways, and it spends significant time merely differentiating among the ways in which the acts could be declared as such, in contrast to those present in a denial of justice context.

533. However, the issue here again is not the level of wrongfulness of the relevant judicial conduct (i.e., whether such conduct is wrongful enough to be characterized as "outrageous" or "egregious" or if it is instead "flawed", "unjust", "arbitrary" or lacking in due process). Instead, in viewing the relevant judicial conduct that is at the heart of the Claimant's case as a whole and of the FET claim specifically, the Tribunal already failed to find any such conduct to be objectively wrongful as a matter of international law. It is true that the Tribunal's analysis under denial of justice focused primarily on the claims of improper application of relevant substantive and procedural laws, but in evaluating whether such conduct amounted to a denial of justice, the Tribunal of course also took into account whether decisions, actions and omissions were arbitrary, lacking in due process, lacking in good faith, etc. Such consideration would quite clearly be necessary in evaluating whether such conduct ran astray of international law both in the denial of justice and in the FET context.

534. Aside from the individual examples of alleged misconduct highlighted by the Claimant, it also contends that "the State's collective wilful blindness to the illicit scheme carried out through the Respondent's courts and its failure to protect the Claimant's investment from the criminal enterprise (or 'corporate raid', as the Prosecutors described it) is the most

---

687 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 623.

688 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 625.

689 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 626.

690 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 627.

691 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 628.

egregious example of the Respondent's lack of good faith and failure to exercise due diligence."[692] This overarching theme of the Claimant's case is difficult to assess as an actual example of the Respondent's failure to afford FET, as it serves more as a legal conclusion that must be based on underlying wrongdoing (i.e., the judicial conduct). The possible contention that the Respondent had an affirmative duty to protect the Claimant's investment from the alleged "illicit scheme" is addressed in more detail below in the analysis of full protection and security.

535. For the purpose of FET, the Tribunal is not convinced that, having failed to find the relevant judicial acts and omissions to be wrongful, the Claimant has sufficiently established how, when taking a holistic view, such acts and omissions, admittedly leading to results considered unfavorable by the Claimant, constitute a lack of good faith and/or due diligence.

536. With respect to the Claimant's reliance on the most-favored nation clause in Article II(1) of the BIT and the applicability of Article 4(2) of the Kazakhstan Investment Law which provides a right for damages for the investor in case of the "enactment by a state body of an act conflicting with legislative acts of the Republic of Kazakhstan or as a result of an illegal action (a failure to act)",[693] even assuming that the Claimant has established that it applies, this claim fails for the same reason as the Claimant's primary FET claim – the lack of state actions that the Tribunal finds to be illegal. Furthermore, the Tribunal also finds plausible the Respondent's position that Article 4(2) "does not create any free-standing entitlement to compensation capable of being invoked by the Claimant, but merely guarantees the availability of any remedies existing under Kazakh civil law."[694]

537. In sum, the Claimant's FET case is primarily a repetition of its denial of justice claim, with the conclusion that such challenged court actions amount to a breach of FET when viewed in the context of differing standards under which an act can be considered wrongful. Because the Tribunal does not consider the relevant judicial conduct to be actionable, i.e.,

---

692 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 628.

693 Claimant's Memorial on the Merits, ¶ 404; The Law of Republic Kazakhstan from January 8, 2003 No. 373-II on Investments (with amendments and additions as of the February 20, 2012) (CL-77).

694 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 541.

wrongful under international law, the Claimant's FET contention under Article II(2)(a) of the BIT fails.

**(4) Article II(6) of the BIT – Effective Means**

538. To recall, Article II(6) of the BIT provides:

> "Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations."[695]

539. As with its other claims, the Claimant's effective means case relies on the same challenged judicial conduct. Specifically, the Claimant contends that this standard guarantees that "a domestic court will (i) fairly and impartially consider its arguments and evidence; (ii) render its decision on the basis of the rule of law and without undue delay; and (iii) make the decision in an honest, independent, and impartial way."[696]

540. The Respondent relies heavily on its contention that the Claimant cannot select an effective means theory when addressing judicial conduct as a way of avoiding a potentially higher burden in the denial of justice analysis. Whether or not the Tribunal agrees with the Respondent's position, it need not address that particular issue here as it finds that the Claimant's case fails under the effective means standard as well.

