UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE: | Case No. 25-50445-hlb |
| | Chapter 7 |
| BIG SKY ENERGY CORPORATION, | |
| | 300 Booth Street |
| | Reno, NV 89509 |
| Debtor. | |
| | Friday, December 19, 2025 |
| | 10:39 a.m. |

TRANSCRIPT OF STATUS RE: DOC# 32 MOTION TO QUASH OR MODIFY SUBPOENAS AND OBJECTION TO SUBPOENAS WITH CERTIFICATE OF SERVICE FILED BY BRENOCH WIRTHLIN ON BEHALF OF BIG SKY ENERGY CORPORATION;
OSC RE: DOC# 1 CHAPTER 7 VOLUNTARY PETITION NON-INDIVIDUAL, FEE AMOUNT 338, FILED BY BRENOCH WIRTHLIN ON BEHALF OF BIG SKY ENERGY CORPORATION
BEFORE THE HONORABLE HILARY L. BARNES
UNITED STATES BANKRUPTCY COURT JUDGE

ZOOM APPEARANCES:

For the Debtor: Wirthlin & Verlaine
By: BRENOCH WIRTHLIN, ESQ.
400 South Fourth Street, Suite 300
Las Vegas, NV 89101
(702) 717-9132

APPEARANCES CONTINUED.

Audio Operator: Natalie Clarke, ECR

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

ZOOM APPEARANCES (Continued):

| | |
|---|---|
| Chapter 7 Trustee: | W. DONALD GIESEKE, ESQ.<br>18124 Wedge Parkway, Suite 518<br>Reno, NV 89511<br>(775) 742-9107 |
| For Republic of Kazakhstan: | Snell & Wilmer L.L.P.<br>By: BOB L. OLSON, ESQ.<br>1700 South Pavillion Center Drive<br>Suite 700<br>Las Vegas, NV 89135<br>(702) 784-5295 |
| | Reed Smith LLP<br>By: LUCY M. WINNINGTON-INGRAM, ESQ.<br>1 Blossom Yard<br>London E1 6RS<br>+44 (0)20 3116 3891 |

(Proceedings commence at 10:39 a.m.)

THE COURT: This is Judge Barnes. We're here on Big Sky Energy Corporation, 25-50445. I'm going to take the order to show cause first. Appearances for the debtor, please.

MR. WIRTHLIN: Good morning, Your Honor. Brenoch Wirthlin on behalf of the debtor.

THE COURT: Thank you, Mr. Wirthlin.

And on behalf of the Republic of Kazakhstan.

MR. OLSON: Good morning, Your Honor. Bob Olson of Snell & Wilmer on behalf of the Republic of Kazakhstan. Also present is Lucy Winnington-Ingram with Reed & Smith in London.

THE COURT: Thank you.

And would anybody else like to make an appearance?

MR. GIESEKE: Yes, Your Honor. This is Don Gieseke, trustee.

THE COURT: Thank you, Mr. Gieseke. I apologize.

Anyone else wishing to make an appearance?

Okay. So I'm not certain that I need argument in connection with the order to show cause, given the briefing in the matter. It seems as though the parties agree that under the relevant case law, cause does not exist to dismiss the case. And if you disagree with that, it seems like a lot of the briefing was related to the parties' positions in connection with the facts of the case and whether or not discovery is necessary, which is also something that we're

going to cover today. But let me know, Mr. Olson or Mr. Wirthlin, whether you feel as though it is necessary to argue, given that I have reviewed and considered the briefs.

Mr. Wirthlin, I'll let you weigh in first.

MR. WIRTHLIN: Thank you, Your Honor. Yes. I do believe that the -- what the debtor's position with respect to dismissal is that cause does not exist for dismissal pursuant to bad faith. The debtor is not necessarily opposed to the Court considering dismissal on other grounds, but as far as bad faith goes, we don't believe there's a basis under the bad-faith rubric, I guess. But, you know, the debtor obviously has the ability or, you know, potentially to file a motion to dismiss on other grounds. We wouldn't want to preclude that possibility. We simply do agree, though, with Kazakhstan that dismissal for bad faith is not, I guess, appropriate.

THE COURT: Okay, thank you.

And Mr. Olson?