541. Whether in the denial of justice context or effective means context, the Claimant's case again makes clear that it must establish wrongful conduct on the part of the Kazakh judiciary to prevail. As noted throughout this Award, while the Tribunal finds certain acts of the judiciary to be questionable in this case, it is not willing to characterize such conduct as actionable as it finds no misapplication of the relevant law rising to the level of a violation of international law.

---

695 Exh. C-1.

696 Claimant's Memorial on the Merits, ¶ 494.

542. Absent any theory as to how the Tribunal could find a breach of the effective means standard despite failing to find wrongful the conduct on the part of the judiciary on which this argument relies, the Tribunal rejects this claim under Article II(6) of the BIT.

**(5) Article II(2)(a) of the BIT – FPS**

543. To recall, Article II(2)(a) of the BIT provides:

> "Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law."[697]

544. There are two primary issues at hand in the FPS aspect of this case: (i) whether the FPS standard requires "legal protection" in addition to physical protection; and (ii) if FPS requires legal protection, whether the Respondent is in breach of this requirement.

545. Both Parties agree that tribunals have been divided as to the scope of FPS.

546. The Respondent provides relevant language from the *Liman v. Kazakhstan* tribunal, which articulated the more restrictive view of FPS by determining that:

> "[w]ith regard to the standard of most constant protection and security, the Tribunal holds that this provision, which must have a meaning beyond, and distinct from, the standard of fair and equitable treatment, provides a standard which does not extend to any contractual rights but whose purpose is rather to protect the integrity of an investment against interference by the use of force and particularly physical damage."[698]

547. As the Respondent notes, this excerpt explicitly found that the FPS provision must not be read to merely provide the sort of legal protection contained in FET analysis.[699]

548. While the Claimant's FPS case relies almost exclusively on the same conduct as its position on FET, which would seem thus to render the FPS "legal protection" redundant, the

---

697 Exh. C-1.

698 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 568; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of the Award, June 22, 2010 (CL-69).

699 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 568.

Claimant does provide a theory by which "protection" could credibly differ from FET without necessarily referring to physical force.

549. In this arbitration, the Claimant has alleged a scheme by private third parties to illicitly deprive it of its investment. Within this context, the Claimant contends that the plain meaning of "full protection and security" entails protection and security, in the legal context, from such illicit conduct aimed at impermissible deprivation of a foreign investment.[700] In such a scenario, as the Claimant appears to argue, it would not be a matter of the Respondent merely providing fair and equitable treatment in how it approaches the Claimant, but rather acting appropriately when confronted with such an illicit scheme in motion.

550. If the Claimant's interpretation were accepted, this would of course beg the question as to what sort of obligation would apply to the Respondent in the face of such an alleged scheme. The Claimant contends, and the Respondent agrees, that Article II(2)(a) requires the Respondent to "take all measures it could reasonably be expected to take" as part of its "duty of due diligence."[701]

551. The International Law Association, cited by both Parties, describes such due diligence in the following manner:

> "In international law obligations of conduct are far more common than obligations of result. This means that international law tends to focus primarily on the behaviour of States rather than the outcomes of that behaviour. Due diligence standards preserve for States a significant measure of autonomy and flexibility in discharging their international obligations. Rigid application of international rules, mandating results, or imposing liability in the event of breach in any circumstance cuts against the grain of notions of State sovereignty and domains of non-interference."[702]

---

700 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 642.

701 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 574; Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 553, 659.

702 Second Report, ILA Study Group on Due Diligence in International Law, July 2016 (CL-131), p. 2.

The Claimant acknowledges that such a duty would be limited to a State taking "reasonable care"[703] which includes "adopt[ing] all reasonable measures to protect assets and property."[704]

552. While not explicitly separated in such a manner, the Claimant appears to argue: i) that the Respondent must provide reasonable legal protection with respect to the Claimant's assets; and ii) that the Respondent must proactively make sure an illicit scheme being perpetrated by private parties fails.

553. As concerns the first theory, the Tribunal is not convinced that, assuming FPS were to be interpreted as extending to legal protection, such protection would extend beyond the existence of "a functioning system of courts and legal remedies to a foreign investor."[705] In this case, the functioning of the judiciary has already been examined at length and the Tribunal has made clear it finds no international law implications with respect to such conduct.