MR. OLSON: Your Honor, Bob Olson for the Republic of Kazakhstan. We believe that dismissal is inappropriate as articulated in our papers under Section 707(a), the Padilla case, and the Sherman case. I would submit that Kazakhstan's papers articulate its position on the issue.

THE COURT: Okay, thank you.

Mr. Gieseke, do you have anything to add?

MR. GIESEKE: No, Your Honor, not at this time.

THE COURT: Okay, thank you.

So this matter is before the Court pursuant to the Court's order to show cause why this case should not be dismissed at Docket Entry 52. The Court sua sponte raised the issue regarding whether the debtor had filed the bankruptcy perhaps in bad faith. The Court appreciates the parties' briefing on the legal issue, and all the -- although the parties have different positions regarding whether or not the debtor filed the bankruptcy in bad faith, which the Court will not address at this time, having reviewed the briefs in response thereto at Docket Entries 57 through 58, 60, 65, and 67, the Court finds and concludes that dismissal of this Chapter 7 case is unwarranted under Code Section 707, In re Padilla, 222 F.3d 1184 (9th Cir. 2000), and In re Sherman, 491 F.3d 948 (9th Cir. 2007).

As a result, this case will move forward in Chapter 7, and the Court will enter an order discharging this matter and stating that no further action is required at this time, but without prejudice to any party bringing a motion to dismiss if they feel the circumstances warrant it in the future. So the Court will enter the order in this case, and I think we're going to move forward with a status conference in connection with the discovery dispute that is ongoing between the parties.

So I reviewed the docket, excuse me, and I see that the trustee has waived the attorney-client privilege, and I

also reviewed Mr. Olson's declaration, which sets forth reasons why the document production, the 30,000 pages sent over by the debtor in advance of the November 5th hearing, why it was not responsive. So that is where I am.

Mr. Olson or Mr. Wirthlin -- I guess Mr. Wirthlin, I'll let you go first, and why don't you let me know where we are in this. Have the parties been discussing how to move forward in terms of the discovery dispute, or is everybody digging their heels in?

MR. WIRTHLIN: Yes, Your Honor, happy to do that. This is Brenoch Wirthlin on behalf of the debtor.

THE COURT: Thank you.

MR. WIRTHLIN: Your Honor, we have been continuing to produce documents. In fact, I let Mr. Olson know earlier this week that in response to Kazakhstan's briefing and documents they claim that they don't have, we are working to produce a supplement to the documentation that we have been producing. My clients are searching, you know, the records. Obviously, what they're looking for goes back quite a ways. So we're working to do that.

I did -- I saw some of the briefing that talked about some of the deficiencies that are alleged. I didn't get kind of a meet-and-confer call, so I'm just going off of what, you know, what was put in the briefing. I'd be more than happy to have a meet-and-confer call with counsel for Kazakhstan because

we are more than happy to provide whatever documentation we have related to that 2022 transfer, which I think is kind of the crux of their argument.

So the short answer to your question, Your Honor, is we're certainly still in the process of putting together the documents that they claim are not produced. Mr. Olson sent me a letter asking us to kind of focus our production efforts, and we're trying to do that. That being said, I do think at some point, there is a cutoff as to where, you know, the documentation is appropriate or not to continue with. I'm not sure what that is. But we're certainly happy to continue producing all the documentation we have that's related to that 2022 transfer.

I do -- I will say that it looks to me like a lot of the documentation that was available on the 2022 transfer was actually publicly available at the time of the transaction was recorded in Canada. I was made aware of that subsequent to the last hearing. So I'm not sure what they have and don't have, but I think most of it was publicly available. You know, we're happy to continue to produce documents on that issue.

With respect to the IUS award from 2008, I think there are some issues there. It's going back quite a ways. And to the Court's point in the earlier hearing, the Court questioned about, you know, documents going back 10 years. And this is going back even further. I guess our position, and I

don't want to rehash it from the briefing. I know the Court clearly reads the briefing. But our position is that the 2022 transfer -- really, I don't think Big Sky, or excuse me, Kazakhstan would have a claim for fraudulent transfer. They assert that that claim by Big Sky Canada is invalid and can't be brought. So I don't -- I think that would preclude any type of fraudulent transfer claim.