554. As concerns the second theory, the Claimant has failed to prove that the Respondent "knew" of the alleged illicit scheme and therefore permitted it to succeed. It is undoubted that certain government officials (e.g., Mr. Ogai) felt strongly that the original owners were acting in bad faith, but this is far from the Respondent as a Party being objectively aware of, and subsequently endorsing, such a "scheme". In this case there was apparent disagreement at various levels of the Respondent's state organs regarding the nature of the relevant proceedings, including their validity and the interpretation of applicable laws.

555. If the FPS standard provides for legal protection, such responsibility remains the same in the face of allegations of fraud, as in this arbitration – that is, the availability of a functioning court system to address such allegations. There is no sufficient evidence that the Respondent failed to provide such a legal system here, with adequate available remedies, and the Tribunal does not find that the Respondent's conduct when confronting

---

703 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 553; Second Report, ILA Study Group on Due Diligence in International Law, July 2016 (CL-131).

704 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 554; *Saluka Investments BV (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-48).

705 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶ 578.

the Claimant's allegations was flawed in manner that would violate the legal protection requirement under FPS.

556. Because the Tribunal finds that the Respondent would not have breached the sort of legal protection requirement under FPS as described by the Claimant, it need not engage in the ongoing debate as to whether, and to what extent, FPS extends beyond physical protection. The Tribunal thus rejects the Claimant's FPS claim under Article II(2)(a) of the BIT.

557. The Claimant also references Article 4(2) of the Kazakhstan Investment Law in the context of its FPS contention. As was the case for the reliance on this law in the FET analysis, even assuming it was applicable here through the MFN clause, the Claimant's position fails for lack of illegal action on the part of the Respondent.

**(6) Article II(2)(b) of the BIT – Arbitrary or Discriminatory Measures**

558. To recall, Article II(2)(b) provides:

> "Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a Party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party."

559. The Claimant "accepts that there may be overlap between the non-impairment clause and the FET clause," but it argues that they are not repetitive claims in this arbitration because it has highlighted "key examples of the Respondent's arbitrary conduct [. . .]."[706]

560. However, in making such an argument, the Claimant refers to paragraphs 484-486 of its Memorial on the Merits,[707] repeating the precise conduct that permeates the Claimant's entire case: (i) invalidation of the 2003 SPA because of lack of spousal consent; (ii) ignoring the Joint Statements; (iii) failure to provide sufficient reasoning for judicial decisions; (iv) generally incorrect legal decisions; (v) deregistration of BSEK's additional

706 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 672.

707 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 672, fn. 1472.

10% shareholding following the Supreme Court judgment; (vi) the 2008 ABT decision; and (vii) 2009 and 2012 set-off proceedings, including the dispute over corporate separateness and proper notice.[708]

561. These are acts that form the basis of the Claimant's general allegation of improper conduct amounting to a breach of the BIT. The Claimant attempts to reframe such conduct in the context of each BIT provision, but it fails to establish how, once the Tribunal rules that such acts were not wrongful, in that they did not constitute manifestly impermissible interpretations and applications of the relevant laws, such conduct could then be considered to constitute a treaty breach under a different title. The fundamental truth remains that the Claimant must establish that the conduct at issue is actionable under the BIT.

562. As has been repeated in this Award, the Tribunal is not willing to act as a court of appeal and is not willing to merely substitute its own interpretation of Kazakh law for the interpretation provided by the Kazakh courts. The Tribunal confirms that it would be permitted to find a breach of the BIT if the relevant judicial conduct was clearly flawed, whether it be because interpretations were "outrageous or egregious", whether there was "blatant misapplication"[709] of the applicable laws or whether the Respondent failed to provide a functioning court system capable of providing sufficient legal remedies, as argued by the Claimant within the varying allegations in this case. However, the Tribunal finds no manifestly wrongful conduct that could be characterized as such. Accordingly, the Tribunal rejects the Claimant's allegation of impermissible arbitrary and discriminatory measures under Article II(2)(b) of the BIT.