That being said, the IUS award was actually to Big Sky Canada. And at the time of the 2022 transfer of Big Sky Canada's shares to Ingalls & Snyder, nothing had been recovered by Big Sky Nevada, the debtor, with respect to that award. So if that transfer to Ingalls & Snyder of the shares of Big Sky Canada was legitimate, which we believe it was, then the documentation is publicly available, and that we produced shows that whatever happened after that with respect to the IUS award that Big Sky Canada owned is irrelevant. That being said, we're digging into that as well. But it certainly is a bit of a chase for us to try to figure that out.

So, Your Honor, what we propose is that at this point I'd like to have a conversation with Mr. Olson to let me know, because we've produced some additional documentation, what exactly they're looking for specifically. I know there's some in the briefing. And if he wants to tell me that's what it is, then that's fine. And we'll produce that and come up with some dates for depositions and, you know, see if we can't reach a

resolution as to what documents they need for those. And if we can't, I suppose we can address it at that point.

THE COURT: Okay. I'm looking at the briefing related to the order to show cause where it said that Kazakhstan -- this is Page 6 of 24 on Document 65, Docket Entry 65. It says Kazakhstan does not have documents giving Ingalls a security interest in the shares of Big Sky Canada, documents empowering Ingalls to take possession of the shares, the UCC financing statement showing perfection of the interest, documents establishing what Ingalls was owed when it obtained the Big Sky Canada stock. That list, I won't go on, but it's three or four more things that Kazakhstan is saying they don't have. Is that the -- are those the documents that you are referring to in terms of what it is that you are searching for and will turn over?

MR. WIRTHLIN: Yes, Your Honor.

THE COURT: Okay. Okay, thank you.

Mr. Olson.

MR. OLSON: Thank you, Your Honor. Bob Olson for the Republic of Kazakhstan.

Our view of this is substantially different than the debtor's. I would like to first focus on the arbitration award. We have been informed -- or by "we," the Republic of Kazakhstan -- that there were confidential settlement negotiations in Switzerland after the foreclosure by Ingalls

with Mr. Lawler's cooperation on the Big Sky Energy Canada or Big Sky Energy Kazakhstan stock that resulted in a substantial payment to, ultimately, Ingalls & Snyder and Mr. Lawler. The debtor has been incredibly guarded concerning that information. I've reviewed the transcript from the meeting of creditors where I tried to get information concerning that, and about all I got from Mr. Lawler was that he faintly recalled mediation in Switzerland and did not know what happened, did not know if any money had been paid, et cetera. It was very, very vague. And I fear that we're going to come back to court at the next hearing and find out that they still have not produced anything on what occurred with the Swiss mediation.

I would note that Mr. Wirthlin, at the last hearing, commented on these mediations. And he stated, and I'm reading from the quoted portion from the transcript, And frankly, the requests in the duces tecum, I think, show some, causes significant amount of concern from my client because they show that Kazakhstan is evidently privy to negotiations that were confidential. It's my understanding. I don't have a lot of understanding as to what the specifics were.

Your Honor, it's clear that something happened there, and it's clear that the debtor has been concealing that, and we really need that information, and all of this occurred after 2022. We're assuming that it relates back to the 2008 IUS $30 million arbitration award. We're not absolutely certain,

but we do believe that to be the case. But in any event, analyzing a fraudulent transfer is going to have to require that we analyze the value of the assets at or about the time of the transfer, and everything that we've seen on this seems to suggest that there was a -- an insider-conducted foreclosure of the shares of Big Sky Energy Kazakhstan or Big Sky Energy Canada that went back to Mr. Lawler, and then there was, after that, a substantial settlement, we believe, made.

We've tried to outline the documents that we think would be relevant, as your Court noted, in determining, you know, the extent, validity, priority, et cetera, of any security interest that Ingalls & Snyder's had in the stock. But we also need to emphasize to the Court that we have not received anything in writing concerning Mr. Lawler's ownership interest in that stock and why he received 15.77 percent of that stock back from Ingalls & Snyder at a later date.

As far as public records go, your Honor, the only thing that we have found publicly in Canada is the shareholder register that has been produced to the Court. We have not seen any other public documents articulating -- strike that, two public documents. We ran a UCC search and also located the financing statement that Mr. Lawler recorded on behalf of the lender in this case the day before the foreclosure sale allegedly occurred.