708 Claimant's Memorial on the Merits, ¶¶ 484-486.

709 Claimant's Memorial on the Merits, ¶ 400.

# VII. DAMAGES

## A. THE CLAIMANT'S POSITIONS ON DAMAGES

563. The Claimant claims that it is entitled to full compensation according to customary international law, which requires the Respondent to re-establish the situation that would have existed if the Respondent had not breached the BIT.[710]

564. According to the Claimant, if the Respondent had not unlawfully divested the Claimant of its 100% interest in Kozhan by April 2008, it would have continued to operate Kozhan until August 2015, at which point it would have sold the company to a third-party, Geo-Jade – the same company to which the IMR sold Kozhan.[711] The Claimant therefore claims compensation equal to: (i) the value of loss of profit that it would have made if it had operated Kozhan from April 2008 to August 2015, and (ii) the proceeds it would have gained from selling Kozhan to Geo-Jade in the counterfactual scenario.[712]

565. The Claimant instructed Mr. Paul Rathbone, an independent valuation expert, to value its 100% interest in Kozhan using the date of the award as valuation date.[713] Mr. Rathbone estimated USD 519.2 million as the value of the Claimant's investment in Kozhan as at September 30, 2018 (a temporary proxy for the date of the award).[714]

566. To reach this estimate, Mr. Rathbone considered four elements: (i) Kozhan's projected cashflow between April 2008 to August 2015 in the "but-for" scenario, (ii) the projected sum which would have been payable to the Original Owners under the 2003 SPA in the but-for scenario, (iii) the sum which would have been received by the Claimant as consideration for the sale of Kozhan to Geo-Jade on August 13, 2015 in the but-for scenario, and (iv) the interest payable to the Claimant from the assumed date of Kozhan's sale (August 2015) to the date of the award.[715]

710 Claimant's Memorial on the Merits, ¶ 525.
711 Claimant's Memorial on the Merits, ¶¶ 320, 526.
712 Claimant's Memorial on the Merits, ¶ 526.
713 Claimant's Memorial on the Merits, ¶¶ 527, 529.
714 Claimant's Memorial on the Merits, ¶ 531.
715 Claimant's Memorial on the Merits, ¶ 530.

567. Mr. Rathbone subsequently produced a revised valuation of Kozhan in the sum of USD 460.1 million, having considered some of the comments made by the Respondent's expert's (Dr. Fisher) report which commented on Mr. Rathbone's valuation.[716] Mr. Rathbone also provided an expert opinion as to the *ex-ante* (date of breach) value of Kozhan as at April 2008 based on the Claimant's market capitalization,[717] which according to the Claimant, demonstrates that the Respondent's expert's date of breach valuation of Kozhan is not credible.[718]

568. The Claimant also relied on an oil industry expert, Mr. Andrew Spriggs, to value Kozhan's reserves and resources as at April 2008,[719] in response to the Respondent's oil industry expert's (Dr. Hornbrook) analysis on a reserves-based valuation of Kozhan as at the date of the alleged breach.[720]

569. Relying on the *Chorzow Factory* case, the Claimant argues that in order to grant full reparation, the Tribunal is required to compare the Claimant's actual situation to the situation that would have existed if the Respondent had not unlawfully deprived the Claimant of its interest in Kozhan (i.e., the but-for scenario). The Claimant notes that this approach has been endorsed in many recent awards.[721]

570. According to the Claimant, in this but-for scenario, it is assumed that the Claimant would have continued to roll out exploration and development activities on a steady basis from April 3, 2008 (the date of expropriation) through to August 2015, when the Claimant would have sold Kozhan to Geo-Jade, an independent buyer, for the price of USD 326.1 million. This sum was arrived at by reducing the actual sale price of USD 340.5 million which Geo-Jade paid to the original owners in August 2015, in order to reflect the fact that there would have been higher production in the counterfactual scenario, and therefore, less

---

716 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 715.

717 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶¶ 809-811.

718 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 811.

719 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 804.

720 Respondent's Reply on Jurisdiction and Rejoinder on the Merits, ¶ 821.

721 Claimant's Memorial on the Merits, ¶ 550.

Case 25-50445-hlb Doc 375 Entered 11/05/25 13:21:54 Page 161 of 170

reserves to sell to Geo-Jade.[722] The Claimant relies on “contemporaneous documents on record” as well as the testimony of its witness Mr. Heysel, in support of this counterfactual scenario.[723]

571. In response to the Respondent’s criticism that the Claimant’s but-for situation is unsustainable on evidence,[724] the Claimant argues that it achieved tremendous success with Kozhan prior to the commencement of the 2003 SPA Proceedings.[725] Mr. Heysel listed some of the milestones that the Claimant had achieved with Kozhan from 2003 to 2008, which according to the Claimant, “are reflected in the Claimant’s contemporaneous SEC filings.” These milestones include: (i) paying the signature bonuses which Kozhan owed to the Kazakh government, (ii) confirming oil at Morskoye, despite the oil field being submerged under water, (iii) commissioning a study by Schlumberger to identify potential hydrocarbon accumulations, (iv) drilling three wells in the Morskoye A Pool, (v) receiving MEMR approval for commercial production at Morskoye, (vi) drilling other accumulations identified in the 2005 Schlumberger report and successfully discovering the Morskoye B Pool and the Ogai Pool, (vii) drilling wells in the Karatal Oil Field and Dauleta Oil Fields, and (viii) raising over USD 80 million to fund its investment in Kazakhstan.[726]