But right now, your Honor, we haven't received

anything. The last document production, as evidenced by the privilege log, was primarily documents from upwards of 20 years ago. The privilege log -- every category of documents except one was between 2006 and 2008, and we've requested documents after 2015. You know, it's our stance that the debtor is doing what they can to not produce anything responsive, to bury Kazakhstan with irrelevant documents from a time period long before the time period we're seeking documents from, and we fear really trying to burn off a period of limitations or statute of limitations to try to avoid any of these transfers to Ingalls & Snyder and Mr. Lawler.

And, you know, we think that the debtor should be ordered to produce everything forthwith. The trustee's waived the privilege. There should be no further efforts by the debtor to hide behind the privilege in this case, and the debtor should produce all the documents for inspection.

And the letter that I did send to Mr. Wirthlin -- and I think it's been accurately described to your Honor -- that was intended to highlight the documents we wanted them to focus on initially.

THE COURT: And when was that letter sent?

MR. OLSON: And again -- Your Honor, I would have to look at our client's file. Please bear with me for a moment.

THE COURT: That's okay. You filed your document on December 12th, so that was a week ago. Had you sent it prior

to that time?

MR. OLSON: It was prior to that, Your Honor.

THE COURT: Okay. And so --

MR. OLSON: I just don't have that handy. I can find it in a moment.

THE COURT: Okay. No, that's all right. I'm just trying to get an idea about what -- because he said -- Mr. Wirthlin said that they're continuing to produce documents regarding the 2022 transfer, and it sounds like what you're saying is there's -- there has been nothing provided to you in connection with the 2022 transfer. Is that correct?

MR. OLSON: Other than what I've described in the papers, that is correct, Your Honor.

THE COURT: Okay.

MR. OLSON: And the letter that I sent to Mr. Wirthlin was dated November 19th.

THE COURT: Oh, okay. So significantly -- so a month ago.

MR. OLSON: Yes, Your Honor.

THE COURT: And -- okay, go ahead. I don't want to cut you off.

MR. OLSON: Your Honor, I think that really covers it at this point. With the privilege waived by the trustee, the debtor should be producing all the documents that are responsive to the subpoena. You know, we're not interested in

going through documents from the late 1900s, which have been produced. We don't really care about Mr. Heysel's trips to Dubai and his days at the Park Heights Regency there in 2004, '5, '6, and '7. We want to look for documents that can lead to assets of Big Sky Energy that can be liquidated for the benefit of creditors and perhaps the benefit of the shareholders that hold interest in Big Sky Energy but have never been disclosed to the Court by the debtor.

THE COURT: Okay, thank you, Mr. Olson.

Mr. Wirthlin, you told the Court that you were continuing to produce documents, but it sounds as though no documents have been produced. Is that correct?

MR. WIRTHLIN: Your Honor, technically from the December 12th -- I'm just looking at that list that Your Honor pointed to in Kazakhstan's briefing on December 12th. It was about a week ago, I guess. That's the first time I saw that list of documents that they're claiming they don't have. I don't know what they did or didn't get publicly available. I know that the vast majority of the documents -- my understanding is that they are publicly available, but regardless, we did see that on the 12th, that Friday, I guess it was last Friday. I reached out to Mr. Olson, I believe it was Monday or Tuesday, to let him know, based upon that, what we had just seen, we were certainly moving forward to produce those documents. And I told him what I plan to do is maybe a

little bit ambitious, but a disclosure next week with the holidays, a little bit hard to coordinate. But like I said, I'd like to have a meet and confer to make sure we're, you know, on the same page in terms of exactly what he's gotten because I think -- or I guess what he's looking for. Because I feel like we've been producing, but then we hear later, well, no, we want this. A little bit -- it feels like a little bit of a moving target on our end. Once we got these bullet points, we said, okay, we're going to focus on those, but it will take a bit, especially with the holidays, to get these productions together. But we're in that process, Your Honor, based upon what we received on the 12th from Kazakhstan about what they're claiming they still don't have.

THE COURT: What about the letter that he sent on November 19th, a month ago? Did it not have the information that was included in the December 12th brief?

MR. WIRTHLIN: It did not, Your Honor. It was kind of a general focusing of efforts on -- you know, related to the 2022 transfer. We understand that.

THE COURT: Uh-huh.