572. According to Mr. Heysel, as a result of these achievements, the Claimant’s market capitalization grew from almost nothing to over USD 350 million.[727] The Claimant further argues that these achievements also meant that in 2007 - the year of the 2003 SPA proceedings – the Claimant made a profit of USD 12.5 million. Therefore, the Respondent’s criticism that the Claimant achieved very little is not supported by the evidence.[728]

---

722 Claimant’s Memorial on the Merits, ¶ 557.

723 Claimant’s Memorial on the Merits, ¶ 558.

724 Respondent’s Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 493; Claimant’s Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 749.

725 Claimant’s Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 751.

726 Claimant’s Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 752.

727 Claimant’s Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 753.

728 Claimant’s Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 754.

## B. The Respondent's Positions on Damages

573. The Respondent's primary position is that the Claimant's claim for damages is unrealistic, as it is designed not only to give the Claimant a "windfall" which the Claimant would not have been able to get through any legitimate business means, but also to evade the key question of whether the damages claimed represented "the situation that would, in all probability, have existed if the Respondent had not breached the BIT."[729]

574. According to the Respondent, the Claimant's approach to the calculation of damages is unsupported by evidence and if indeed damages are due, they must be quantified on a reserves-based valuation as at the date of breach, or with reference to Claimant's sunken costs.[730]

575. The Respondent instructed an accounting expert, Mr. John Fisher, to prepare a quantum report and a petroleum engineer, Dr. John Hornbrook, to prepare a technical report on Kozhan's available oil reserves and other relevant aspects of the oil and gas industry in Kazakhstan.[731]

576. The Respondent argues that the Claimant's conclusions regarding its "but-for" scenario are unsustainable on the evidence. According to the Respondent, the Tribunal should reach the following conclusions on a proper analysis: (i) in a "but-for" situation, the Claimant would either not have been able to operate Kozhan profitably, or at best, it only would have been able to invest a fraction of what was invested in Kozhan by the actual owners in the actual situation; and (ii) it would therefore be unrealistic to conclude that Geo-Jade would have been willing to buy Kozhan from the Claimant in August 2015, on similar terms to those negotiated between IMR and the Geo-Jade in August 2015.[732]

577. The Respondent asserts that the Claimant's combination of a date of award valuation with its assumption of how Kozhan would have operated between April 2008 – August 2015, seeks not only to de-risk the inherently risky proposition that Kozhan represents, but also

729 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 476.

730 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 477.

731 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 478.

732 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶¶ 479-480.

to enable the Claimant to take advantage of the growth which Kozhan experienced under the ownership of IMR - an affiliate of ENRC which is one of the world's largest private mining groups, and which brought significant "financial clout" to Kozhan.

578. The Respondent further argues that the Kozhan's trajectory in the actual situation cannot provide a realistic guide as to what Kozhan's trajectory would have been if it was under the Claimant's control. Therefore, the Claimant's damage case is an attempt to secure a windfall and obtain through arbitration what it cannot obtain on its own.[733]

579. According to the Respondent, to determine the appropriate but-for scenario, two key questions arise: (i) would the Claimant have operated Kozhan as profitably (or even, as it claims, more profitably) as the actual owners did from April 2008 to August 2015, and (ii) would Geo-Jade have been willing to purchase Kozhan from the Claimant in August 2015 on the terms asserted by the Claimant.[734]

580. To answer these questions, the Respondent refers to contemporaneous evidence as the most important evidence as to how Kozhan operated under the Claimant's control from August 2003 to April 2008.[735] According to the Respondent, the available evidence does not paint a positive picture, as the Claimant: (i) did not have a successful track record in exploiting similar opportunities in Kazakhstan; (ii) had been delisted from OTC-BB; (iii) appeared to face management retention issues; (iv) reported uncertainty as to its ability to continue as a going-concern; (v) reported restrictions to additional funding; (vi) reported liquidity issues; (vii) faced various title challenges; and (viii) had a declining trend on its share price from early 2006.[736]

581. The Respondent asserts that in a but-for situation, the Claimant would have continued to incur losses and would not have been able to raise sufficient capital to operate Kozhan.[737] Therefore, in the circumstances, it is not obvious if the Claimant would have been able to

733 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 481.
734 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 482.
735 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 483.
736 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 484.
737 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 487.