MR. WIRTHLIN: But it's -- on the 12th, what we received -- and frankly, I did expect to have a call or some type of communication if there was specifics. I didn't see anything subsequent to that and subsequent to our last production until the 12th, that Friday, I guess last Friday,

that we saw this bullet point of documents that they're still looking for. So we are in the process of doing that. I wasn't aware until I saw this briefing that that's -- those are the categories of documents that they're claiming they don't have, and we're trying to put those together. Part of the issue is that we've got people in different states and different areas that we're trying to coordinate with the documents and some of them in storage. And so it's difficult to locate a lot of these. But we're doing our best to do that, Your Honor. I think we could certainly -- like I said, I would request that Mr. Olson and I just have kind of a focused discussion, either a letter or if he feels that this is sufficiently detailed as to what they're looking for, we're working on that. If he'd like to have a little more detailed discussion, I'd appreciate that. But certainly we're putting together the documents that are requested in that -- last Friday's production. It would probably take, you know, three weeks to be able to put that together. I think we'll be able to do that, and we'll see where -- you know, if there's anything else they feel that they need.

THE COURT: Okay. So it seems as though Mr. Olson has been pretty clear about the timeframe and what he's looking for both in the original briefing and directing you to focus with regard to the 2022 transaction. And I appreciate that he listed the documents that Kazakhstan still doesn't have, and

it's kind of odd to me that at this point they still don't have it.

So what I'm going to do is order the parties to meet and confer before the end of the year, and we're going to have another hearing on January 15th at 10:30 a.m. And in two days prior to that hearing, I want a status report signed by the both of you in connection with what has been turned over and what has not been turned over. And then if we're still in the position that we're in right now, sanctions will be awarded.

So if you would please meet and confer before January -- or I'm sorry, before December 31st. And if you would make certain that the documents you have in your possession and anything that you believe is publicly available is also turned over. Because Mr. Olson has searched, and maybe he's not searching in the same way that you know you could search. I don't know, but it seems as though there's this blockade that needs to be breached. And so we will see you both on January 15th at 10:30, and if -- or -- and I want a status report by January 13th signed by the both of you regarding the status of the production and whether depositions have been scheduled.

MR. WIRTHLIN: Understood, Your Honor. I'll prepare that, as well. I'm happy to do that.

THE COURT: Okay. Thank you.

MR. OLSON: Understood, Your Honor. There is one additional point I would like to make, if I may have one

moment, Your Honor.

THE COURT: Go ahead.

MR. OLSON: With respect to the list of documents appearing on Pages 6 and 7 of ECF Number 65, that's not an exclusive list of what Kazakhstan is looking for.

THE COURT: I understand.

MR. OLSON: I was instead just trying to focus on that.

THE COURT: Right. I understand that.

MR. OLSON: Thank you.

THE COURT: It's just what I'm trying to do is at least get them focused in that way, and I'm assuming that the meet and confer is going to be more targeted to what it is that you are looking for. In addition to these things, I know that you tried to focus, Mr. Wirthlin, on the 2022 transaction, but to the extent that there are other things that you're looking for, the meet and confer should take care of that. Agreed?

MR. OLSON: Agreed. Thank you, Your Honor.

THE COURT: Okay. Thank you both.

And, Mr. Gieseke, is there anything that you would like to say? I apologize for not including you.

MR. GIESEKE: That's okay. I would like to be at least notified of the meet and confer so that I can stay on top of document production and what's going on.

THE COURT: Okay. In that case, Mr. Gieseke, I'm

going to have you sign off on the status report on January 13th, and the parties are directed to include Mr. Gieseke on any meet-and confer- telephone call so that we can ensure that Mr. Gieseke understands what's happening. Understood?

MR. WIRTHLIN: Understood, Your Honor.

THE COURT: Okay.

MR. OLSON: Understood, Your Honor.

MR. GIESEKE: Thank you, Your Honor.

THE COURT: Thank you, and we are adjourned. Happy holidays, all.

UNIDENTIFIED: Thank you, Your Honor.

UNIDENTIFIED: Thank you.

(Proceedings concluded at 11:06 a.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Alicia J. Jarrett

____________________________

ALICIA JARRETT, AAERT NO. 428 DATE: January 18, 2026

ACCESS TRANSCRIPTS, LLC