Case 25-50445-hlb Doc 37 Entered 11/05/25 11:32:15 Page 164 of 220

continue as a going concern in the counter-factual scenario and even if it could be assumed that the Claimant would have that ability, it is unrealistic to expect from such an unpromising start that the Claimant would have been able to match the development of Kozhan that took place in the actual scenario.[738]

582. The Respondent further argues that the Claimant's claim for compensation does not engage with the possibility of a partial success of its claims. Thus, if for instance, the Tribunal were to conclude that the Respondent did not breach the BIT in relation to the 2003 SPA Proceedings, but that a breach occurred in relation to the 2008 ABT Proceedings, 2009 Set-Off Proceedings or the 2012 Set-Off Proceedings, then there would be no basis for the recovery of the Claimant's 90% interest in Kozhan in the but-for scenario.[739]

### C. The Tribunal's Analysis

583. Because the Tribunal finds no breach of the BIT, it need not engage in issues of causation and damages.

## VIII. COSTS

### A. Claimant's Cost Submissions

584. In its request for relief, the Claimant requests that the Tribunal order the Respondent to pay "all of the costs of the arbitration, including all the fees and expenses of ICSID and the Tribunal and all the legal costs incurred by the Claimant."[740] In noting the Respondent's proposal that "a 60-day grace period [] be permitted before any post-award interest should begin to accrue,"[741] the Claimant requests that the Respondent "pay compound interest at LIBOR + 2 percent on any amount awarded to the Claimant, such compound interest to

---

738 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 488.

739 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 729-740.

740 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 837(f).

741 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 836; Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 556.

accrue from 60 days after the date of the Award until the date upon which payment is made."[742]

585. The Claimant has submitted the following claims for legal and other costs:[743]

- Claimant's counsel's fees (paid and unpaid) for work completed at applicable hourly rates – **USD 7,635,000**
- Claimant's Kazakh law consultant's fees – **USD 190,000**
- Professor Abzhanov's fees – **USD 75,000**
- Dr. Sprigg's fees – **USD 125,000**
- Mr. Rathbone's fees – **USD 350,000**
- Claimant's costs apart from the above (including all printing and translation related expenses, filing expenses, hearing-related expenses, travel and accommodation expenses, consultants' fees, IT assistants' fees, expenses incurred by the Claimant's witness and experts, cost of document management system) – **USD 206,702**
- ICSID lodging fee – **USD 25,000**
- ICSID advance on costs – **USD 575,000**
- Total – **USD 9,181,702**

## B. RESPONDENT'S COST SUBMISSIONS

586. In its request for relief, the Respondent requests that the Tribunal order the Claimant "to bear in full the costs of the arbitration," and "to bear all of the Respondent's costs of legal representation and other expenses including expert and witness costs."[744]

---

742 Claimant's Counter-Memorial on Preliminary Objections and Reply on the Merits, ¶ 837(e).

743 Claimant's Statement of Costs (as updated on October 15, 2021).

744 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 866(c)-(d).

Case 25-50445-hlb Doc 575 Entered 12/05/25 11:28:54 Page 218 of 222

587. With respect to interest, in its Memorial on Jurisdiction and Counter-Memorial on the Merits, the Respondent argued that "a 60-day grace period should be permitted before any post-award interest should begin to accrue."[745] In its Reply on Jurisdiction and Rejoinder on the Merits and Quantum, however, the Respondent requests interest on any sums awarded "at a rate of 12-month USD LIBOR + 2.0% compounded annually, running from the date of the Award until the date of payment."[746]

588. The Respondent has submitted the following claims for legal and other costs:[747]

- Reed Smith LLP – **USD 6,294,963.30**
- Counsel – **USD 1,401,139.17**
- Expert Fees – **USD 2,163,536.35**
- ICSID Advances – **USD 575,000.00**[748]
- Disbursements – **USD 324,647.46**[749]
- Total – **USD 10,759,286.28**

## C. THE TRIBUNAL'S DECISION ON COSTS

589. Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

745 Respondent's Memorial on Jurisdiction and Counter-Memorial on the Merits, ¶ 556.

746 Respondent's Reply on Jurisdiction and Rejoinder on the Merits and Quantum, ¶¶ 866(d).

747 Respondent's Statement of Costs.

748 This amount includes the last advance on funds received on April 9, 2021 (i.e., after the Respondent's Statement of Costs).

749 This sum includes the sum of USD 3,259 which the Respondent paid to cover expenses associated with the Parties' Kazakh experts and witnesses at the Hearing.

Case 25-50445-hlb Doc 357 Entered 11/05/25 11:21:51 Page 197 of 220

590. This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

591. In this arbitration, both Parties have requested that the Tribunal order the other Party to pay for all costs and expenses of the arbitration, including ICSID fees and expenses, fees and expenses of experts and fees and expenses spent on legal representation.

592. It is fairly common practice to allocate costs and fees based on the principle that costs follow the event. In these proceedings, however, neither party was fully successful in its claims. That is, the Claimant prevailed on a jurisdictional objection while the Respondent prevailed on the merits.

593. As a result of these mixed outcomes, the Tribunal feels a justified outcome requires a more balanced approach.

594. The Respondent's unsuccessful jurisdictional objection in this arbitration accounted for a significant portion of the written and oral pleadings and the witness examinations at the Hearing. While the proceedings were not bifurcated to address the jurisdictional concerns, the Respondent requested such bifurcation, the resolution of which caused additional delay and increased costs. The Respondent's jurisdictional objection thus played a significant role in this arbitration.

595. Concerning the merits, the Claimant's case ultimately failed in its entirety, as the Tribunal has dismissed all of the Claimant's claims. This is the fundamental result of this arbitration, and thus while the Tribunal acknowledges that the Respondent also failed in a major aspect of its case, its success on the merits renders it the more successful party of the two opposing sides.

596. As a result, the Tribunal concludes that the Claimant should bear a larger share of the expenses associated with this arbitration than the Respondent, but that such an increased share should be minimal, reflecting the substantial time and costs allotted to the Respondent's failed jurisdictional objection.

597. Accordingly, the Tribunal determines that the Claimant should bear all of the costs of the arbitration, while each Party should bear its own legal and expert fees.

598. The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Prof. Bernardo M. Cremades | 470,030.45 |
| Judge Peter Tomka | 164,283.64 |
| Professor Stanimir A. Alexandrov | 113,400.00 |
| ICSID's administrative fees | 210,000.00 |
| Direct expenses (estimated) | 187,411.33 |
| **Total** | **1,145,125.42** |

599. The above costs have been paid out of the advances made by the Parties in equal parts.[750] In addition, the Respondent paid USD 3,259 to cover expenses associated with the Parties' Kazakh experts and witnesses at the Hearing.[751] As a result, the Parties' respective shares of the costs of arbitration amounts to USD 572,562.71 for the Claimant and to USD 575,821.71 for the Respondent.

600. Accordingly, the Tribunal orders the Claimant to pay the Respondent USD 575,821.71 for the expended portion of the Respondent's advances to ICSID. The Tribunal chooses to apply the interest rules originally agreed upon by the Parties before the Respondent's alteration of its request in its Reply on Jurisdiction and Rejoinder on the Merits and Quantum. The Tribunal thus orders that this payment be subject to interest at a rate of 12-month USD LIBOR + 2.0%, compounded annually, which shall accrue from 60 days after the date of the Award until the date upon which payment is made.

---

750 The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

751 See Respondent's Statement of Costs, fn. 2 and correspondence between the Centre and the Parties, dated December 15, 2020.

## IX. AWARD

601. For the reasons set forth above, the Tribunal decides as follows:

(1) UPHOLDS its jurisdiction over the Claimant's claims;

(2) DENIES all of the Claimant's claims;

(3) DENIES all other claims;

(4) ORDERS the Claimant to pay the Respondent USD 575,821.71 for the expended portion of the Respondent's advances to ICSID plus interest at a rate of 12-month USD LIBOR + 2.0%, compounded annually, which shall accrue from 60 days after the date of the Award until the date upon which payment is made; and

(5) ORDERS the Parties to bear their own legal and expert fees.

Professor Stanimir A. Alexandrov
Arbitrator

Date: November 23, 2021

Judge Peter Tomka
Arbitrator

Date: November 23, 2021

Professor Bernardo M. Cremades
President of the Tribunal

Date: November 23, 2021